**J. Keith IDEMA; Gary Scurka; Kathy Scurka; and Jim Morris, Plaintiffs,**

v.

**DREAMWORKS, INC., et al., Defendants.**

**No. CV0010316ABC (RNBX).**

United States District Court, C.D. California,

Sept. 10, 2001.

---

J. Keith Idema, Fayetteville, NC, Pro se.

David Olan, Los Angeles, CA, for Plaintiffs.

Terence J. Clark, Irene Y. Lee, Squire, Sanders & Dempsey, Los Angeles, CA, Stephen Contoplulos, Bradley Ellis, Frank J. Broccolo, Sidley, Austin, Brown & Wood, Los Angeles, CA, Louis Petrich, Howard Wien, Leopold, Petrich & Smith, Los Angeles, CA for Defendants.

### ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND TO DISMISS

COLLINS, District Judge.

In this civil action complaining of alleged misappropriation of Plaintiffs' ideas and expression for the creation and production of the 1997 motion picture "The Peacemak-

er," Plaintiffs allege claims of direct and contributory copyright infringement, and eleven associated claims under different state laws. Defendants have filed two motions: the first seeks summary judgment on Plaintiffs' first two (copyright) claims; the second seeks dismissal of Plaintiffs' state law claims. Both motions came on for a hearing before this Court on September 10, 2001. The Court GRANTS the summary judgment motion, and GRANTS IN PART AND DENIES IN PART the motion to dismiss. The SAC is DISMISSED: the First through Fifth, Seventh through Tenth, Twelfth, Thirteenth, and part of the Eleventh Claims are DISMISSED, with prejudice. The Sixth and remaining Eleventh Claims are DISMISSED, without prejudice.

## I. PROCEDURAL HISTORY

Plaintiffs *Pro Se* J. KEITH IDEMA ("Idema"), GARY SCURKA, KATHY SCURKA ("the Scurkas"), and JIM MORRIS ("Morris") (collectively, the "Plaintiffs") commenced this civil action with an initial Complaint filed September 25, 2000.[1] The original Complaint alleged nine causes of action based on the facts alleged therein,[2] and named as Defendants DREAMWORKS, INC. dba DREAMWORKS SKG, DREAMWORKS FILMS LLC, DREAMWORKS DISTRIBUTION LLC, DREAMWORKS LLC, (the "Dreamworks entities"), STEVEN A. SPIELBERG ("Spielberg"), BANTAM DOUBLEDAY DELL PUBLISHING GROUP ("Random House"),[3] ANDREW COCKBURN, LESLIE COCKBURN ("the Cockburns"), JESSICA STERN ("Stern"), MICHAEL SCHIFFER ("Schiffer"), and PHILLIP PETERSEN ("Petersen"). The original Complaint was 83 pages and 244 paragraphs. To the extent that its allegations can be summarized, it claimed that "The Peacemaker" was based at least in part on the life story, and/or on several versions of a partly fictionalized story of the life of the lead Plaintiff, Idema, a former "Green Beret."

On October 30, 2000, several Defendants filed a motion to dismiss the Complaint and/or to require a more definite statement. However, on November 16, 2000, the Court instead granted what it construed to be an *ex parte* request by Plaintiffs for leave to file a First Amended Complaint ("FAC"), and therefore took the motion to dismiss/require a more definite statement off calendar. Plaintiffs were cautioned that they should file the FAC only after having reviewed and considered the objections raised by Defendants' motion. This caution was repeated in a subsequent extension of time within which to file the FAC granted to Plaintiffs (all of whom were at this time still *pro se* ) on

1. Plaintiff Idema has appeared *pro se* throughout, and does also for purposes of opposing these motions. The three other Plaintiffs (the two Scurkas and Morris) also initially appeared *pro se,* and did not retain counsel until relatively recently. On March 9, 2001, the attorney of record for the Scurkas became David Olan; this attorney also became the attorney of record for Morris on March 21, 2001. The oppositions to the present motions are signed by both Idema and Olan.

2. Claims in the initial Complaint: (1) Copyright Infringement; (2) Contributory Copyright Infringement; (3) Unfair Competition under Lanham Act; (4) Breach of Implied Contract; (5) Breach of Contract; (6) Violation of Right to Privacy/Publicity; (7) Civil Conspiracy; (8) Declaratory Relief; and (9) Injunctive Relief.

3. Original Defendant BANTAM DOUBLEDAY DELL PUBLISHING GROUP was apparently named in error, and has since been replaced by Defendant RANDOM HOUSE, INC. (in the Second Amended Complaint). *See* Joinder in Motion to Dismiss and Motion for Summary Judgment filed February 16, 2001 (Docket No. 27); Second Amended Complaint. Thus, the Court will refer to this Defendant as "Random House" throughout this Order.

December 6, 2000. Nonetheless, the FAC filed by Plaintiffs on December 19, 2000 expanded the asserted claims.[4] It contained 12 causes of action: the nine asserted in the original Complaint plus three new claims.[5] The FAC was 96 pages and 295 paragraphs in length (plus one attachment). The FAC told the same basic story as the original Complaint, and aside from the addition of new allegations and new claims for relief did not appear to deviate significantly from Plaintiffs' original effort. It named all of the same Defendants as did Plaintiffs' initial Complaint.

On January 10, 2001,[6] several Defendants filed another motion to dismiss and/or to require a more definite statement (and/or to strike certain material from the FAC). This motion was joined by all named Defendants except Defendant Petersen. The motion sought dismissal of the First through Fifth and Seventh through Twelfth Claims for Relief, i.e., all claims in the FAC except for the Sixth Claim for Breach of Contract, which was then asserted only against Defendant Petersen. On January 30, 2001, pursuant to a Stipulation and Order submitted by the parties and signed by the Court, the hearing on Defendants' motion was continued from its noticed date of February 12, 2001 to a new date of March 12, 2001. Plaintiffs filed opposing papers on February 26, 2001 (timely under Central District Local Rule 7.6 though not timely under a briefing schedule laid out by the Stipulation and Order).[7] A Reply was filed/joined by all Defendants except Petersen on March 5, 2001.

4. This expansion (and the lack of discernible differences, other than the new claims, between the Complaint and the FAC) led the Court to comment, in its March 12, 2001 Order, that Plaintiffs apparently had not heeded the Court's admonition to take Defendants' arguments into account before filing the FAC. Though the Court did not attach a particular legal significance to this fact in light of the rulings in the March 12, 2001 Order, the Court did note that Plaintiffs appeared to have largely ignored the prior motion to dismiss/for more definite statement, in direct contravention of the Court's prior caution not to do so. *See* March 12, 2001 Order (Docket No. 62) at 4 n. 4.

5. The full slate of FAC claims were: (1) Copyright Infringement; (2) Contributory Copyright Infringement; (3) Conspiracy to Infringe Copyright; (4) Unfair Competition under Lanham Act; (5) Breach of Implied Contract; (6) Breach of Contract; (7) Theft of Personality/Violation of Right to Publicity; (8) Civil Conspiracy; (9) Conversion; (10) RICO; (11) Declaratory Relief; and (12) Injunctive Relief.

6. The motion was actually lodged on January 8, 2001, along with an *Ex Parte* Application by Defendants for leave to file an oversized memorandum of points and authorities. The

*Ex Parte* Application was granted by the Court on January 10, 2001, which became the effective filing date for Defendants' motion. This was the beginning of what has become a pattern of verbose argument from both sides. On February 28, 2001, for instance, the Court also granted Plaintiffs' *Ex Parte* Application to file an oversized memorandum of points and authorities in opposition to Defendants' motion. Plaintiffs' oversized memorandum was subsequently accepted, and deemed filed as of its filing date of February 26, 2001. Since that time, both sides have routinely sought, and received, permission to file oversized memoranda in support and/or opposition to Defendants' motions to dismiss and Defendants' motions for summary judgment. These memoranda have averaged 45–50 pages each, and both sides have been guilty of lack of concision or efficiency in presentation of their arguments. Nonetheless, the Court has afforded the parties full opportunity to brief the issues. In the remainder of this Order, where the Court refers to the filing date of papers filed by the parties (e.g., motions, oppositions, or replies), these are the dates as recorded in the civil docket, which may or may not reflect a delay occasioned by the parties' *ex parte* requests for more pages.

7. All of the Plaintiffs were at this point still unrepresented.

In the interim, on February 20, 2001, all of the named Defendants except Defendant Petersen also filed (or joined) a motion for summary judgment. This motion was specifically addressed only to the claims ostensibly brought under the federal Copyright Act (the First, Second, and Third Claims for Relief), and was only applicable if those claims survived the motion to dismiss.[8] The summary judgment motion was also noticed for March 12, 2001, the hearing date of the motion to dismiss. On February 28, 2001, in lieu of an opposition to the summary judgment motion, Plaintiffs filed a "Request to Deny or Continue Defendants' Motion for Summary Judgment," invoking Rule 56(f). Plaintiffs claimed that summary judgment was premature without allowing them discovery on, *inter alia,* earlier versions of the script for "The Peacemaker," a two-page pitch "treatment" for the movie that was allegedly crucial to development, people who worked on the scripts and the film (such that they might be deposed), contract(s), if any, between the Dreamworks entities, the Cockburns, and Stern, and source materials allegedly given to Defendant Schiffer (screenwriter) by Defendant Spielberg. Defendants filed their Reply to this "Request" on March 5, 2001.

On March 12, 2001,[9] the Court heard oral argument on the motions to dismiss and for summary judgment and, with minor modifications made based on the arguments raised in the hearing, signed its Order which granted in part and denied in part the motion to dismiss and denied without prejudice the motion for summary judgment. The March 12, 2001 Order (the "March 12 Order") granted Defendants' motion to dismiss as to Plaintiffs' First through Fourth and Tenth through Twelfth Claims for Relief. *See, e.g.,* March 12 Order (Docket No. 62) at 43. This Order declined to consider, and thus denied, the motion to dismiss insofar as it applied to Plaintiffs' state law (Fifth through Ninth) Claims for Relief. The March 12 Order also denied Defendants' motion for summary judgment, as well as Plaintiffs' Rule 56(f) motion, both without prejudice to their re-filing, finding both motions mooted by the grant of the motion to dismiss as to the First and Second Claims.

Specifically, the Court concluded that Plaintiffs were barred from proceeding on the First (for Copyright Infringement) and Second (for Contributory Copyright Infringement) Claims for Relief because they had not yet obtained or submitted proofs of copyright for all of the allegedly copyrighted works on which these claims were based. As a result, the Court dismissed these claims, though without prejudice to

---

**8.** Defendants filed a number of documents and exhibits in support of this prior motion for summary judgment, which are incorporated by reference into the present Motion for Summary Judgment. These include the following declarations or exhibits filed on February 20, 2001:(1) Declaration of Jo Dee Freck ("Freck Decl."), identifying Exhibits A to C; (2) Declaration of Louis P. Petrich ("Petrich Decl."), identifying Exhibits D to G; and (3) Notice of Lodging of Exhibits B, F, and G. These Exhibits include: Exhibit B to Freck Decl., a VHS copy of "The Peacemaker" film (hereinafter "Peacemaker VHS"); Exhibit C to Freck Decl., the May 13, 1996 Final Shooting Script for "The Peacemaker"

film (hereinafter "Peacemaker Shooting Script"); Exhibit D to Petrich Decl., a "Synopsis" of the eight works alleged by Plaintiffs to make up "Idema's Story" prepared by defense counsel Petrich (hereinafter "Defendants' Idema Story Synopsis"); Exhibit E to Petrich Decl., the "Synopsis" of "The Peacemaker" also prepared by Petrich (hereinafter "Defendants' Peacemaker Synopsis"); and Exhibits F and G to Petrich Decl., which are copies of Plaintiffs' various copyrighted works.

**9.** Though someone from attorney Olan's office attended the March 12, 2001 hearing, only Plaintiff *Pro Se* Idema offered any argument.

their re-filing in a subsequent complaint should Plaintiffs succeed in obtaining certificates of copyright registration (or amendment of these claims in the FAC to rely only on works for which Plaintiffs *had* obtained registration certificates). On this basis, the Order also dismissed the Eleventh and Twelfth (for equitable remedies) Claims for Relief, with limited leave to amend. *See* March 12 Order at 30–31, 41.

In the Order, Plaintiffs were given until April 23, 2001 to file a Second Amended Complaint ("SAC") basing copyright claims *only* on any allegedly copyrighted works for which Plaintiffs had by then obtained certificates of registration. *See* March 12 Order at 31. The Order stipulated that if no SAC complying therewith was filed by that date, the First and Second Claims for Relief would be dismissed, without prejudice, based on the Court's lack of jurisdiction thereon. *See id.* The same deadline applied to Plaintiffs' ability to amend the Eleventh and Twelfth (equitable remedies) Claims for Relief. *See id.* at 41.[10]

The March 12 Order also dismissed, *with* prejudice, Plaintiffs' Third (Conspiracy to Infringe Copyright), Fourth (Unfair Competition under the Lanham Act), and Tenth (RICO) Claims for Relief. *See id.*

at 32–41, 43. Also dismissed with prejudice were Plaintiffs' Eleventh and Twelfth Claims for Relief to the extent that they relied on the Lanham Act allegations. *See id.* at 41, 43. However, because it was at that point uncertain whether Plaintiffs would re-institute their copyright claims, the only remaining federal claims upon which this Court's original jurisdiction might be based, the Court declined to rule on Plaintiffs' state law claims (the Fifth through Ninth) because of the real possibility that it might decline to exercise supplemental jurisdiction over these claims should Plaintiffs not amend or re-file their copyright claims. The Court specifically stated that if no SAC was filed, and the First and Second Claims were dismissed, it would not exercise supplemental jurisdiction over the state law claims, and the entire case would be dismissed. *See* March 12 Order at 42–43.

On April 23, 2001, Plaintiffs filed their SAC, which is now the operative complaint in this matter. The SAC contains a total of 13 Claims for Relief.[11] Without having sought or received leave from the Court to amend or add claims, and despite the fact that the Court in its March 12 Order was quite explicit that leave to amend was granted *only* as to the First and Second

---

**10.** Plaintiffs were specifically granted leave to amend *only* the First and Second, and Eleventh and Twelfth, Claims for Relief. There was no general grant of leave to amend or add new claims in the SAC.

**11.** These claims in the SAC are: (1) Copyright Infringement; (2) Contributory Copyright Infringement; (3) *Breach of Confidence* (solely under North Carolina law); (4) **Fraud** (under both California and North Carolina law); (5) **Negligent Misrepresentation** (under both California and North Carolina law); (6) Breach of Contract (under both New York and Virginia law); (7) *Invasion of Privacy* (under District of Columbia as well as North Carolina law); (8) *Conversion* (relying on California, District of Columbia, *and* North Carolina common law); (9) **Intentional Interference**

**with Prospective Economic Advantage** (under California law only); (10) **Negligent Interference with Prospective Economic Advantage** (also under California law); (11) *Civil Conspiracy* (under District of Columbia, North Carolina, and Virginia law); (12) **Unfair and Deceptive Trade Practices** (under North Carolina law); and (13) *Violation of the Trade Secrets Act* (under North Carolina law). Those claims which are highlighted in **boldface** are wholly new claims presented for the first time in the SAC. Those which are *underscored* are *similar* to claims in the FAC, and/or are asserted under the laws of new or different states or other jurisdictions than were similar claims in the FAC. Those in plain font are relatively unchanged from their statement in the FAC.

(and Eleventh and Twelfth) Claims for Relief, Plaintiffs' SAC represents a significant departure from the FAC. The SAC both adds new claims and amends existing claims either in their form or with regard to the states (or other jurisdictions) upon the law of which Plaintiffs feel these claims draw. The SAC is now 61 pages and 230 paragraphs in length (plus one attachment).

Indeed, the only Claims for Relief which have remained relatively constant between the FAC and the SAC are the First, Second, and Sixth Claims for Relief (i.e., the copyright and breach of contract claims). Plaintiffs have acquired Certificates of Registration for each of the eight copyrighted works upon which they base their copyright claims.

Aside from these constants,[12] nearly every claim in the SAC is in some way an amendment or addition to the FAC.[13] For instance, while the FAC included a claim for Breach of Implied Contract *and/or* Breach of Confidence (previously the Fifth Claim for Relief), the SAC terms this claim as solely Breach of Confidence (now the Third Claim for Relief), and whereas the FAC made this claim under North Carolina *as well as* California, Michigan, and New York law, the SAC relies solely on North Carolina law for this claim. *See* FAC ¶ 183; SAC ¶ 130.[14] The present Fraud claim (the Fourth Claim for Relief) in the SAC is wholly new, as are Plaintiffs' claims for Negligent Misrepresentation, Intentional, *and* Negligent, Interference

with Prospective Economic Advantage, Unfair and Deceptive Trade Practices, and Violation of the (North Carolina) Trade Secrets Act (the Ninth, Tenth, Twelfth, and Thirteen Claims for Relief). *See* SAC ¶¶ 131–146, 168–175, 189–194. All of these new claims are asserted against all of the Defendants.

Moreover, Plaintiffs made not-insubstantial changes in each of the remaining claims in the SAC, for Invasion of Privacy, Conversion, and Civil Conspiracy (now the Seventh, Eighth, and Eleventh Claims), all of which did appear in one form or another in the FAC. *See* FAC ¶¶ 191–221 (previously Seventh to Ninth Claims); SAC ¶¶ 153–167, 176–188.

What had been a claim for Theft of Personality/Violation of Right to Publicity (Seventh Claim in the FAC) under District of Columbia as well as New York and North Carolina common law against the Dreamworks entities, Spielberg, the Cockburns, Stern, and Schiffer, has become a common law claim for Invasion of Privacy (Seventh Claim in the SAC) under the laws of the District of Columbia and North Carolina, as to the Dreamworks entities, Spielberg, the Cockburns, Stern, Schiffer, *and* Ballpark. *See* FAC ¶¶ 191–198; SAC ¶¶ 153–159. Similarly, what had been a claim for Conversion under the laws of California and the District of Columbia (Ninth Claim in the FAC) against all Defendants, has now become a Conversion claim against all Defendants (Eighth Claim in the SAC) under the laws of California,

**12.** Also constant is the fact that the First Claim for Relief is asserted against the Dreamworks entities, Spielberg, the Cockburns and Schiffer, and also that the Sixth Claim for Relief is asserted solely against Defendant Petersen. In the FAC, however, the Second Claim for Relief was asserted only against Defendants Spielberg, the Cockburns, Stern, Schiffer, and Petersen; in the SAC it is as to all Defendants.

**13.** Indeed, Plaintiffs even added two new Defendants (allegedly in place of previously-included Doe Defendants): BALLPARK PRODUCTIONS, INC. ("Ballpark") and BLACKWATER PRODUCTIONS, INC. ("Blackwater"), as well as substituting Defendant RANDOM HOUSE, INC. ("Random House").

**14.** Of course, this kind of clarification is to be encouraged.

the District of Columbia, *and* North Carolina. *See* FAC ¶¶ 215–221; SAC ¶¶ 160–167. And finally, what was previously a claim for Civil Conspiracy as to the Dreamworks entities, Spielberg, Random House, the Cockburns, Stern and Schiffer (Eighth Claim in the FAC) under District of Columbia, New York, North Carolina, and Virginia law, is now a claim for Civil Conspiracy (the Eleventh Claim in the SAC) under the laws of the District of Columbia, North Carolina, and Virginia (i.e., no longer New York), though it is made against the same Defendants. *See* FAC ¶¶ 199–214; SAC ¶¶ 176–188. Thus, the SAC adds six wholly new state law claims, and also makes additions or deletions to four others, all without leave of court.[15]

On May 10, 2001, several Defendants filed the instant Motion to Dismiss the Third through Fifth and Seventh through Thirteenth Claims for Relief (the "Motion to Dismiss"), originally noticed to be heard on June 11, 2001.[16] Defendants Random House and Petersen each filed separate Joinders in the Motion to Dismiss ("Random House MTD Joinder" and "Petersen MTD Joinder") such that all named Defendants are now represented thereon. Each of these Joinders largely relies on the arguments made in the initially-filed Motion to Dismiss,[17] except that the Petersen MTD Joinder also moves to dismiss the Sixth Claim for Relief (for Breach of Contract), which is asserted in the SAC only as to Defendant Petersen.[18] Except with regard to the Sixth Claim for Relief, therefore, the Court refers largely to the Motion to Dismiss.

On May 23, 2001, the same primary group of Defendants[19] filed the instant Motion for Summary Judgment on Plaintiffs' First and Second Claims for Relief

---

15. On this basis, and also because of Plaintiffs' prior expansion of claims from the original Complaint to the FAC in contravention of the Court's prior caution to incorporate Defendants' initial motion to dismiss, Defendants' present Motion to Dismiss also seeks dismissal, *with prejudice*, of these six wholly new claims, under the authority of the Court pursuant to Rule 41(b). However, although Defendants are correct that Plaintiffs were not granted leave by the March 12 Order to amend any but the First and Second Claims, nor did that Order state explicitly that *new* claims in the SAC could *not* be added. Thus, it is not correct to argue, as do Defendants, that Plaintiffs have expressly *violated* the March 12 Order. Instead, Plaintiffs' conduct represents a violation of Rule 15(a), which allows amendments subsequent to the first only upon leave of court or written consent of adverse parties. *See* Fed.R.Civ.Pro. 15(a). Though Plaintiffs are sharply admonished for this violation, the proper remedy therefor would not be dismissal of these newly-asserted claims *with* prejudice under Rule 41(b), but a dismissal thereof *without* prejudice. Therefore, because these claims are in any case the subject of Defendants' Motion to Dismiss pursuant to Rule 12(b)(6), the Court declines to consider their dismissal under Rule 41(b). Accordingly, Defendants' Motion is DENIED on this basis.

16. All of the following Defendants are represented herein by the same counsel (Leopold, Petrich & Smith) and are the primary movants on both motions considered herein: the Dreamworks entities, Spielberg, the Cockburns, Stern, Schiffer, Ballpark, and Blackwater.

17. The Random House MTD Joinder does separately point out what it claims are a paucity of alleged facts even establishing Random House's *participation* in any "conspiracy." *See* Random House MTD Joinder at 3.

18. These Defendants also do not join the Motion to Dismiss as to those claims not asserted against them: e.g., Random House joins the Motion to Dismiss as to all but the Third, Sixth, and Seventh Claims for Relief, and Petersen also does not join as to the Seventh Claim.

19. Again, the primary movants consist of the Dreamworks entities, Spielberg, the Cockburns, Stern, Schiffer, Ballpark, and Blackwater.

(the "Summary Judgment Motion"), also noticed for a hearing date of June 11, 2001.[20] Defendants Random House and Petersen once again filed separate Joinders in the Summary Judgment Motion (the "Random House MSJ Joinder" and "Petersen MSJ Joinder"), such that all the named Defendants are also represented on this Motion. Again, the Court relies primarily on the Summary Judgment Motion for Defendants' arguments in favor of summary judgment on the First and Second Claims.

On June 14, 2001, the parties entered, and the Court signed, a Stipulation and

Order continuing the hearing on both of Defendants' motions to August 20, 2001. The Stipulation and Order called for the Plaintiffs to file and serve oppositions no later than July 12, 2001, and for Defendants to file any replies on these motions by August 6, 2001. Under this stipulated schedule, Plaintiffs filed an Opposition to the Motion to Dismiss (the "MTD Opposition") on July 12, 2001.[21]

However, Plaintiffs did not file their Opposition to the Summary Judgment Motion (the "MSJ Opposition") until July 20, 2001.[22] Along with the MSJ Opposition, Plaintiffs also filed a significant number of voluminous exhibits in purported support of their copyright claims.[23]

20. The Summary Judgment Motion incorporates by reference as its evidence the Freck Decl., Petrich Decl., and Exhibits thereto, all of which were filed by Defendants on February 20, 2001. Along with the Summary Judgment Motion, Defendants also lodged the separate Statement of Uncontroverted Facts and Conclusions of Law (the "UF") required by Local Rule 7.14.1, and a Declaration from Larry Weisberg ("Weisberg Decl.") attesting to the copyright status of the Peacemaker Shooting Script (Exhibit C to Freck Decl.). Subsequently, Defendants lodged, on July 6, 2001 (Exhibit H), another copy of this Peacemaker Shooting Script accompanied by its Certificate of Registration as a copyright (Copyright No. PAu 2–216–889). From all appearances, the two separate documents (Exhibit C and Exhibit H) are identical. The Court will use Exhibit H as its reference copy of the Peacemaker Shooting Script.

21. Plaintiffs filed a single opposition brief, signed by Idema on his own behalf and attorney Olan on behalf of the Scurkas and Morris.

22. Again, Plaintiffs filed a single (oversized) opposition brief.

23. Among the exhibits filed by Plaintiffs are the following: as Exhibit 1 the Declaration of Gary Scurka ("Scurka Decl."), along with his resume and a copy of an October, 1995 article from U.S. News & World Report in which Gary Scurka and Kathy Wolff (Kathy Wolff Scurka) are given "other contributors" credit (the "USN & WR Article"); Exhibit 2 is the Declaration of J. Keith Idema ("Idema Decl.") to which is attached a December 6,

1994 letter allegedly mailed on that date from Idema to Defendant Spielberg which contains his "story ideas" (the "12/06/94 Letter to Spielberg"), and also the "letters of support" from various government and other officials and a "poster" depicting Idema's career in the military (and elsewhere), both of which were allegedly enclosed with the 12/06/94 Letter to Spielberg; Exhibit 3 is the Declaration of Major (Ret.) James Morris ("Morris Decl."), with covers from various books and magazine articles authored by Morris as well as the article "Operation Dumbo Drop," authored by Morris, which eventually became a Disney feature film on which Morris was allegedly given writer credit; Exhibit 4 is the Declaration of Stanford Whitmore ("Whitmore Decl.' "), a self-described screenwriter and arbitrator for the Writer's Guild of America, who is Plaintiffs' purported expert on similarities between Plaintiffs' works and "The Peacemaker"; Exhibit 5 is the Declaration of Kathy Wolff Scurka ("Wolff Scurka Decl."), with her resume; Exhibit 6 is the Declaration of Robin Moore ("Moore Decl."), along with covers of various books authored by Moore; Exhibit 7 is the Declaration of Lt. Colonel (Ret.) David Silbergeld ("Silbergeld Decl."), who offers testimony on Plaintiffs' behalf as to the military authenticity of the accounts in Plaintiffs' works versus allegedly similar events depicted in "The Peacemaker," to which are attached pertinent pages of Idema's "Red Bull Rising" draft novel, as well as copies of the comments of the Department of Defense on "The Peacemaker" drafts. Plaintiffs also filed a significant number of other exhibits designed to demonstrate a substantial

In light of the delayed filing of Plaintiffs' MSJ Opposition, and the voluminous evidence submitted therewith,[24] on August 9, 2001 the parties submitted, and the Court signed, a Stipulation and Order which continued the date of the hearing on Defendants' motions, this time to September 10, 2001, and gave Defendants more time to file replies.

In conformity with the schedule outlined by this Stipulation and Order, on August 20, 2001 the primary Defendants filed their Reply to Plaintiffs' Opposition to the Motion to Dismiss (the "MTD Reply") and their Reply to Plaintiffs' Opposition to the Summary Judgment Motion (the "MSJ Reply").[25] Defendants Random House and

---

level of similarity between Plaintiffs' work(s) and "The Peacemaker." These include: a "Similarities Videotape" (Exhibit 8); a list of 106 alleged similarities ("Similarities List") (Exhibit 9); a chart purporting to be a "Character Comparison" (Exhibit 10) between Plaintiffs' works, "The Peacemaker," and the alleged Peacemaker source material by the Cockburns; a "Setting Comparison" chart (Exhibit 11); an events and "Story Timeline Comparison" (Exhibit 12); a map of the "Smuggling Routes" in the two stories (Exhibit 13); and a "Character List & Hype Page" from Idema's "Red Bull Rising" story (Exhibit 14). Plaintiffs also submitted an "Opposition" to the Defendants' separate Statement of Uncontroverted Facts, which is apparently intended as the separate Statement of Genuine Issues required by Local Rule 7.14.2, though it is not titled as such, does not comply with the rule, and is extremely unhelpful to the Court in its design and blanket citations.

**24.** This evidence also includes: Exhibit 15, another copy of the 12/06/94 Letter to Spielberg (from Idema); Exhibit 16, a copy of the unpublished article by the Cockburns which the film "The Peacemaker" was allegedly "based on," according to its credits (the "Cockburns' Article"); Exhibit 17, the Cockburns' film treatment (on Blackwater letterhead) which allegedly also formed some part of the development of "The Peacemaker" (the "Cockburns' Film Treatment"); Exhibit 18, the Department of Defense documents containing the DOD/Army's comments on various drafts of "The Peacemaker," and changes it would require to secure its endorsement of the film; Exhibit 19, pages from Defendant Petersen's book proposal allegedly submitted to the Cockburns; Exhibit 20, a letter from Kathy Wolff, dated November 13, 1995, addressed to a Christine Stewart, purportedly an employee of Amblin Entertainment to whom Wolff spoke (Wolff Scurka Decl. ¶¶ 5–6), attached to which is a second letter addressed to Defendant Spielberg signed by Kathy Wolff and Gary Scurka describing their plot ideas for a movie about Idema's story ("11/13/95 Letter to Amblin"); Exhibit 21, printouts from the internet of various reviews and other promotional materials about "The Peacemaker" which include references to the alleged sources therefor (e.g., the Cockburns' article, or Defendant Stern as character model); Exhibit 22, the full credits and promotional materials for the film, which include a bit of "the making of" story; Exhibit 23, a copy of a poster with a promotional photograph of the four main characters in "The Peacemaker"; Exhibit 24, a copy of the complete manuscript of the "Red Bull Rising" draft novel written by Idema, which appears to be an identical copy of that produced by Defendants as Exhibit G (the Court will rely on this copy produced by Plaintiffs, hereinafter "Red Bull Rising"); Exhibits 25 and 26, earlier drafts of the final screenplay for "The Peacemaker" ("Peacemaker Charlie Draft," and "Peacemaker Kilo Draft," respectively); Exhibit 27, a videotape trailer of a film about Plaintiff Idema ostensibly being made by the Scurkas which is called "Any Lesser Man"; Exhibit 28, Gary Scurka's resume tape, on which is included the October, 1995 story "The Worst Nightmare" which aired on "60 Minutes" for which Scurka and Wolff Scurka got producer credit(s); and finally Exhibit 29, which is Kathy Wolff Scurka's resume tape.

**25.** Along with the MSJ Reply, on August 20, 2001 the primary group of Defendants also filed a pleading titled Statement of Objections and Motion to Strike Plaintiffs' Evidence, which is addressed primarily to the purported expert testimony offered by Whitmore. Defendants argue that this is improper testimony, and should be stricken. Though their arguments for exclusion of this testimony are well-taken, the Court is quite capable of making what use of Whitmore's testimony as may seem appropriate, and ignoring the rest. Ac-

Petersen once again joined these replies, thus including all named Defendants thereon.

## II. LEGAL MOTION STANDARDS[26]

### A. *Motion for Summary Judgment Pursuant to Rule 56*

The party moving for summary judgment has the initial burden of establishing that there is "no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ. Pro. 56(c); *see British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir. 1978); *Fremont Indemnity Co. v. California Nat'l Physician's Insurance Co.,* 954 F.Supp. 1399, 1402 (C.D.Cal.1997).

If the moving party has the burden of proof at trial (*e.g.,* a plaintiff on a claim for relief, or a defendant on an affirmative defense), the moving party must make a "showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986) (quoting from Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–88 (1984)). Thus, if the moving party has the burden of proof at trial, that party "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in [its] favor." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original); *see Calderone,* 799 F.2d at 259.

If the opponent has the burden of proof at trial, the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. 2548. "Instead, ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (citations omitted).

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... [T]he adverse party's response ... *must set forth specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.Pro. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish the essential elements to that party's case, and on which that party would bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in favor of the nonmovant. *Id.* at 248, 106 S.Ct. 2505. However, the court

cordingly, the motion to strike this declaration is DENIED, and these objections OVERRULED. The Court will consider Defendants' objections to certain paragraphs of Idema's declaration, and to Exhibits 8 and 9, as those objections come up.

**26.** Inasmuch as the Court will address, first, Defendants' Summary Judgment Motion be-

fore discussing Defendants' Motion to Dismiss (in part because Defendants argue that all or several of Plaintiffs' state law claims addressed in the Motion to Dismiss are preempted by the copyright claims addressed in the Summary Judgment Motion), these standards are also presented in that order, though it is the reverse of the order in which these motion types are most usually presented.

must view the evidence presented "through the prism of the substantive evidentiary burden." *Id.* at 252, 106 S.Ct. 2505.

### B. Motion to Dismiss Pursuant to Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. *See* Fed.R.Civ.Pro. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a) which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990). "The Rule 8 standard contains 'a powerful presumption against rejecting pleadings for failure to state a claim.'" *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir.1997). A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988); *accord Gilligan,* 108 F.3d at 248 ("A complaint should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'").

The Court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them. *See Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir.1998). Moreover, the complaint must be read in the light most favorable to the plaintiff. *See id.* However, the Court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations. *See, e.g., Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981).

Moreover, in ruling on a 12(b)(6) motion, a court generally cannot consider material outside of the complaint (*e.g.,* facts presented in briefs, affidavits, or discovery materials). *See Branch v. Tunnell,* 14 F.3d 449, 453 (9th Cir.1994). A court may, however, consider exhibits submitted with the complaint. *See id.* at 453–54. Also, a court may consider documents which are not physically attached to the complaint but "whose contents are alleged in [the] complaint and whose authenticity no party questions." *Id.* at 454. Further, it is proper for the court to consider matters subject to judicial notice pursuant to Federal Rule of Evidence 201. *Mir, M.D. v. Little Co. of Mary Hospital,* 844 F.2d 646, 649 (9th Cir.1988).

Lastly, a Rule 12(b)(6) motion "will not be granted merely because [a] plaintiff requests a remedy to which he or she is not entitled." Schwarzer, Tashima, and Wagstaffe, *Civil Procedure Before Trial* § 9:230 (2000). "It need not appear that plaintiff can obtain the *specific* relief demanded as long as the court can ascertain from the face of the complaint that *some* relief can be granted." *Doe v. United States Dept. of Justice,* 753 F.2d 1092, 1104 (D.C.Cir.1985); *see also Doss v. South Central Bell Telephone Co.,* 834 F.2d 421, 425 (5th Cir.1987) (demand for improper remedy not fatal if claim shows that the plaintiff is entitled to a different form of relief).

### III. STATEMENT OF FACTS AND ALLEGATIONS

The Court finds itself in the somewhat unusual circumstance of simultaneously considering both a motion for summary judgment and a motion to dismiss, albeit the two motions are addressed to separate claims in Plaintiffs' SAC. The Court must therefore examine whatever evidence is presented by the parties as support for the moving and/or opposing papers on the Summary Judgment Motion,[27] with regard

**27.** The Court addresses the Summary Judgment Motion first, for at least three reasons:

to the copyright claims, and subsequently disregard that same evidence for purposes of the Motion to Dismiss, as to the state law claims.[28]

Fortunately, little of the evidence presented as to Plaintiffs' First and Second Claims for Relief will in any case have any bearing on Plaintiffs' remaining claims. Indeed, because Defendants concede (for the purposes of the Summary Judgment Motion) that they had access to Plaintiffs' copyrighted works, the primary evidence relevant to the decision of that motion are the works themselves. Therefore, in what follows the Court gives: detailed descriptions of the works relevant to the Summary Judgment Motion; and then a summary of the allegations in the SAC underpinning Plaintiffs' eleven separate state law claims.

## A. *Evidence Relevant to the Summary Judgment Motion—The Works*

Defendants' Summary Judgment Motion seeks judgment as a matter of law on Plaintiffs' First (for Copyright Infringement) and Second (for Contributory Copyright Infringement) Claims for Relief. As

has been stated, Defendants concede for the purposes of this motion that they had sufficient access to Plaintiffs' copyrighted works to make use of those works in the creation of "The Peacemaker." *See, e.g.,* Summary Judgment Motion at 15. They argue, nonetheless, that "The Peacemaker" is insufficiently similar to the protected expression in Plaintiffs' works to support any inference of unlawful copying. *See id.* at 16–43. Of primary relevance to Defendants' motion, therefore, are the works themselves: Plaintiffs' copyrighted works, versus "The Peacemaker."

### 1. Plaintiffs' Copyrighted Works— "Idema's Story"

There are eight primary works upon which Plaintiffs base their First and Second Claims for Relief. Plaintiffs allege, and there is no challenge from Defendants, that each of these works is registered with the U.S. Copyright Office,[29] and that each of the Plaintiffs has assigned to each of the others all rights under each of the various authors' copyrights in these respective works.[30] *See* SAC ¶¶ 14–15.

---

(1) It may be easier to address the argument(s) in Defendants' Motion to Dismiss about preemption of Plaintiffs' state law claims by copyright after addressing the viability of Plaintiffs' copyright claims; (2) Plaintiffs' copyright claims are clearly their central/primary claims in this case; and (3) Because these copyright claims are Plaintiffs' only remaining federal claims, and the Court has jurisdiction over Plaintiffs' state law claims only by virtue of an exercise of supplemental jurisdiction attendant on these copyright claims, the survival or lack thereof of these claims may influence the Court as to whether to continue to exercise supplemental jurisdiction.

28. Only Defendant Petersen, to whom it is solely addressed, has actually moved to dismiss the Sixth Claim for Relief. However, for simplicity's sake, the Court incorporates this

separate request into the general relief under Rule 12(b)(6) sought by all Defendants.

29. Plaintiffs include as Exhibit A to the SAC the Certificates of Registration for only five of the eight allegedly copyrighted works: Red Bull Rising; The Vilnius Brief; Loose Cannon (film); Loose Cannon on Target (SOF); and Spiking a Loose Cannon (SOF). Moreover, the last two of these actually show ownership of copyright by The Omega Group. They allege the receipt of Certificates for the others, but they have not been filed. However, Defendants do not challenge their rights to these copyrights. Accordingly, the Court assumes ownership thereof.

30. Plaintiffs also allege that The Omega Group, publisher of the *Soldier of Fortune* magazine in which Plaintiff Morris' articles (three total) appeared, has assigned its rights to Plaintiffs. *See* SAC ¶ 15.

These eight works collectively comprise what Plaintiffs refer to as "Idema's Story." [31] *See* SAC ¶ 14. They include: (1) a novel (draft form) written by Plaintiff Idema, in or around 1995, titled "Red Bull Rising" (Copyright No. TXu 967–236) (hereinafter "Red Bull Rising"); (2) a film treatment written by Plaintiff Morris, in or around 1994, titled " 'Loose Cannon'—The Keith Idema Story" (Copyright No. PAu 2–510–608) (hereinafter "Loose Cannon (film)"); (3) an article written by Plaintiff Morris which appeared in *Soldier of Fortune* magazine in the March, 1995 issue, titled "Loose Cannon on Target: Special Forces NCO Battles 'Federal Bureau of Intimidation'" (Copyright No. TX 4–016–251) (hereinafter "Loose Cannon on Target (SOF)"); (4) another article by Plaintiff Morris (the two articles were a "series") published in *Soldier of Fortune* magazine, the April, 1995 issue, titled "Spiking a Loose Cannon: FBI Used KGB Tactics to Jail SF Operator" (Copyright No. TX 4–029–542) (hereinafter "Spiking a Loose Cannon (SOF)"); and (5) a draft of the March, 1995 and April, 1995 *Soldier of Fortune* article(s) (Copyright No. TXu 968–343) (hereinafter "1995 SOF Article draft"). *See, e.g.,* SAC ¶ 14; Exhibits F and G to Petrich Decl.; Exhibit 24.

Also included among the eight works upon which Plaintiffs' First and Second Claims for Relief are premised are: (6) a film treatment written by Plaintiff Gary Scurka, in or around 1994, which is titled "The Vilnius Brief" (Copyright No. PAu 2–522–556) (hereinafter "The Vilnius Brief"); (7) a third article written by Plaintiff Morris for *Soldier of Fortune* magazine, which appeared in the September, 1997 issue, titled "Cool–Hand Keith: Police–State Tactics Keep Ex–SF NCO in Federal Slam" (Copyright No. TX 4–535–005) (hereinafter "Cool–Hand Keith (SOF)"); and finally (8) a press packet/story outline/clip reel (videotape), prepared on an unspecified date, for a documentary film planned/produced by the Scurkas titled "Any Lesser Man: The J. Keith Idema Story" (Copyright No. PA 1026–932) (hereinafter "Any Lesser Man (film)"). *See, e.g.,* SAC ¶ 14; Exhibit F to Petrich Decl.

All eight of these works are based to a greater or lesser extent on purported actual events in Plaintiff Idema's life. Only the Red Bull Rising novel holds itself out as a fictional account, and even the prologue and acknowledgments thereto proclaim it is a "true story" and that "almost all of it is based on fact ..." Exhibit 24 (Red Bull Rising) at 000006, 000012. The other seven works purport to be, or appear to be, journalistic reportage of events in Plaintiff Idema's life, of his character, and of events in the former Soviet Union and the Lithuanian republic. These seven works are, like Red Bull Rising, focused on Idema as anti-hero, and report primarily

**31.** Plaintiffs do not claim any sort of copyright in a *combination* of these eight works, and each of the Plaintiffs' works is copyrighted individually. Therefore, each work is only entitled to protection of the original expression in *that particular work,* and Plaintiffs cannot extend or enhance that protection by reference to a compilation of the various works which make up "Idema's Story" (i.e., each work must be judged against any allegedly infringing work *on its own,* not as part of some larger whole claimed by Plaintiffs). Nor does the assignment of rights between the Plaintiffs effect greater protection for each of the individual works. It is therefore a bit of a misnomer to refer to the eight works collectively, as if they make up a *single* work that is entitled to protection of any original expression contained in any *one* of the eight. Nonetheless, the Court will on occasion hereunder adopt this nomenclature to refer to all eight of the Plaintiffs' works upon which their copyright claims are based, at once. This does *not* signal or indicate that the Court considers these eight works as one whole; it is simply a matter of convenience to reference the works this way.

from his point of view. *See* Exhibit F to Petrich Decl. at 000007–00026 ("Loose Cannon (film)"), 000055–000059 ("Loose Cannon on Target (SOF)"), 000063–000066 ("Spiking a Loose Cannon (SOF")), 000029–000049 ("1995 SOF Article Draft"), 000069–000080 ("The Vilnius Brief"), 000086–000087 ("Cool–Hand Keith (SOF)"), 000090–000103 ("Any Lesser Man (film)").

Though the contents of these works (and the protected expression therein) will also be the subject of a comparative discussion in Part **IV.A,** below, a working synopsis of each is also in order here:

> **Loose Cannon (film)**—The reader is asked to imagine "a rabid, tyrannical Third–World despot bringing a back-pack nuclear weapon into Manhattan in a diplomatic pouch and taking out the U.N.," an event which Idema's sources "have alluded may be a current plan by Abu Nidal or Hezbollah." Loose Cannon (film) at 000008. The treatment goes on to reference the 1991 murder of eight border guards in the newly inde-pendent Lithuanian military, and sug-gests that their assassination was part of a plot to smuggle nuclear weapons out of the former Soviet Union/Russia to Iran, Iraq, or North Korea. *See id.* These events reportedly "brought together in friendship three men who were once en-emies; a Russian Colonel, a Lithuanian General, and an American Green Beret; with a 'Connie Chung' news producer. Their bond would be the investigation and pursuit of an international nuclear smuggling conspiracy." *Id.* As the treatment goes on to say, the nuclear weapons at issue did or may include "backpack" nuclear devices called Spe-cial Atomic Demolition Munitions ("SADMs"). *See id.* at 000009. Follow-ing some background and build-up on Idema's history and training as a Green Beret, his character, his business(es) running expositions for Special Forces

units worldwide, and his 1991 involve-ment in training and befriending the newly independent Lithuanian Army, the treatment credits Idema's alleged "trusted American" status among the Lithuanians as explanation for the fact that he was the first they called when they intercepted (former) Soviet KGB and Ommon (also called GRU, a military intelligence branch similar to the KGB) agents trying to smuggle four SADMs out of Russia into Lithuania on their way to Iraq, Iran, or possibly North Korea. *See id.* at 000012. The treat-ment says the bad news was that this was the third of four shipments: the first two made it through to Saddam Hussein (Iraq), and either to Iran or to North Korea. *See id.* The treatment says one SADM is capable of taking out more than 10 Manhattan city blocks, a figure which rises to 80 square blocks with secondary damage. *See id.* So, the treatment goes on, Idema attempted to bring this information to U.S. agen-cies like the FBI and the CIA, and the State Department, but refused to "play by the rules," as is consistent with his character as a "tough," "volatile," and "puckish" man cursed with a "big mouth." *Id.* at 000014. This attitude led him, among other things, to refuse to divulge his sources to the U.S. agencies, according to the treatment (among them a Commissar in the Lithuanian Army and a Colonel in the Russian KGB who "chose Keith as his pipeline for informa-tion to the west."). *Id.* at 000015. As a result of this refusal to cooperate, the treatment speculates, the FBI "set up" Idema, causing him to be thrown in jail for wire fraud. At this point, Idema began working with a producer of "Con-nie Chung Eye to Eye" and is still in-volved in trying to expose smuggling out of the former Soviet Union. *See id.* at 000016. The treatment concludes with

some details of the alleged FBI "plot" to frame Idema, his trial, and his conviction. *See id.* at 000017–000019.

**Loose Cannon on Target (SOF)**—This article is more of the same, as it begins with a "heroic" description of Idema's decision, at the age of 12 after seeing the movie "The Green Berets" starring John Wayne, to become a Special Forces Operative/Green Beret (to which end he allegedly turned down an acceptance to Harvard so as to enroll in the Army), his acquired expertise with weapons, and his "bad" attitude: e.g., "He's quick to take offense, quick to blow his stack, quick to rant and rave." Loose Cannon on Target (SOF) at 000056. The article speculates that Idema's "attitude problem . . . may be what has landed him in jail today." ¤ It then goes on to describe Idema's alleged status in the "SpecOps community," and his business which offers "significant services to that community . . .," but notes "what is all that compared to the fact that Idema has pissed off several FBI agents so badly that many would lie, cheat and steal—and feel good about it, to put him in jail?" *Id.* The article refers to a meeting between Idema and officials at the Pentagon, in 1992, during which Idema (apparently according to Idema himself, though the article gives no sources) reported on what he had personally observed in Russia and Lithuania during his tenure there training the new Lithuanian Army. Among the items upon which Idema allegedly reported were various factions of the KGB and/or Ommon which were reportedly involved with state-sponsored terrorism and working with the Abu Nidal and Hezbollah terrorist organizations. The article claims that a CIA officer present at the meeting asked how Idema got his hands on information that the CIA had been trying to get, and in response Idema allegedly told them that he out-

drank and out-shot the Lithuanians, and managed to impress them/earn their trust (a reference to a purported "shooting match" between Idema and the Lithuanians also briefly described in this published article, but more fully described in other of Plaintiffs' works)— again, the article refers to Idema's alleged friendship with a Commissar (akin to a General) of the Lithuanian Army (named Jorgo in the article, though the film treatment states this is a pseudonym). *See id.* Despite his "good intel," however, the article says that Idema's "bad attitude" got him in trouble, and the representative of the State Department warned Idema to stay out of the way: "We don't want you here." In response, Idema allegedly said "Who is this 'we' . . . I'm a civilian and I'll do whatever I want." Id. at 000057. Reportedly, Idema then said to one of the Lithuanian commanders he brought with him to the meeting that he should not allow the State Department into Lithuania the next them it tried to come into the country. According to the article, some six weeks later a State Department representative was thrown out of Lithuania because "Keith had forgotten to tell Petras it was a joke." Id. Idema reportedly went next to the FBI, but refused to give them a list of his Lithuanian/Russian contacts, to which they responded that he cooperate with them "the easy way, or the hard way." Id. Despite his best efforts to cooperate with them, and to give them the information he later received about SADMs being smuggled out of Russia through Lithuania, his attitude and his refusal to give names allegedly led the FBI to set him up and to convince his present/former employees to help. This article ends with the FBI playing "hardball," both with Idema and with his girlfriend,

a woman named Dawn Glosson. *Id.* at 000059.

**Spiking a Loose Cannon (SOF)**—Picking up where the prior article left off (the two articles were a "two-part series"), this second installment gives additional details on the alleged "frame job" performed on Idema by the FBI (and by his former employee, now competitor, Charlene Hembrick, and her cronies), on his love-and-hate relationship with girlfriend Dawn Glosson, and on the FBI's unending mission to "get" Idema. The article describes what are clearly thought to be Idema's heroic attempts to clear his own name, notwithstanding which he was convicted (at a second trial) and eventually sentenced to 20 years in prison, plus threatened with a sanity hearing. *See id.* at 000066. According to this account, Dawn Glosson was sentenced to 15 months. *See id.* At publication, Idema apparently was in federal prison. *See id.*[32]

**The Vilnius Brief**—This treatment covers much of the same ground as is covered by the three works already described. It starts out by saying there are two people who "claim to have proof that small atomic devices and the weapons grade uranium to activate them have made it out of Russia's nuclear inventory and into the hands of Iraqi dictator, Saddam Hussein. They are a former U.S. Army Green Beret who still gathers intelligence for the U.S. military and a top official of the Lithuanian Criminal Police." The Vilnius Brief at 000070. However, the film treatment goes on, "[t]he Lithuanian official is now afraid for his life and is considering moving to the United States. The Green Beret is in a North Carolina prison awaiting sentencing for a crime he says he did not

commit." *Id.* The treatment gives the background for the story, describing the development and purpose of the "backpack" nuclear weapons (SADMs) in the Russian/former Soviet Union army. According to the treatment, a single "typical SADM" is capable of "leveling a small city and leaving radiation contamination which would eventually kill tens of thousands." *Id.* at 000071. Also as background, the author describes U.S. development of so-called "Black Operations" Special Forces teams in the late 1970s through the mid–1980s, engaged in covert missions in foreign lands, and speculates that Idema may have been involved in some of these. *See id.* at 000072. In the first part of the "current story," the treatment describes Idema's 1991 involvement in training the new Lithuanian Army, and his developing friendship with one Juozas Rimkevicius (apparently his real name), Senior Commissar of the Organized Crime section of the Lithuanian Criminal Police. Among the events investigated by Rimkevicius was the 1991 murder of the Lithuanian border guards, believed to be the work of the Ommon (or OMON). *See id.* at 000073. Eventually, Rimkevicius was able to intercept four disassembled SADMs at the border with Russia. Relying on his friendship with Idema (cemented during a shooting match with the Lithuanians, described in detail), he accompanied Idema to the 1992 meeting at the Pentagon. From here the story is much the same as already described, ending in an FBI set-up of Idema, his trial, and his conviction. *See id.* at 000076–000080.

**Cool–Hand Keith (SOF)**—This third *Soldier of Fortune* article by Morris is essentially a reprise and update of the

---

**32.** The Court does not separately describe the draft of these two 1995 articles, as it appears to be identical to the text of the two published articles. *See* 1995 SOF Article draft at 000029–000049.

first two. It starts by noting that Idema remains in federal prison, where he is allegedly "enduring the fourth week of a 55–day hunger strike" protesting his confinement and the conditions thereof. *See* Cool–Hand Keith (SOF) at 000086. Echoing one of the themes of those works already described, the article notes that Idema "walked into a storm when he reported that Russian nuclear-smugglers, ex-and active-KGB types and hardcore Russian mafiosi had moles" in the ranks of the CIA/FBI. *Id.* The article reports that Idema had intelligence sources inside the KGB in Russia, and that he told Gary Scurka, "then a CBS producer," about these concerns "*before* Aldrich Ames or Earl Pitts," former CIA and FBI agents alleged to be KGB infiltrators, were arrested. *Id.* (emphasis in original). The author (Morris) speculates that Idema "could have walked at any time by giving the FBI his full cooperation. They wanted the names of his assets who knew the extent to which CIA and the FBI had been infected. Idema refused, believing that within the FBI lurked traitors who would get his people killed." *Id.* The article opines that for this "crime" of refusing to give up the names of his sources in Russia and Lithuania, "Keith has sacrificed six years of his life, his marriage, and $400,000 of his family's money battling bogus criminal charges in a valiant effort to save the FBI from its cancer within." *Id.* The article also claims that Idema was the Special Forces soldier responsible for a *US News & World Report* story detailing North Korean, Iraqi, and Iranian receipt of Russian nuclear contraband, and that the companion "60 Minutes" story also relied on information supplied by Idema. However, the article claims that Idema was "stiffed" by CBS, as his name and biography were not included in the "60 Minutes" story, as Idema had hoped (he hoped the notoriety would help get him out of jail) for fear that "his imprisonment (albeit on trumped up charges) would destroy his credibility and muddy the waters of their true focus and interest: nuclear smuggling." *Id.* at 000087. The story concludes by saying that despite the best efforts of the FBI to "break" him, Idema remains resolute: "No doubt about it, Keith is a hardass, but a true patriot, a man of courage and inviolable honor." *Id.* The article speculates about the validity of some of the evidence used to convict him, and in its concluding passages says: "If Keith is right, Saddam Hussein has six backpack nukes, each of which would easily fit in a bus terminal locker in any major city and pulverize 50 city blocks. The North Koreans have another six." *Id.*

**Any Lesser Man (film)**—This final example of the "non-fiction" versions of Idema's Story purports to tell the "true story" of a Green Beret (Idema), "a young man full of hope, patriotism and ambition." Any Lesser Man (film) at 000091. It outlines the story of Idema's discovery of information on nuclear smuggling, his attempts to bring this information to the U.S., his refusal to give up name(s) of his contacts to the FBI, and his conviction for a crime he allegedly did not commit. *See id.* The treatment focuses on Idema's struggle to prove his own innocence, his quest to expose nuclear smuggling, and his strong suspicions about KGB infiltration of the FBI and/or CIA. *See id.* at 000091–000099.

**Red Bull Rising**—The final piece of the assembled works which Plaintiffs collectively call "Idema's Story," this novel penned by Plaintiff Idema is in a rough draft form. Only five of the projected twenty-seven chapters are in anything approaching a "completed" form, and even these are interspersed with various

acknowledgments of the need to flesh out their text. The text is fronted by an "Inside Cover" prologue, a "Hype" page, and a long Acknowledgments section. *See* Red Bull Rising (Exhibit 24) at 000006–000013. Before launching into a description of the text of the novel, these introductory sections bear some treatment.

*Inside Cover:* This proposed prologue states that the novel "has been published as a work of fiction" but is actually "the true story of the governments [sic] inept handling and outrageous cover-up of events that endanger the lives of all Americans." It continues by claiming that "[m]ost of what you will read is true, especially in regard to the criminal conduct of the FBI, CIA, and Soviet/Russian nuclear smuggling." The prologue admits that the missions of the U.S. military and/or Department of Defense that are described in the novel are fictional, though the missions, and/or the groups which perform them, are similar to real life. "Keith Idema remains totally loyal to the U.S. Military and it's [sic] dark special operations community.... On the other hand, his expose [sic] of names, organizations and motives inside the FBI, DOJ and CIA, may help bring their evil organizations one step closer to ruin ..." *Id.* at 000006.

*"Hype" Page:* This page begins with a definition of SADMs, as "manportable backpack nuclear weapons." *Id.* at 000007. "[T]he Soviets had them, the Americans had them. Now they were on the way to Saddam Hussein, his ... allies, and North Korea." *Id.* "Someone powerful was behind it, but who? And why?" The page then lists five "plot points" to follow: " ... A Lithuanian Commissar tried to stop them; his government fired him.... An American Green Beret tried to catch *them;* his government jailed him.... His wife wouldn't help *them;* her government de-

stroyed her in prison.... A CBS producer tried to expose *them;* his government blackballed him.... A Russian Colonel tried to doublecross *them;* his government killed him." *Id.*

*Acknowledgments:* After describing his colleagues' (including co-Plaintiffs Gary Scurka and Jim Morris) advice to put aside a prior novel called "At What Price Justice" (focused on a "system of injustice" passing as the American justice system), Idema goes on to describe how the present book was largely written at the insistence of his friends, and his wife, Dawn Glosson. He then describes the "difficult" decision to write the book as fiction rather than non-fiction. *See id.* at 000008–000009. He credits some of his heroes and mentors, and explains why he wrote the book in the third, rather than first, person. *See id.* at 000010–000011. He then declares that despite the fictional tone of the story, "almost all of it is based on fact ..." *Id.* at 000012. After describing a proposed non-fiction collaboration with Gary Scurka to "complete" the story, this section concludes: "By the end of this book I hope to save the world, kill all the bad guys, disarm the bobby [sic] traps, escape in the nick of time, and get the girl. In the nonfiction version, I'll be happy just to hold on to the girl, but I don't there either." *Id.* at 000013.

*Chapter One:* The text opens in Fayetteville, North Carolina on August 18, 1991, where Idema is getting ready to take a flight to Moscow (and then to Crimea). He is at his home. His then-girlfriend, Dawn, comes out of the shower and they begin to make love. Idema flashes back to how he met Dawn, in a bar where he was looking for his ex-girlfriend who had left him for a biker. During that search, Idema got into a bar brawl with several more bikers (from which Idema emerged victorious and un-

scathed) before he found the guy who had taken his girlfriend and also beat him up. The flashback ends with Idema and Dawn still beginning to make love, but Idema has to go. *See id.* at 000014–000031.

The scene shifts to DIA headquarters in Washington, D.C., on the same day in August, 1991, where there is a discussion of a reported rumor that a Soviet coup against Gorbachev and Yeltsin is about to occur. The discussion includes a reference to one "SOF type" who will be on the ground there (it is clear that it is Idema from the reference to his flight), and they agree to keep him as "an option." This is followed by a still unwritten section, in which Idema has plans to "lay out the story" of the attempted coup in Moscow on August 21, 1991. *See id.* at 000034.

The final section of this first chapter is a flashback to Idema as a twelve year old boy in Poughkeepsie, New York in May, 1968, where he and his father go to a local theater to see the movie "The Green Berets," starring John Wayne. After the movie, Idema tells his father that he wants to be a Green Beret. Then, several years later, Idema joins the Army and begins training under Colonel "Chargin' Charlie" Beckwith, who was the model for John Wayne's character in the film, according to Idema. Robin Moore is the author of the book upon which it was based. Wayne, Beckwith, and Moore become role models for Idema, and he meets all of them personally. Beckwith saves Idema from himself (his "attitude") on several occasions. *See id.* at 000034–000051.

*Chapter One (again).*[33] At Smoke Bomb Hill, in Fort Bragg, North Carolina, on September 12, 1976, Sergeant

Tolliver and an unnamed man in a Hawaiian shirt (presumably Idema) discuss the real possibility that the special school for Green Berets at Fort Bragg may be disbanded. In an author narrative, some of the training of Green Berets is described, including "Goat Lab" where Green Berets must operate on and revive a goat that has been shot repeatedly. The two men discuss a meeting that is planned to discuss continuing operations outside of the official channels since the Army may disband the Green Beret unit. Both men agree to attend the clandestine meeting. *See id.* at 000051–000057.

The scene shifts to Special Forces Headquarters in Managua, Nicaragua on September 21, 1978. The man in the Hawaiian shirt arrives (he is a "HwaRang Do warrior"). He is met by several Special Forces soldiers who engage him in a mock battle, and then welcome him. The man in the Hawaiian shirt asks for a Michael Echanis, founder of the classified HwaRang Do warrior school he ran on Smoke Bomb Hill until it was disbanded. He was killed, however, and his body never found. *See id.* at 000057–000065.

The next scene takes place in Coral Gables, Florida on July 12, 1982, where an assassination is carried off by a sniper and his spotter. As they are packing up, they agree that they do not want to do this kind of work anymore. This particular hit took place on American soil, and it seems to be at the direction of some unnamed U.S. government agency. The shooter notes that he has kept copies of all his target folders for the last fourteen months in case he needs them as leverage to convince the

---

**33.** The draft has two chapters titled "Chapter One." To avoid any confusion, the Court also adopts and uses this typographical error.

agency to let him quit doing this work. *See id.* at 000065–000069.

In San Salvador, El Salvador, on February 12, 1983, at the U.S. Embassy, the man in the Hawaiian shirt arrives and asks to see Colonel Boyington of Mil–Group. The two men greet warmly. the Colonel assumes he is there to work for him, but the man in the Hawaiian shirt says he is just on vacation. He does ask to borrow several weapons. Boyington gives him the weapons, but directs his officers to track him. *See id.* at 000069–000073.

In Tegucigalpa, Honduras, on May 23, 1984, the man in the Hawaiian shirt checks into a Ramada hotel, orders some drinks, and goes to his room to assemble sniper weapons. The scene then shifts to Morazon Province in El Salvador, on March 15, 1985, and the man in the Hawaiian shirt arrives in the midst of a Special Forces war with the communists. Several more Special Forces men are also scheduled to arrive. Next, the scene shifts to Bangkok, Thailand, on November 20, 1985, where the man in the Hawaiian shirt meets General Alexander Haig and his aide on a flight to Bangkok. Upon arrival, Thailand customs officials discover the weapons in the man in the Hawaiian shirt's luggage. He responds by offering gifts and Special Forces gear to the officials, and they become friendly. They let him enter, armed. During these descriptions, the author interjects some narrative about how the U.S. government removed the Special Forces from Thailand for some time, but then renewed their involvement when Reagan was elected President, and also a discussion of twin brothers, Bob and Sam Colflesh, who were legends in Special Forces, who played what is described as an instrumental role in reestablishing official ties with the Thai Special Warfare Command. *See id.* at 000073–000085.

*Chapter Two:* In Moscow, Russia, in February, 1991, Colonel Vladimir Trozenko of Soviet military intelligence (the "GRU") leaves the Kremlin on the way to a meeting at KGB headquarters. This is followed by a narrative of the history of the KGB and its leader, Feliks Dzerzhinsky. At KGB headquarters, Trozenko meets with General Viktor Greshkov of the KGB. They discuss a joint KGB–GRU secret operation ("MUZURKA"). *See id.* at 000086–000090.

The scene shifts to Beirut, in March, 1991, where "world class terrorist" Amal Jaman enters a café and meets with a man whose name is not given. Jaman and his associate discuss that they will soon have the means to even the odds of their terrorist forces against the Jews in their homeland(s). Jaman informs his associate that their comrades in Moscow have given their blessing and money is coming from their "brothers" in Iran and Iraq. The OMON, a Soviet state-sponsored terrorist group, will also ensure their safe escort. Jaman tells the associate that his Russian contact will be Major Vladimir Bakayev. He also mentions that they will be "working with" a man named Selvi, who is some kind of advanced military weapons expert. *See id.* at 000091–00093.

In Langley, Virginia, at CIA headquarters, in April, 1991, a Middle East analyst named David Cole meets with his superior, a man named Sinclair, to discuss the recent activity and movement of Amal Jaman. Cole reports that Jaman has been traveling all over the Middle East and to Moscow and Vilnius, Lithuania. Cole requests a team to track Jaman's movements, but Sinclair is not interested and turns him away. *See id.* at 000094–000098.

Meanwhile, in Vilnius, Lithuania in May, 1991, we meet the commander of Lithuania's National Bureau Office of

Interpol, a Commissar Jouzas Rimkevicius. We are told that he created the office after Lithuania's break from Russia and independence in 1991. Rimkevicius meets with female Major Erika Trakemiente and discusses border skirmishes with the Russians (there is also a bit of commentary on Trakimiente's "sumptuous" body, and at the end of the meeting she is quite flirtatious with Rimkevicius). Rimkevicius suspects that Lithuanians involved with OMON may be behind the skirmishes; he gives Trakemiente all the files on OMON members operating in Lithuania. *See id.* at 000099–000102.

In June, 1991, a meeting at KGB headquarters in Moscow is held between Trozenko of the GRU and Greshkov of the KGB, along with others. They discuss officers selected to participate in the special operation they have planned. Greshkov says Bakayev, a GRU Major, has been transferred to KGB Alpha Group and will be in operational control. Bakayev reportedly has experience with the OMON in Vilnius, Lithuania, and with Middle East terrorists and the Russian mafia (the "Volstoi"). Greshkov says that a man named Boleslav Makutynovich, Commander of the Vilnius OMON, will also be part of the operation, but will be told they are only transporting rifles and rockets. Greshkov says that Metin Selvi will handle the logistics and the transfers, and will follow the shipment(s) to the final destination(s). Selvi believes this is a black market sale, and the Russian mafia's involvement will reinforce that belief; Selvi has solid mafia contacts. At the meeting, there is also a discussion of the rise of Russian mafia organizations in the crumbling Soviet Union, and the possibility of the KGB using the mafia for its own purposes. They agree it is now up to the KGB to stem the tide of Moslem fundamentalism and unrest within the Soviet Union. The goal of this operation is to turn all of Islam against the U.S., and to make Moslems loyal to the Soviet Union. The benefits will be both power and money. This will help preserve the Soviet Union from the threat of Moslem fundamentalism in the various Moslem republics, while also garnering needed currency. *See id.* at 000103–000112.

Back in Fort Bragg, North Carolina, on July 1, 1991, Idema goes into a bar, where he meets with a CIA agent who tells him that he is to go to Poland, Russia, and Lithuania (particularly Vilnius) for a potential operation. *See id.* at 000112–000118. Three days later, on July 4, 1991, in Vilnius, Lithuania, Major Bakayev (now the KGB Alpha Group leader) arrives at the OMON base outside of Vilnius. He is tracked by hidden OMON sniper guards who discuss their desire for some action. Bakayev meets with the man in charge and they discuss the upcoming operation. OMON is to provide security for weapons transport to Latvia (across the Russian–Lithuanian border). This is followed by a narrative on the history and purpose of OMON. *See id.* at 000118–000126.

*Chapter Three:* On August 6, 1987, in a "classified location" in northern Virginia, there is a discussion between two men named Darnel and Carter as to the various groups the CIA could use to conduct a covert operation. These include General Purpose Force ("GPF"), Delta Force, Intelligence Support Activity ("ISA"), and Foreign Operating Group ("FOG"). After their discussion, Carter telephones a man named Joe and asks for a team to conduct what he terms a "rescue" in the Caribbean. Instead of suggesting any of the discussed options, Joe suggests Idema. He is a civilian with a "perfect cover" and he is presently running a counter-terrorist

school. Though Carter objects that he is a "loose cannon," they apparently agree to use him. That same day, at "Counterr Group" in Red Hook, New York, a Colonel David Hines calls Idema at his training school and asks him to meet him at LaGuardia Airport in New York. At LaGuardia later that day, Joe and Command Sergeant Major Jake Rovenko meet with Idema. Joe wants Idema to go bring Prince Kaleiman Abadr Al–Duhameen, the crown prince of Kuwait, to the U.S. from the Bahamas. The Prince ran away from home with five or six hundred million dollars after attempting a coup. He is now involved with the PLO in an attempt to get even with his father. The Saudis and Kuwaitis both want the Prince. Everyone wants him dead, and the Prince knows it. Idema is to bring the Prince back to Washington, D.C., but the U.S. government has no involvement. Idema is given a contact in the Caribbean who owns a bar, an encrypted ring, and a briefcase with a photo of the Prince and other information. *See id.* at 000127–000149.

*Chapter Four:* On July 31, 1991, at the Medininkai Border Post on the Belorussian Border, Corporal Siarnas is on the job. He is happy that Lithuania has gained its independence, but he knows that the OMON is still a threat. The OMON makes terrorist attacks on border outposts at night and is under the control of the KGB, a narrative reports. At 1:00 a.m., a limousine arrives and Siarnas asks the Russian driver to exit the vehicle and open the trunk. He does not notice the weapon that the driver has in his jacket pocket. *See id.* at 000150–000155. At about the same time (1:15 a.m.), in the Belorussian Soviet Socialist Republic, 21 kilometers from the Lithuanian Border, Bakayev's operation force assembles. There is a narrative concerning who they are, their vehicles, and their armaments. Bakayev

instructs the men on the operation. They will attempt to get through the border without a search, but if the border guards attempt to search, an assault plan will be executed. The group is ready for what they deem to be an honorable mission in defense of the Soviet way of life (the purported "purpose" of OMON). Two operatives discuss that there is a large amount of firepower on this mission just to make sure that a shipment of rifles makes it to the underground Soviet forces; they are interrupted by Bakayev. The narrative then moves through the next three to four hours of the operation, and covers the OMON operatives' taking of positions around the border post, an initial inspection by the border guards which is followed by a decision to conduct a search of the convoy, and Bakayev giving the command to attack the border outpost. The border guards are outgunned. Corporal Siarnas is shot; five of the border guards are captured. Bakayev orders them killed, and they are shot in the back of the head. *See id.* at 000155–000201.

*Chapter Five:* Flashback to February 3, 1977, at headquarters of the U.S. Army Special Warfare Command in Fort Bragg, North Carolina. A message is received by a Special Forces General in which Idema and another man are ordered transferred to a special weapons assignment regarding "Possible Red Bull Threat." A team is to be deployed on March 15, 1977. *See id.* at 000202–000204. A Lt. Colonel Montel comes into the General's office and informs him of a gunfight between U.S. Special Forces and KGB agents the night before in Berlin, Germany. The U.S. forces apparently got the better of the firefight, and found documents on the dead KGB agents, radio messages, notes, and electronic equipment, but

"our boys haven't been in touch with anyone since." *Id.* at 000206. The General arranges to be flown to Germany immediately to get answers. *See id.* at 000202–000207. The scene then shifts to the headquarters of the Tenth Special Forces Group in Fort Devens, Massachusetts the next day, February 4, 1977, where six Green Berets discuss the beginning of a Special Weapons course it is rumored they will be taking. The course, according to Specialist Idema, will pertain to "SADMs," which are "mini backpack nukes, designed to be carried in by an SF . . ." *Id.* at 000209. They are met by a man named Fairchild, who informs the Green Berets that he is now their new boss (he is described as looking "like a nerd from Radio Shack," the obvious implication being this is the end of the Green Berets). In the briefing room, they are also met by another Special Forces operative named McCabe. There is no "ending" to this chapter, as it cuts off suddenly with the phrase "TO BE CONTINUED . . ." *See id.* at 000208–000211. This is the end of the novel, but not the end of Idema's text.

*Character List:* Following the text is a list of thirteen characters that have been or will be revealed in Red Bull Rising, each of which is given a one to two paragraph description. The characters described are: (1) Idema, the "cocky" and "arrogant" Green Beret/covert operative who "never plays by the rules," and is a "loose cannon" but who is expert "in every weapon known to man" and instructor in HwaRang Do, the "blackest of the martial arts" and is "imprisoned for a crime he did not commit" (*Id.* at 000212); (2) Commissar Rimkevicius, a "seasoned veteran" of the Soviet Militia who helped overthrow the Soviets and is "a new breed of policemen" in the Lithuanian state, and whose married status "does not prevent an af-

fair with his lovely female aide who is quickly promoted to Major" (*Id.*)—Rimkevicius became fast friends with Idema after a shooting match and they team to crack the nuclear smuggling ring; (3) Gary Scurka, an award-winning investigative journalist and Idema's conduit to the outside world (*see id.* at 000213); (4) Major Bakayev, Soviet GRU officer with a similar background to Idema's who leads Russian nuclear smuggling operations "in order to deliver backpack nukes to the Hezbollah and Hamas terrorists," but has conflicting loyalties between the KGB and GRU and his own pocketbook and who also "loves Marlboro cigarettes and Budweiser beer as much as he hates the west" (*Id.*); (5) Amal Jaman, who is tall, dark, and lanky, the "world's most obsessive terrorist," with eyes showing the "blackness of a lost soul," and the goal of destroying Manhattan and bringing the UN to its knees because a joint Israeli/UN bombing of the Bekaa Valley killed his entire family years before (*see id.*).

Also listed are: (6) Metin Selvi, a "slimy little creature," Turkish by birth, who is a nuclear weapons/materials smuggler, educated at Oxford, and is the middleman in the nuclear smuggling scheme between the Hezbollah, the KGB/GRU, and the Russian mafia, in alleged support of Moslem fundamentalism but really for love of money; (7) "Nick," a Soviet KGB Colonel, Idema's confidential source inside Russia's military command, who passes information to Idema through Nick's daughter; (8) Dawn Glosson, Idema's "soul mate" and girlfriend who is also thrown in prison by the FBI on trumped up wire fraud charges; (9) Joe Gray, a "hard as nails" DIA intelligence officer who tolerates Idema's "never play by the rules attitude, but only because Idema never fails

a mission" (*Id.* at 000215); (10) Erika Trakemiente, who looks "more like a fashion model than a Major in the Lithuanian Organized Crime Task Force," and is Rimkevicius' "playful and sexy mistress," but also a "cunning undercover operator" and "key player in unraveling" the nuclear smuggling plot (*Id.*); (11) David Cole, a CIA analyst whose "hobby" is tracking terrorists, and who constantly battles his bosses to alert them to threats (*see id.*); (12) Greg Weber, a former U.S. Army Ranger now in the Federal Bureau of Prisons who "sticks his neck out and bends the rules to help Idema survive the brutal confines of a ... federal prison" (*Id.*); and (13) William Zinnikas, an FBI agent given the task of "breaking" Idema and learning the names of his sources, who engages in a "cat and mouse game" with Idema "for years," but Idema never yields "in his promise to protect his friends and sources" (*Id.*).[34]

*Upcoming Chapters:* Also included in the Red Bull Rising text are brief outlines (one paragraph or less) of "upcoming" chapters planned by Idema (chapters "five" through twenty-seven). These include plans to describe Special Forces operations in Europe in the late 1970s and 1980s regarding SADMs, assassinations, and other covert operations; the crumbling Soviet Union in the early 1990s, Lithuanian independence, and U.S. Special Forces help in that

struggle; Idema's trips to Moscow in 1991 and 1992 (with a "car chase" between Idema and an OMON force assigned to protect nuclear shipments and KGB front companies smuggling them) and his meetings with the FBI, CIA, DIA and the Pentagon in 1992; a 1993 arrest of Idema on false charges and his "double cross" by the FBI; Idema's first and second trials; his success in arranging the smuggling into the U.S. of documents (from Selvi) evidencing nuclear smuggling by Russia; Idema being jailed in 1994, and the warnings that his government will crush him; Scurka bringing back documents from Europe to expose the story; and Idema's release from prison in time to turn the documents over to the Senate. At the very end is a glossary of terms.[35] *See id.* at 000217–000225.

## 2. The Allegedly Infringing Work(s)—The Peacemaker

Plaintiffs' copyright claims are based on alleged similarities, between their copyrighted works of fiction and/or fictionalized fact, and Defendants' film "The Peacemaker." *See, e.g.,* SAC ¶¶ 3–9. Their occasional references to the copyrighted final screenplay (the Final Shooting Script), and or earlier drafts thereof, notwithstanding, it is clear that Plaintiffs' First and Second Claims for Relief[36] assert that the final version of the film released in

---

**34.** Of the thirteen characters listed, three are mentioned only in the "upcoming" chapters of the Red Bull Rising text: "Nick," Weber, and Zinnikas. They did not enter the described "completed" chapters.

**35.** Among other things, somewhere in proposed chapters 21 to 27: "The Clinton Administration passes out Valium." *Id.* at 000221.

**36.** Under which Plaintiffs seek damages "in no event less than" a total of $75,000,000.00

for the First and Second Claims for Relief (of total damages of $230,000,000.00 sought under all Thirteen Claims for Relief), comprised of, *inter alia,* just compensation including income from selling the movie rights to Idema's Story and a percentage of the profits from "The Peacemaker" film, as well as a percentage of profits from the sale of the Cockburns' book *One Point Safe,* released at or about the same time as "The Peacemaker" film. *See* SAC ¶¶ 111–119.

1997 constitutes an unlawful infringement of the exclusive rights granted to them by the ownership of copyrights in the works comprising Idema's Story.[37] In what follows, therefore, the Court provides a full synopsis of the plot and characters of the film, as summarized from the Court's own viewing of the film (on the Peacemaker VHS provided by Defendants).[38]

**The Peacemaker**—The opening scene takes place inside a church; a baptism is being conducted in a language other than English (the later events in the movie suggest it is a Balkan language). One of the (older) men in attendance receives a call on his pager; he leaves the service to go into the hallway to retrieve his call, where he is met by an assassin, shot, and presumably killed.

The next scene takes place at a missile base in Russia (in the post-Cold War period)—Kartaly Missile Base in Chelyabinsk—where nuclear missile warheads are being loaded onto a train for purposes of transport to an unspecified site to be dismantled by the S.T.A.R.T. team(s) (presumably under disarmament treaties). The younger officer supervising the loading is visibly nervous; it is this younger officer who enters the security code to close the security doors on the warheads once they are loaded inside. A Russian General (Kodoroff) arrives, wishes the younger officer "Good luck" in a knowing tone, and the soldiers board the train.

The train is next shown traveling through the countryside of Russia, at night. In the interior, all of the soldiers in the troop car are asleep, except for the young officer depicted in the prior scene (who is still visibly nervous). A second train comes alongside, traveling in the same direction on a parallel set of tracks. Armed commandos wearing night-vision head gear are on the second train. They jump aboard the first train and murder all of the sleeping soldiers, sparing the young officer. The young officer enters the code to open the car holding the nuclear warhead, and the commandos make a bridge between the two moving trains to transfer all of the warheads except one onto the second train. General Kodoroff, who has by now appeared, orders the commandos to set a detonator on the remaining warhead left on the first train with a timer set for ten (10) minutes, and the timer is started as the commandos switch the track for the first train, sending it continuing onward (with its now-counting-down cargo) while the second train stops into a tunnel/cave. A shot of the passenger car of the ill-fated train is followed by an interchange between the young officer and General Kodoroff in which the officer expresses some regret/reservations about the plan, and General Kodoroff eventually shoots and kills him.

---

**37.** Plaintiffs' references to the Final Shooting Script and/or to earlier drafts of the screenplay appear to be focused on raising an inference of "actual" copying, or refuting the claim in the credits of "The Peacemaker" film that it was "based on" an article written by the Cockburns. *See* MSJ Opposition at 20–22, 36–41 (also relying on stray comments from the Department of Defense/Army as purported evidence the changes in the final film were a result of an effort to appease rather than an attempt to avoid infringement of Plaintiffs' works). These references do not alter the fact that Plaintiffs' claims are directed solely at the final product of "The Peacemaker" film. *See also* SAC ¶¶ 48–59, 61–63, 72–119 (all allegations focused on the final film).

**38.** As is true for all of the synopses provided herein, the Court prepared this summary description without the aid of the synopses that were provided by Defendants, to which the Court referred only after it had prepared its own outlines of the various plots and characters.

The original train soon collides with another train coming the other direction on the same track. As an older couple comes out of their home (a few minutes after the crash) to investigate the flames resulting from this original collision, they are met by a blinding nuclear blast from the detonation of the warhead in the original train, which fills the screen with bright light.

The next scene shows Dr. Julia Kelly (Nicole Kidman) being interrupted in her lap swim by a soldier summoning her on the basis of the emergency posed by the Russian nuclear detonation. Kelly is a nuclear physicist who is the acting Director of the White House Nuclear Smuggling Group. She arrives, with still-wet hair, at her White House office, where she and her staff compile information on the nuclear blast. When Kelly impresses upon the head of the National Security Council that this blast was "not an accident," but was likely a terrorist act, she is put in charge of investigating the nuclear detonation. She asks for a military contact/liaison with an "intel" background, Russian contacts, and who would not mind taking orders from a woman superior.

The next scene shows a congressional hearing at which Lt. Colonel Thomas Devoe (George Clooney) has been called to appear to explain his use of government funds to provide a gift of an SUV (a Ford Explorer) to a Russian Army Colonel named Dimitri Vertikoff. Devoe explains that the gift was for Vertikoff's 16–year old daughter. The hearing also reveals that Vertikoff had helped Devoe uncover and foil a plan to smuggle nerve gas out of Russia, to Iraq, by former agents/members of the Russian KGB. Devoe cavalierly calls his gift a form of "exporting goodwill."

Meanwhile, back in Russia, the second train, carrying the nine nuclear warheads, is moved out of the tunnel in which it had been hidden to escape the blast from the original train, and the warheads are unloaded and placed on a cargo truck under General Kodoroff's supervision. He is met by a civilian man of unclear origin (it turns out later that he is most likely Bosnian), who gives General Kodoroff a backpack full of American currency. As the film later reveals, this man is named Vlado Mirich. Vlado and Kodoroff argue about whether it was necessary to detonate the one warhead—Kodoroff argues it will provide cover for the theft of the remaining nine, and provide them with enough confusion to escape, under the cover of providing necessary medical aid and supplies. Kodoroff pulls a rope which causes the flaps covering the sides of the truck to come down, disguising it as a medical truck, and thereby completing the necessary cover story.

In the next scene, Kelly is briefing an assembled group (in a White House meeting room) on groups of terrorists who might be responsible for a nuclear detonation on Russian soil. Several times, however, Devoe (who walks in during the meeting and has not yet introduced himself) interrupts Kelly's presentation to point out the evidence indicating that this was not a terrorist act, but rather a hijacking/robbery designed to acquire warheads for sale on the open market. Devoe believes that the detonation was merely a "smokescreen" to hide the robbery, and Kelly ends the meeting by saying she will "consider" Devoe's theories.

Interspersed with footage showing the progress of the first aid truck holding the warheads through the Russian countryside, the film flashes to various vignettes inside the White House. In the first, Kelly returns to her offices in the White House, where Devoe introduces himself as her military liaison. They

engage in a bit of sparring about possible theories (and their backgrounds) until Kelly telephones a Russian official to ask for a passenger list for the train which had originally carried the warheads. In spite of the fact that Devoe warns Kelly not to expect reliable information from an official Russian source, the official list of passengers on the train does include General Kodoroff's name, a fact which Devoe finds quite suspicious because of his knowledge of Kodoroff as a money-hungry mercenary. Devoe's suspicions are further aroused when Kelly and Devoe, at the Pentagon National Military Command Center ("NMCC") receive information that calls are still being placed to General Kodoroff's long-time mistress in Helsinki, Finland (which would be impossible were he dead). To act on this information, Devoe calls his friend in the Russian Army, Vertikoff, to tell him of his suspicions. Vertikoff sends back a fax telling Devoe and Kelly to meet him in Vienna where he will arrange a meeting with Kordech (Russian trucking monopoly).

Kelly and Devoe are next seen on a private airplane on the way to Vienna, where they again spar about their respective roles and pasts, and their approaches to the problem before them. In particular, Kelly references Devoe's allegedly shady past and his allegedly money-based interactions with Vertikoff, while Devoe refers to Kelly's transition from making bombs at Livermore lab to trying to prevent their use for the White House, and makes a distinction between "theory" and good guys versus bad guys. He closes by saying he is not so frightened of a government which wants *several* nuclear weapons; he is more afraid of the single individual who only wants *one* (implying a terrorist action).

The backdrop next jumps to a partially destroyed area and/or suburb of Sarajevo, where a middle-aged man (Dusan Gavrich) is giving piano lessons to a young girl in his apartment. Dusan is interrupted by a phone call, which is from Vlado (the civilian traveling with Kodoroff), who is Dusan's brother. Vlado calls from the truck, and reports that the plan is now on schedule.

Back in Vienna, Vertikoff meets Kelly and Devoe (who gives him some CDs for Vertikoff's teen daughter) and Vertikoff tells them that he has arranged for them to meet with a representative of Kordech, a "front" business for Russian mafia/ex-KGB agents that operates as a trucking company. Vertikoff also explains that Kordech has now developed ties with the Russian military, via a generation of officers like Kodoroff who are greedy. As Vertikoff cannot himself investigate without alerting Kodoroff, he explains that he must rely on the U.S./Devoe to do so.

After a brief shot of Vlado and Kodoroff picking up a man with a large bag who was apparently waiting for them, and taking him into the back of the first aid truck to do something with the warheads located therein, the scene jumps back to Vienna, where Kelly and Devoe are meeting with the "scheduler" for Kordech. They pose as business people interested in scheduling deliveries inside of Russia, but as they are entering the meeting a security camera takes a picture of Devoe's face, which a security man on what appears to be a sophisticated computer system uses to begin to compare to a collection of similar faces in a database. In the meeting, Devoe and Kelly are not getting any of the answers they hoped to get from the "scheduler," and Devoe soon loses his temper, breaks the man's nose, and ties him up. He threatens to shoot him unless he gives them the password for his computer so they can get the truck-

ing schedules for the period during which the hijack took place. Armed with the password, Kelly prints out (and sends to her outside email account) the schedule for this pertinent period. Just as Kelly and Devoe race out of the office the security man matches Devoe's face with a computer photo of him in a U.S. military uniform, and alerts someone by telephone.

A chase ensues, as Kelly and Devoe are picked up in a car driven by Vertikoff. When they are initially cut off, Vertikoff goes out to negotiate, assuming that their pursuers can be bought off with sufficient currency. However, he is shot, and Kelly and Devoe (with Devoe driving) are forced to try to escape in a long car chase. The chase ends in a public square, wherein Devoe uses his car as a battering ram to disable the several other cars and kill their occupants. Devoe and Kelly narrowly escape as their own car explodes, and Devoe goes back to shoot the sole survivor.

Inside their Vienna hotel room, Devoe is distraught over the death of his friend Vertikoff: "You just don't kill a Dimitri Vertikoff." Kelly is upset at witnessing her first killing(s). They were forced to leave the printouts of the trucking schedule in their car when it exploded, but Kelly receives her email with this schedule attached, and Kelly and Devoe find an invoice that is clearly the (first aid) truck carrying the stolen warheads. They conclude that the truck is traveling through southern Russia toward a destination in Azerbaijan, just five miles from Iran. Devoe places a call to a military contact, to ask him to target the identified truck, and to ask if there are "any birds" that might later be used to stop the truck from going into Iran.

After a brief flash of the first aid truck in a long line of trucks attempting to travel a crowded road in southern Russia, the scene shifts to the Serbian Parliament in Bosnia, where it has just been reported that the man shot at the beginning of the film, the Finance Minister, has died from his wounds. One of the members of the Parliament approaches Dusan Gavrich, who is also in attendance, and says that although he knows that Dusan has always been reluctant to get involved in politics, Dusan is the alternate for the Finance Minister position, and "your people need you." Dusan looks to the gallery, where he meets the eyes of the very assassin who killed the original Finance Minister.

The next scene shows Dusan in his apartment videotaping a speech (which he intends to be found later), explaining that his actions are not the actions of a monster, but of a normal man, a man who is a Serb, a Croat, and a Muslim, and who blames the western powers for all the bloodshed that has taken place in the Balkans: the West drew the boundaries; the West supplied all the armaments; the West interfered. He clearly wants his revenge.

The first aid truck carrying the warheads is shown making its way through southern Russia, while the (apparently Indian or Pakistani) man recently picked up (Dr. Taraki) is in the back, apparently disassembling one of the warheads. He is observed and/or helped by Vlado. Meanwhile, at a Special Forces Command Center in Turkey, Kelly and Devoe are tracking the progress of the truck, and note that it is heading for the southern border in Dagestan, Azerbaijan, where it is caught in a long line of trucks (a traffic jam) because of renewed fighting between the Armenians and the Azerbaijanis, and the flow of refugees. Devoe and Kelly cannot tell which particular truck holds the weapons, because the trucks are too close together to get a satellite shot of their license plates. Devoe somehow gets a

direct connection to the cellular phone which General Kodoroff has with him in the truck, and tells him he is about to be blown up by a rocket. Kodoroff quickly pulls out of the line of trucks and onto another road, but the satellite pictures have now identified his truck and are able to follow it. The truck will soon be out of satellite range and although the U.S. government has not authorized Devoe to take action to intercept the truck (because the Russian government has said it will handle the situation), Devoe convinces Kelly to let him fly into NATO airspace (at the Russian border) and wait for authorization to intercept the truck. While this is going on, Dusan is shown playing the piano in his apartment, and then is shown sobbing at the grave of his wife and daughter.

Devoe takes off in one helicopter, and is accompanied by two others. Via his radio, he is told by Kelly to wait for Russian authorization to enter its airspace. Meanwhile, Kodoroff's truck approaches a checkpoint/roadblock in southern Russia. A Russian Sergeant tells Kodoroff that they have been ordered to search all vehicles, but Kodoroff intimidates the Sergeant into agreeing not to search the truck. However, just as the truck is about to get away, the border guard hears someone inside, and tells Kodoroff to step out of the truck. Kodoroff says yes, but then shoots the Sergeant and kills him. From inside the truck, the commandos shoot all of the roadblock soldiers, and the truck moves on.

Back at the U.S. base in Turkey, a U.S. satellite transmits a picture of the dead roadblock soldiers. The Russians have no other troops in the area. Kelly also sees a report on the news about the killing of the Bosnian Serb Finance Minister, who is scheduled to take part in peace talks in New York. She begins to try to deduce a reference to "44E" that she found in the Kordech scheduling invoices, and initially believes that it refers to the global position for Sarajevo. She orders additional research on the bank routing numbers. Meanwhile, Devoe tells Kelly that she must get him U.S. authorization to allow the three helicopters to intercept the truck and recover the warheads, even though it will require entering Russian airspace. Kelly calls the President's military and political advisors, who put her on the spot to make the decision. She tells them to authorize the attack; they do.

As soon as the three U.S. helicopters enter Russian airspace they are challenged by Russian Army personnel in a Russian Air Command center. The three helicopters are targeted for surface to air missiles, and during radio contact with the Russians Devoe and the helicopter pilot(s) try to convince the Russians to let them proceed, to no avail. The Russians launch their missiles, and one helicopter is destroyed, but the other two (including the one holding Devoe) fly out of range and continue the chase.

In the back of the truck, Taraki has succeeded in removing the nuclear "primary" from the warhead, and he puts it into a backpack. He tells Vlado that the primary can be activated by one man, and will render a nuclear yield of one-to-two kilotons, obliterating everything for a quarter mile. Just before the two helicopters intercept the truck, Vlado jumps out of the truck with the backpack and escapes, walking up into the mountains (he is later met by Dusan and the assassin, who have a small plane). The two helicopters attack the truck, and Devoe engages in hand-to-hand combat with Kodoroff after he is lowered into the truck. Eventually, Kodoroff and his men are killed, and the warheads are recovered, but there are

only eight of them. As Kelly reminds Devoe, that means that one is missing. Devoe discovers Taraki hanging from a power line dangling down from the bridge where the truck was attacked. In exchange for being rescued, Taraki tells Devoe about the man (Vlado) who escaped with the warhead primary.

From the routing number, Kelly deduces a reference to the Sarajevo suburb where Dusan and Vlado live. She notes a backpack primary could "take out 10 city blocks." Bosnian soldiers storm Vlado's apartment, and find the videotape left by Dusan. At the U.S. base in Turkey, Kelly and Devoe watch the Dusan videotape, and Kelly concludes Dusan is headed for the UN, in New York.

Dusan travels to New York as the Bosnian delegate to a peace treaty negotiation/signing at the United Nations building in New York (Manhattan). He puts the nuclear primary/backpack into a footlocker which is labeled "Diplomatic Papers." At the same time, Kelly and Devoe are also taking a plane back to New York. Kelly, with the authority of the President, calls for all of the airports in New York to be shut down/put on high security.

The rest of the movie takes place in New York City, in and around Manhattan. Devoe and Kelly oversee emergency measures to try to intercept and disarm the nuclear primary, which includes securing the airports, evacuating and searching any planes that land, and so forth. In a "war room" set up in New York, Kelly and Devoe meet with military and police commanders, one of whom shows Kelly and Devoe a map of New York showing that the "blast zone" of the backpack primary would have a three mile radius of primary and collateral damage. They discover that Vlado, who has a history of smuggling and black marketeering, is missing, and that

he was supposed to be on a plane landing at JFK airport. A chase through JFK ensues, but instead of finding Vlado at the gate, Kelly and Devoe find the assassin, who is captured. We see Vlado getting into a cab, escaping once again. A stray comment from a customs officer alerts Devoe that diplomatic delegations do not go through customs. After a flash of Dusan in his hotel room taking the nuclear primary/backpack out of the footlocker, and setting the detonation timer for forty minutes, Kelly and Devoe speak to a U.S. diplomatic representative who informs them that the person on the videotape is not Vlado, but Dusan, the new Finance Minister and diplomatic delegate since the assassination. Kelly and Devoe, accompanied by an FBI S.W.A.T. team, storm the hotel room registered to Dusan, but he has escaped down the fire escape and onto the streets of New York. He is walking with the backpack strapped to his back, and Devoe and Kelly quickly lose him in the swarming crowds of downtown mid-day Manhattan.

While he is walking, Dusan flashes back to a memory of his town in Bosnia, where his wife and daughter are killed by sniper fire. In the flashback, Dusan carries his daughter in his arms and begs what appear to be UN peacekeeping troops for help, to no avail. Sobbing, he begins to run with his daughter in his arms. The flashback ends with Dusan sobbing and running down the New York sidewalk, with his arms out as if holding his daughter. He gets into a cab, and heads for the United Nations building.

The area around the UN building is now in chaos as Devoe, Kelly, and numerous agents and police officers attempt to find Dusan. Roadblocks are put off, and police are accosting anyone

with a backpack (until Devoe tells them to clear out so that they do not alert Dusan that they know his plan). Snipers are set up on rooftops. One sniper gets a bead on Dusan, but refuses to shoot, despite orders from Devoe and Kelly to do so, because a little girl on her father's shoulders is in his line of fire.

Just as another sniper spots Dusan, two policemen come up behind him (while he is under a tree and obscured from the view of the sniper) and tell him to stop. They order him down to his knees, but just as it seems that he will be apprehended, out of nowhere Vlado appears, shoots the two policemen from behind, and grabs Dusan and runs away with him down the New York sidewalk.

Kelly (in an SUV) and Devoe (on foot) chase after them; at one point Kelly almost runs over Dusan as he runs out into the street and bangs into the front of her car. Eventually, Kelly and Devoe catch up to Dusan in an alley, but are caught between Dusan and Vlado at the two ends of the alley. Devoe manages to shoot Vlado (more than once), but Vlado and Dusan escape into a school. At some point during this chase, Dusan was also shot. Dusan leaves Vlado (who is dead) and tries to escape, and just then the school bell rings and schoolchildren rush screaming out into the halls at the sound of gunfire. Dusan gets away again, and Kelly and Devoe are trying to track him by the radiation from the nuclear device that he carries. Eventually, Kelly hears the sounds of a church choir, and somehow knows that Dusan will be in the church. Kelly and Devoe rush in, and meet the choir members rushing out because Dusan made them leave. At the altar of the church, Kelly and Devoe find Dusan lying on the floor, and when they ask him what he wants, he answers, sobbing, that "I want it to be like it was." Devoe shoots and kills

him, but he and Kelly see that the timer on the device has less then three minutes left before detonation. There is no time for a bomb squad, so Kelly has to defuse the bomb. She manages to knock off one panel of the non-nuclear detonator explosive, thereby lessening the blast enough, she hopes, to prevent the warhead from being triggered. With seconds to spare, Devoe and Kelly leap through the window of the church, just as the blast from the non-nuclear explosive in the detonator goes off, shattering the church and throwing them to the ground. Devoe and Kelly are hurt, but alive, and there was no nuclear explosion. Devoe embraces the sobbing Kelly.

The closing scene shows Kelly back in the pool, doing laps. As she reaches the same end where she was, at the beginning of the film, confronted by the shoes of the soldier who summoned her to deal with the crisis, this time another pair of shoes turn out to belong to Devoe, in full military uniform. He reveals that he received a new medal, and offers to buy her a beer. She says she has ten more laps to do. He says he will wait. In the final credits for "The Peacemaker," it says that it was "based on an article", by Leslie and Andrew Cockburn ("the Cockburns").

Though Plaintiffs point to minor differences between the final screen version of the film and the Final Shooting Script, and/or to differences between the Final Shooting Script and earlier drafts of the screenplay, they admit that the allegedly infringing product on which their claims are based is the film. *See* MSJ Opposition at 48. Accordingly, except as they may become relevant to its discussion of individual sections or events in the final film, the Court will not separately describe any differences between the various iterations

of the screenplay and the final product that has been described above.

### 3. The Alleged "Basis" for The Film—The Cockburns' Article(s)

Plaintiffs also refute the allegation in the credits of the film that it was "based on an article" by Leslie and Andrew Cockburn. To further support their claim that the film was *actually* based on their own works, rather than on these alleged sources, Plaintiffs provide copies of what are alleged to be the unpublished article written by the Cockburns, and also a film treatment they prepared. *See* Exhibit 16 ("Cockburns' Article"); [39] Exhibit 17 ("Cockburns' Film Treatment"). Though these pieces are only tangentially relevant, if at all, to the question of whether Defendants' film infringes *Plaintiffs'* works, in an abundance of caution the Court also briefly summarizes these works.

**Cockburns' Article**—The article largely consists of a narrative or series of narratives describing evidence of the availability of nuclear materials from Russian storehouses through various black market profiteers within and without Russian government. The article commences with a description of a meeting conducted with Viktor Mikhailov, "Czar of the Russian nuclear empire" as "all-powerful chief of MINATOM (Ministry of Atomic Energy) ..." Cockburns' Article (Exhibit 16) at 0069. Mikhailov is said to be largely responsible for a billion dollar deal to sell Russian nuclear reactors to Iran.[40] Mikhailov claims that the Russians are not responsible for Israel's development of nuclear bombs, nor for South Africa's, both of which were aided by westerners. He insists that building a reactor in Iran is no different than the U.S. building one in North Korea. *See id.* at 0070. In the course of the meeting, Mikhailov defends the Iranians' need for and right to "peaceful" nuclear power. However, the author(s) speculate that Russia is becoming a marketplace for nations to procure weapons-grade plutonium and bomb materials. *See id.*

The authors report that they have recently uncovered what appears to be evidence that the threat of theft of both nuclear materials and ready-made weapons is real, and that it may be the work of a huge and powerful Russian business organization which has documented ties to Russian government agencies, the mafia, and the old KGB, and which may have foreign buyers, including Saddam Hussein. *See id.* at 0071. Though Mikhailov denies this allegation, and insists that Russian stockpiles are safe from any criminal activity, sources cited by the authors (including Phil Petersen, the Defense Intelligence Agency's chief Soviet expert until 1991)[41] argue that there is a real possibility that these weapons are or soon will be available on the black market. *See id.* at 0072–0073. The Pentagon also is taking the threat quite seriously. *See id.* at 0074. Another (unnamed) source within the Wash-

---

**39.** This article, "Russian Nuclear Bazaar," was apparently written with the intent to have it published in *Vanity Fair,* to which both of the Cockburns are reportedly contributing editors, but was apparently never published there or elsewhere. Though it is not *clear* that this is the "article" referenced in the final credits of "The Peacemaker" film, it was apparently produced to Plaintiffs in discovery by named Defendant Random House, and Defendants have not refuted the claim by Plain-tiffs that this is the article upon which the film was "based." There is no similar reference to the film treatment made anywhere.

**40.** Though the year is not specified, it appears to be somewhere between 1992 and 1994 that this alleged meeting was arranged.

**41.** This is apparently the same Petersen named as a Defendant.

ington, D.C. area called "the most knowledgeable man ... on machinations among the upper tier of the Russian establishment" also believes the rumors about sales of nuclear technologies, in part just based on the large amounts of money to be had. *See id.* But, he says, the National Security Agency does not seem to want to acknowledge the scope of the problem. *See id.* at 0075. " 'But we're driving off a cliff. It's gonna happen.' ... 'If it's the Middle East, that'll be an attention getter. Or a nuclear backpack at the Lincoln Memorial. This is a lot more serious than the Cold War....' " *Id.* Despite "dire" warnings, these authors decided they had to investigate. *See id.* at 0076.

They went to Russia, to the distant city of Murmansk, on the far northern (Arctic) coast. *See id.* There, they met with a military investigator who looked into a reported case of theft of uranium rods from Military Unit 31326. This investigator (Kulik) impressed upon the authors just how easy the theft had been: "Ten to twelve minutes to saw off the lock. It's harder to steal potatoes." *Id.* at 0077. The thieves were only arrested months later, when someone informed on them; their asking price for the uranium fuel was $40,000.00. *See id.* at 0078. The investigator bemoans the state of the Russian military (the thieves were in the Russian navy), and the light sentence given them when they were convicted. Kulik believes the uranium was meant for mafia buyers, and was probably headed from them on to Iraq. *See id.*

The authors note that since the U.S. and Russia signed the S.T.A.R.T. treaties, both sides have been dismantling nuclear warheads. Back in Mikhailov's office, they are assured that the security for these dismantling operations is flawless. *See id.* at 0079. However, in a secret meeting with a nuclear physicist working for the Yeltsin government, the authors are told that he has seen how badly they guard the "secret of secrets, the pit of a plutonium bomb." *Id.* at 0080. He says that such bombs were made in three places: Chelyabinsk, Kranoyarsk, and Tomsk. This physicist says that before disarmament, pits from old bombs were used in new bombs. They are now dismantling so many warheads, however, that the "pits" are just being delivered to Chelyabinsk and Tomsk in staggering numbers, and are stored in insecure metal sheds with very little guard personnel or security. *See id.*

After their conversation with the physicist, in which he also pointed out additional security breaches possible at the storage sites for the "pits," the authors are convinced that it would not be difficult to steal one of these. *See id.* at 0081. Compounding this problem is that the U.S. is ironically actually *less* able to keep track of the Russian nuclear arsenal than it was during the height of the Cold War. *See id.* at 0082. Based on one of their contacts, the authors were able to arrange to meet with the commanders (Generals) of the Twelfth Department, the unit responsible for keeping the arsenal secure and in good working order. *See id.* These officials emphatically deny the possibility of theft, and emphasize the security of the nuclear arsenal in Russia. *See id.* at 0082–0083. Nonetheless, they also refer to the storage of the "pits" at Tomsk, at the site where the nuclear physicist claimed that theft would be so easy. *See id.* at 0083. With the underpayment of the soldiers charged with guarding Russia's arsenal, and the temptation of making money by selling or allowing theft thereof, the authors suggest that the protestations of security are doubtful. *See id.* at 0083–0085. They report

on several documented instances of small-scale theft or smuggling of nuclear materials. They then go to meet with a government official in Prague, where they are told that there is possible involvement by the infrastructure that used to be the KGB in nuclear theft and/or smuggling. *See id.* at 0085–0086. In the same meeting they are also told that it is unlikely that the mafia would be interested in nuclear smuggling. *See id.* at 0087. However, with the collapse of the Russian state, the authors are not sure if *any* authority is reliable. *See id.* at 0087–0089.

The authors refer to an incident wherein an Iraqi nuclear physicist contacted the London Sunday Times and faxed documents evidencing what he claimed was an extensive cache of supplies or materials being used by Saddam Hussein to build nuclear weapons. He soon disappeared. *See id.* at 0088–0089. Soon thereafter, the authors meet an (unnamed) senior Clinton administration official, who tells them that the U.S. is monitoring transactions between a KGB front company in Vienna and Saddam Hussein. The name of the front company is allegedly Nordex. *See id.* at 0089. When the authors mentioned this name to Jessica Stern, a "thermonuclear bomb designer on the National Security Council who chairs the interagency Nuclear Smuggling Group . . ." she told them that she could not talk about that topic. *See id.* Other sources and/or officials similarly "froze" when the name Nordex was mentioned. *See id.* at 0090. When the two authors go to Vienna to check on the company, Nordex appears to be a quite distinguished/refined corporate office with a polished receptionist accompanied by a "beefy colleague" at the

front desk. *See id.* When the authors happen to mention their investigation of the Russian mafia in Vienna to a western diplomat at a party, the diplomat responds: "Oh . . . you know about Nordex? They're heavily involved in organized crime. . . ." The diplomat goes on to say: "Vienna is where terrorists from the Middle East and Russia come together." *Id.* at 0091. The rest of the article describes the two authors' attempts to verify rumored connections between Nordex, organized crime, and nuclear smuggling (with repeated trips to the Nordex offices), which they are unable to do. *See id.* at 0092–0096.

**Cockburns' Film Treatment**—Dated March 29, 1995, the treatment begins by describing the Cockburns' recent investigation of a "post cold war nightmare . . . 'breakout,' a nuclear warhead from the former Soviet arsenal stolen by the Russian mafia turning up on the international market. . . ."[42] The pitch describes three "lead" characters envisioned by the Cockburns for the film.

The "[l]ead female" is a nuclear physicist "who works from a vault inside the White House" and is much like Amy McDowell.'@ockburns' Film Treatment (Exhibit 17) at 0097. This woman runs the Nuclear Smuggling Working Group, overseeing CIA, DOD, FBI, State, Customs, and DOE efforts to make sure nobody walks out of Russia with a bomb. She has seen an increased number of reported cases of nuclear material smuggling, and tries to get Russia to tighten up controls. But when Russian nuclear physicists are not getting their paychecks and the guards are starving, there is a lot of temptation. She is trying to get the U.S. to take the smug-

---

**42.** The treatment is addressed to a Walter Parkes, one of the two producers of "The Peacemaker," on Blackwater letterhead, but it is not clear whether it made its way to any of the other named Defendant(s).

gling threat seriously when, at the very beginning of the "film," the crisis falls in her lap when warheads from three cruise missiles are stolen off a train outside the closed nuclear city of Arzamas 16; "it will be her job to find out who stole them and why, and deploy forces to stop it." *Id.* at 0098.

The second proposed character, the "[l]ead male (and love interest)," is also a nuclear physicist, in charge of the "Lab to Lab" project, which is an attempt to keep channels open with the Russian nuclear establishment. He knows Russia well and will be called in by the female lead to help solve the mystery of how Russian security broke down, and to help her determine the final destination of the weapons. "It turns out the weapons are bound for the Serbs for their war in Bosnia, a fact that the second male lead is instrumental in uncovering." *Id.*

The third and final character, a "[s]econd male lead," is a former top ranking KGB General who is now in Washington, D.C. He is ruthless and brilliant, but is now "reduced to dreaming up cold war videogames ..." *Id.* He is brought out of retirement by the female lead to help infiltrate the criminal organization behind the nuclear theft. The organization was once a KGB front corporation "and has now taken on the dimensions of Ian Fleming's SPECTRE. Run by an old KGB colleague of the General's, it is staffed with some of the most brutal mafia men" in Russia, and is financed by smuggling and other criminal activities. The film treatment emphasizes that "[t]his organization exists." *Id.*

Finally, the film treatment briefly describes the proposed plot of the film, which is that the three leads unravel the case and discover a "cut out" company which represents the Serbs, but which has been "penetrated" by the CIA, *helping* the Serbs. *See id.* The theft is of three warheads being transported by rail for dismantlement, and the heist is an inside job. *See id.* at 0099. For help in stopping the disastrous scenario of having nuclear weapons fall into the hands of the Serbs, the three leads turn to a "Red Team" of nuclear Green Berets for "rougher stuff." *Id.*

### 4. Alleged Evidence of Access to/Copying of Plaintiffs' Works

The final "pieces" of evidence upon which Plaintiffs rely for their claims of alleged copyright infringement have to do with the Defendants' purported "access" to and/or direct copying from their copyrighted works. Defendants have conceded access, thereby making largely irrelevant some or all of this purported evidence. Indeed, Defendants have not bothered to refute some of the more controversial accusations made by Plaintiffs. Nonetheless, the Court just briefly describes the purported evidence upon which these Plaintiffs rely.

As to access, Plaintiff Idema asserts in his own declaration that in or around 1994 (at which time he was imprisoned) Plaintiff Morris, whom he had known for years, began writing "The Keith Idema Story," a project which Morris allegedly felt was perfect for a book or movie. *See* Idema Decl. ¶ 10. Sometime during late 1994, Morris (with Idema's comments) apparently finished final drafts of the Loose Cannon (film) treatment, as well as the unpublished version of the text that would become the two 1995 *Soldier of Fortune* articles. *See id.;* SAC ¶ 48. Idema asserts that he wrote a letter to Defendant Spielberg, dated December 6, 1994, which he mailed to him two days later. *See* Exhibit 15 ("12/06/94 Letter to Spielberg"). Idema asserts that attached to the letter were various letters from his supporters, a poster of his military career,

and copies of the Loose Cannon (film) treatment and the unpublished version of Morris' article(s). Plaintiffs also claim that the letter itself contained a significant portion of the "story" of Idema's Story, and that it was this letter which was itself a main motivator for Spielberg to make "The Peacemaker" the way that he did. *See, e.g.,* MSJ Opposition at 16 ("In one 8–page letter written by Idema, the defendants found the [story they needed for their film].").

Though Plaintiffs do not claim a copyright in the text of the letter itself, they place a heavy reliance on the ideas communicated to Spielberg thereby, as purported evidence of copying. Therefore, a brief synopsis of Idema's 1994 letter also seems to be in order:

> 12/06/94 **Letter to Spielberg**—The letter begins with Idema's claim that he is in prison for a crime that he did not commit, as a result of his refusal to cooperate with the FBI regarding his contacts and information inside the former Soviet Union and/or Lithuania. He claims to have uncovered the smuggling of nuclear weapons and materials to Iraq, Iran, and North Korea, by Russian military officers and the KGB. Idema asserts that the FBI has repeatedly offered to let him go if he will only cooperate, but he has refused to divulge his sources to protect their safety. *See* 12/06/94 Letter to Spielberg (Exhibit 15) at 0061–0062.

> Idema then goes on to "pitch" various ways to tell his story that would potentially be feasible for a two-hour movie format. He suggests that the first scene might be getting him released from prison in order to work with the government (he claims this is distinguishable from "Rambo" because it is based on a "true" story). He acknowledges that because nuclear weapons are still being actively smuggled, he has not yet come up with an "ending" for the story, but states that the Scurkas are actively pursuing leads, and suggests that they could also have some part to play in the story he is proposing to Spielberg. *See id.* at 0062–0063.

> Idema states that he is currently working on a novel to be called "Red Bull Rising," which basically follows Morris' story idea about a third world terrorist smuggling a backpack nuke into Manhattan to blow up the United Nations, but "my novel is more of an action thriller." *Id.* at 0063. Idema then gives an outline of the plot of Red Bull Rising which spans about four pages. He describes a plot by high-level KGB officers to detonate nuclear weapons in the Middle East in order to revive the Cold War, while at the same time smuggling SADMs to rogue nations in exchange for hard currency to use to fund covert operations. The KGB agents meet with Major Bakayev of the GRU, who agrees to smuggle nukes to Iran and Iraq. This is his third shipment, but at the border between Russia and Lithuania he and his Alpha Team are confronted by a border guard who wants to search his truck(s). In a bloody assault, Bakayev and his men wipe out the border post (Idema's theory of what happened in August, 1991). *See id.* at 0063–0064.

> Meanwhile, the outline continues, an American Green Beret in Lithuania working undercover for a secret unit while training the Lithuanian commandos becomes close friends with a Commissar in Lithuania's Organized Crime Task Force and commander of Interpol. The Commissar tells the Green Beret about the border killings, and the two of them begin chasing OMON terrorists and weapons being smuggled by the Lithuanian Communist underground, but then stumble on the nuclear smuggling plot. Having bonded with the Lithuani-

an commandos, the Green Beret decides to return to the U.S. to brief the Pentagon on what he has discovered (and, one presumes, to get interdiction help). *See id.* at 0064–0065.

However, when the Green Beret will not reveal his sources, the FBI "plays hardball" and sets him up for an arrest. When the Pentagon disavows all knowledge of his Lithuanian operation, the FBI jails him to try to force him to turn his operation over to the FBI and/or the CIA. He refuses, and the Green Beret finds himself in prison, completely on his own. The CIA is having no success in Eastern Europe, because the Green Beret's friends are loyal to him and do not trust any other Americans. Thus, just as the Green Beret is being threatened with 20 years in prison, the courtroom doors fly open and in walk high-ranking members of the U.S. government, who declare the fraudulent nature of the charges against him, and take him out of the courtroom to the airport. Because the Russians will not cooperate, and the Lithuanians are not willing to have Americans officially on their soil, the Green Beret is given a direct order from the President to go back in to meet the Commissar and catch smugglers. *See id.* at 0065–0066.

Meanwhile, Bakayev is transporting another shipment of nukes and one of them ends up in the hands of Amal Jaman, a "psycho terrorist" whose avowed "goal is to unite the Arab people in a Jihad against the west" and who is "obsessed with getting revenge because his family was killed in a UN attack on the Bekaa Valley, and to this end, Jaman heads to Manhattan where he intends to blow up the United Nations." *Id.* at 0066. However, the Green Beret and a team of hand-picked Special Forces operatives leave from Germany and chase the nukes, while coordinating with the Commissar and the Green Be-

ret's covert contact in the Kremlin, a man known only as "Nick" who passes classified information to the Green Beret by secure fax and satellite phone. Nick helps him uncover the proof to link the KGB officials to the smuggling of the nuclear weapons, but he is subsequently killed by a team of assassins employed by the KGB and/or Russian mafia. *See id.*

At the same time, a journalist (based on Gary Scurka) is following the story one step behind the Green Beret, who is tipping him off as events transpire, because the Green Beret also has an ulterior motive to expose the Clinton administration's alleged cover-up of the nuclear smuggling operation and related events. The Green Beret and his team kill the smugglers in a bloody shootout, and recover most of the nuclear weapons on the Iraqi border before they arrive at a terrorist training base in Iraq. The team learns, however, that Jaman has escaped with one nuclear device, which he is smuggling in a diplomatic pouch, and that he is on his way to JFK airport. The Green Beret rushes to a nearby airbase, commandeers an F–16 by threatening to shoot the pilot, overtakes Jaman's airliner and beats it to New York where he has called for back-up from a Special Forces team. The team kills the terrorists accompanying Jaman before they can detonate the nuke, but Jaman escapes with C–4 explosives strapped to his body, and threatens to blow up everyone. With the nuke recovered the White House orders the Green Beret to let Jaman go, "but this is personal." The Green Beret shoots a detonator out of Jaman's hand, and when Jaman raises his hands in surrender, shoots him between the eyes. The journalist arrives just in time to capture the final seconds of the gunfight on film. He gets the story of his life, but has to

fight a cover-up, gets fired, and publishes it as a Pulitzer Prize-winning book. *See id.* at 0066–0067.

Plaintiffs claim that following the alleged transmission of this letter to Spielberg in December, 1994, Defendants were also afforded access to the ideas comprising "Idema's Story" when Kathy Wolff (now identified as Kathy Wolff Scurka) heard in November, 1995 that one of her acquaintances had heard Spielberg mention an interest in doing a movie about nuclear smuggling. *See* Wolff Scurka Decl. ¶ 4. This was shortly after the October, 1995 airing of the "60 Minutes" story on possible smuggling of "dual use" nuclear materials out of Russia, on which the Scurkas had been given producer credit. *See id.* ¶ 3.

In response to this tip, Wolff Scurka says that she called the offices of Amblin Entertainment and asked to speak to the person who could get a letter and film treatment to Spielberg. Wolff Scurka says that she was transferred to a Christine Stewart, to whom she explained who she was and why she was calling (i.e., the story of Keith Idema). Wolff Scurka says that Stewart was very friendly, and even suggested that Wolff Scurka write Spielberg a letter, send it to Stewart, and that Stewart (who told Wolff Scurka she worked directly for Spielberg) would see that the attached letter got to him. *See id.* ¶ 5. Thus, on November 15, 1995, Wolff Scurka says that she completed a letter and story treatment for Spielberg, and sent it under the cover of a letter to Stewart (with a copy of the *US News & World Report* article which accompanied the "60 Minutes" piece enclosed). Wolff Scurka says she then mailed the packet to Stewart, but was never able to get her on the phone again, and was subsequently told by somebody else at the Amblin Entertainment offices that if there were any interest

in the story she had submitted, she would be contacted. *See id.* ¶ 6.

The letter allegedly submitted to Amblin in November, 1995 (under a cover letter addressed to Stewart) describes the following story:

**11/13/95 Letter to Amblin**—The story treatment in the "second" letter to Spielberg (with no address) signed by both Kathy Wolff and Gary Scurka is quite brief. Beginning by saying that "[w]e have heard you may be interested in making a movie about the smuggling of nuclear materials out of the former Soviet Union," the authors indicate that they have been working on that very topic since April, 1994, an effort which culminated in the "60 Minutes" report, and the *US News & World Report* article. *See* 11/13/95 Letter to Amblin (Exhibit 20) at 0186. "However, those stories were missing something . . . a heart and soul." *Id.* The Scurkas claimed to have found that "heart and soul" in the story of a friendship between a former U.S. Green Beret and a Commissar in the Lithuanian Criminal Police. Claiming that it all began in Lithuania in 1991, when the Green Beret befriended a Lithuanian official and began to train Lithuanian commandos, the letter says that this friendship led the Lithuanian official to share his intelligence information with the Green Beret, including evidence by 1993 that nuclear materials (i.e., beryllium plugs) were being smuggled out of the former Soviet Union. When the Green Beret tried to convey this information to U.S. officials, however, he encroached on the "turf" of the State Department, and when the FBI wanted him to divulge his sources and he refused, he was put in prison on trumped up wire fraud charges. *See id.* at 00186–00187. In April, 1994, the letter continues, this Green Beret reached out to Gary Scurka, who was at the time

an investigative producer for CBS News. For seven months, the senior producers at "Eye to Eye with Connie Chung" allowed him to work on the case, but ultimately they told him to drop it for lack of evidence. *See id.* at 00187. Eventually, Gary Scurka quit his job and the two of them (the Scurkas) began to work on the story together. Against all kinds of odds they uncovered a paper trail of the beryllium confiscated in 1993, proving that "Russian mobsters and politicians were involved in the smuggling of nuclear materials." However, "[i]n an effort to thwart us, a government source leaked word of our story to U.S. News and World Report," so the Scurkas decided to join forces with the magazine, to lend credibility to the evidence and convince CBS to run the story. *Id.* The result was allegedly the October, 1995 "60 Minutes" story and the *US News & World Report* story run at the same time. *See id.* The letter ends by saying that the Green Beret says there is much more, including the smuggling of small atomic devices (SADMs). "Though we were never able to confirm this for publication, we believe that [SADMs] may have been smuggled out ..." *Id.* In closing, the letter says that the Scurkas would be very happy to talk to Spielberg or with anyone else at Amblin. *See id.*

In addition to these alleged instances of "access" by Defendants to the concepts and ideas (if not to all of the texts) of Plaintiffs' copyrighted works, Plaintiffs also claim to have evidence of "actual" copying in the production of "The Peacemaker" film. They argue this evidence is unrefuted by any Defendant. *See* MSJ Opposition at 20–24.

For instance, Plaintiff Idema claims in his declaration that in a conversation he had with Defendant Petersen during the fall of 2000, "Petersen admitted to me that Spielberg, the Cockburns and Stern had copied my story for The Peacemaker." Idema Decl. ¶ 15. As Plaintiffs point out, there is no declaration from Petersen denying that this conversation took place. However, as Defendants point out in their objections filed with the Reply, this hearsay statement is clearly inadmissible as to Petersen's co-Defendants, and there is no hearsay exception that would make it admissible evidence. Furthermore, even if admissible, this "admission" does not constitute proof of "actual" copying, as Plaintiffs claim, but is essentially only further proof of Defendants' *access.* *See id.* ("Petersen admitted to me his involvement in the copying of my story, and admitted that his co-defendants had used my information and materials, to make The Peacemaker film.").[43]

Nonetheless, it is perhaps a bit odd that there is no statement from Petersen denying this alleged "admission." Also curious is the fact that there is no declaration of any sort from the screenwriter for "The Peacemaker," Michael Schiffer, attesting to the source(s) of its creation, and/or refuting Idema's claim that Schiffer told him it was not an "independent creation," but was the result of "a defined set of parameters" given to him to create the movie (presumably by the production team at Dreamworks). *See* Idema Decl. ¶ 16. Idema claims that Schiffer told him he got the idea for a backpack nuclear device from the Cockburns' article(s), and based the Devoe character on an amalgam of various "covert ops" guys he had known. *See id.* ¶¶ 17–18.

It must be remembered, however, that Defendants have conceded the factual

---

**43.** In other words, an admission that Defendants might have "used" Plaintiffs' works to create the movie constitutes proof of unlawful copying only if there is *also* misappropriation of protected expression therefrom (i.e., "substantial similarity" to protected expression).

predicate that they had "access" to Plaintiffs' works prior to or during the development and creation of "The Peacemaker." Thus, in spite of Plaintiffs' efforts to raise suspicion at the "sphinx-like silence" of the various named Defendants on the present Motion, the Court draws no particular inference on the basis thereof. As framed by the Defendants, the sole question presented by the present motion is whether "The Peacemaker" copied protected expression from any or all of Plaintiffs' works. As noted below, "independent creation" is a defense which is invoked only *after* a prima facie case of unlawful copying is made. Therefore, it is not surprising that Defendants have proffered no testimonial evidence as to the creation of the film.[44]

### B. Factual Allegations Supporting Plaintiffs' Remaining Claims

The SAC contains numerous allegations tracking and supplementing the version of events suggested by the evidence offered in support of the copyright claims. These allegations essentially claim that the "60 Minutes" and *US News & World Report* stories about smuggling of nuclear materials by the KGB and Russian officials with ties to the Russian mafia which ran in October, 1995 were based on *information* provided to the Scurkas by Plaintiff Idema, although his name and his biographical information were "excised" from the stories. Plaintiffs also allegedly thought this story "ripe" for a movie. *See* SAC ¶ 4.

To that end, Plaintiffs claim that in 1994, they began writing film treatments, book proposals, and non-fiction accounts of Ide-

ma's Story. *See id.* These include the copyrighted works at issue in this case. *See* SAC ¶ 14. In 1992 or 1993, Idema had been convicted of wire fraud, and sent to federal prison.[45] With the help of Moore and the Scurkas, Idema began writing *Red Bull Rising* while in prison, and Morris and the Scurkas began working on their own writings. *See* SAC ¶¶ 43–47. In 1994 and then in 1995, Idema and the Scurkas allegedly sent the two letters described above to Spielberg. *See* SAC ¶¶ 49–59.

The SAC also contains several allegations ostensibly related to the copyright claims, but which are not supported by any admissible evidence. For instance, the SAC (but not Idema's own declaration) claims that Idema also sent Spielberg a second letter and packet, in May, 1995, with copies of at least The Vilnius Brief, the first few pages of Red Bull Rising, the now-published articles from *Soldier of Fortune* (by Morris), and color photographs of Idema in military gear. *See* SAC ¶ 52. The SAC also implies that Defendant Petersen played a central role in transmission and dissemination of Idema's Story to the other Defendants. Allegedly, in January, 1995, the Scurkas retained Petersen as a consultant, and Petersen agreed to keep confidential the elements of Idema's Story and the secret Russian documents that he had managed to smuggle out of Russia (Idema's Story and these documents were allegedly faxed to Petersen on February 1, 1995). *See* SAC ¶ 50. However, Plaintiffs claim, Petersen was actually covertly working

---

**44.** The Court is even willing to assume, based on Defendants' lack of refutation of Plaintiffs' allegations thereon, that Defendants made "use" of Plaintiffs' works as source materials during the development of "The Peacemaker," and that some or all of these works may even have been in a "source packet" allegedly given to Schiffer. The question remains

whether Defendants copied Plaintiffs' *protected expression*.

**45.** According to the SAC, he was released in 1997, "just weeks" before "The Peacemaker" was released, and also allegedly just before the Cockburns' book *One Point Safe*, was published. *See* SAC ¶¶ 38–42.

for several of the other Defendants, in breach of his contract. *See id.*

Among other things, Petersen is alleged to have handed over the secret Russian documents received (by fax) from the Scurkas to Jessica Stern, at the White House,[46] in 1995, who then allegedly gave or sold these documents to her Georgetown neighbors, the Cockburns, who in turn sold them to Spielberg. *See* SAC ¶ 51. Spielberg is alleged to have eventually paid both the Cockburns and Stern for their assistance in these illegal acts, though Plaintiffs did not discover this alleged payment (and/or wrongful transmission(s)) until late 2000. *See id.* Petersen also allegedly feigned interest in Idema's Story, claiming he was willing to help sell the idea as a book and/or film, all the while transmitting any information he gleaned from the Scurkas to Stern, for it to be used in creation of "The Peacemaker." *See* SAC ¶ 53.

The remaining factual allegations, though tangentially related to the copyright claims, are primarily offered in support of Plaintiffs' state law claims. For instance, in support of the Third Claim for Relief (for Breach of Confidence), Plaintiffs claim that the 1994 and 1995 submissions to Spielberg and/or Amblin by Plaintiff Idema were of "confidential" documents, as indicated by the envelopes in which they were mailed, marked "Confidential" or "Personal and Confidential," and by the 12/06/94 Letter to Spielberg (cover letter), which is marked "CONFIDENTIAL" at the top. *See* SAC ¶¶ 121–122. Plaintiffs further allege that Kathy Wolff Scurka told (Stewart) that the docu-

ments she was submitting in November, 1995 were confidential. *See* SAC ¶ 123.

In further support of this Breach of Confidence claim, Plaintiffs also point to Defendant Petersen's alleged conduct in passing to his co-Defendants the various documents and ideas he received under his agreement of confidentiality with the Scurkas. Plaintiffs claim these documents contained proprietary materials such as "treatments, story outlines, unpublished articles, and secret documents outlining nuclear smuggling and discussing plaintiffs' novel idea to use ... Idema's experiences to produce a fictional movie ..." SAC ¶ 127. Referring back to the 1994 and 1995 submissions to Spielberg/Amblin, Plaintiffs also claim that Defendants had opportunity to reject the confidential documents sent by Plaintiffs, and "clearly understood the confidential nature of these materials in advance" (because of the markings on the envelopes), yet never returned these materials. *See* SAC ¶ 128.

In support of their Fraud and Negligent Misrepresentation claims (the Fourth and Fifth Claims for Relief), Plaintiffs point to the book *One Point Safe*, written by the Cockburns and published by Random House in 1997, at or around the same time "The Peacemaker" was released, and especially to the "gold foil" medallion on the cover of the book: "The true story that inspired The Peacemaker, a major motion picture from DreamWorks Pictures."[47] SAC ¶ 105. Plaintiffs claim that Defendants falsely misrepresented that the source of "The Peacemaker" was *One Point Safe* and/or the Cockburns' unpub-

---

**46.** According to the SAC, Defendant Stern is a former White House employee who was in the National Security Counsel's Nuclear Smuggling Group, who served as a paid consultant on "The Peacemaker." *See* SAC ¶ 23. Defendant Petersen is alleged to be a former Defense Intelligence Agency ("DIA") analyst hired by the Scurkas to act as a consultant on

Idema's Story, who secretly worked for Defendants. *See* SAC ¶ 25.

**47.** Neither side describes/provides a copy of *One Point Safe*. It is worth noting that Plaintiffs concede that *One Point Safe* "bears no resemblance to ... Idema's Story." SAC ¶ 107.

lished article (from which *One Point Safe* is apparently an extrapolation), and repeated these false statements during promotion, in order to conceal the "truth" that the film was actually derived from Plaintiffs' works. *See* SAC ¶¶ 132–142.

Plaintiffs' Sixth Claim for Relief (for Breach of Contract) is asserted only against Defendant Petersen, and is based on an alleged contract between the Scurkas and Defendant Petersen, under which he allegedly understood that Idema's Story could be used only if he/they were paid reasonable value, and also knew that the Plaintiffs already had prepared book and movie proposals. *See* SAC ¶ 148. Plaintiffs claim, however, that Petersen breached his agreement to keep all of the information shared with him by the Scurkas confidential and/or not to release Idema's secret Russian documents to anyone without consent from the Scurkas, when he turned over proprietary information to Stern (and apparently also to Channel One television). *See* SAC ¶ 149.

Plaintiffs' common law Invasion of Privacy claim (the Seventh Claim for Relief) is based on the alleged theft of Idema's personality and rights to his story for the character of Thomas Devoe in the film "The Peacemaker." Defendants "knowingly misappropriated" Plaintiff Idema's "likeness and persona without his consent ..." SAC ¶ 156. Their Conversion claim (the Eighth Claim for Relief) asserts that the Defendants knowingly and intentionally converted the property of the Plaintiffs for their own use and profit, consisting of the "tangible property" of the secret Russian documents that belonged to Idema and the Scurkas. *See* SAC ¶¶ 162–163.

For the Ninth and Tenth Claims for Relief (for Intentional and Negligent Interference with Prospective Economic Advantage), Plaintiffs allege that Defendants, by stealing Idema's Story, "among other breaches ... wrongfully interfered with the prospective business relationship between plaintiffs" and various companies with whom Plaintiffs had "come close to closing deals" or had "prospective business relationships." SAC ¶¶ 170–171. Plaintiffs claim they were owed a duty of care by Defendants. *See* SAC ¶ 174.

As to the Eleventh Claim for Relief (for Civil Conspiracy), the SAC alleges that Defendants engaged in a conspiracy, the object(s) of which included hiding their liability to Plaintiffs, concealing the true source of "The Peacemaker," and converting Plaintiffs' property. *See* SAC ¶¶ 178–179. This knowing conspiracy was allegedly furthered in September or October, 2000, when Spielberg, somebody at DreamWorks, or their agents, interfered with the employment of Kathy Scurka. *See* SAC ¶ 180.[48] Among the acts allegedly committed in furtherance of the conspiracy is also Petersen's transfer of the secret Russian documents and story outline given to him by the Scurkas to Stern, "then a White House appointee on the Nuclear Smuggling Group." SAC ¶ 182. The SAC claims that Petersen handed these documents to Stern in her "official" capacity and at her White House office. *See id.* Based on her later alleged transmission of these documents to the Cockburns, and/or the alleged payments by Spielberg to the Cockburns and Stern for receipt of same, Plaintiffs claim that the conspiracy includ-

---

**48.** According to her declaration, Kathy Scurka's employment with 20th Century Fox was abruptly terminated October 4, 2000, "just nine days after our lawsuit against DreamWorks was filed." Wolff Scurka Decl. ¶ 7. She claims that she had thought her job was safe, because she believed DreamWorks and 20th Century Fox were competitors, but she claims to have since learned that the two entities have entered into a multi-million dollar joint enterprise on projects including "Minority Report" (a feature film starring Tom Cruise). *See id.*

ed violations of several federal criminal statutes, such as bribery of public officials and witnesses (18 U.S.C. § 201), unauthorized removal and retention of classified documents or material (18 U.S.C. § 1924), and many others. *See* SAC ¶ 182. These were alleged "objects" of the conspiracy. On these bases, Plaintiffs seek civil damages for alleged conspiracy.

Finally, in support of their claims of Unfair and Deceptive Trade Practices, and Violation of the Trade Secrets Act (the Twelfth and Thirteenth Claims for Relief), under North Carolina law, Plaintiffs assert that Defendants have made (unspecified) false, fraudulent and unfair representations (presumably the allegedly false claims as to the derivation of "The Peacemaker" film), and that this conduct has injured Plaintiffs by wrongfully obtaining and profiting from property not protected by copyright in violation of the Trade Secrets Act. *See* SAC ¶¶ 190, 193. This is the conclusion of the SAC allegations.

## IV. DISCUSSION

The Court may only consider the evidence discussed in Part III.A, above, with reference to Defendants' Summary Judgment Motion (and must construe the evidence in the light most favorable to Plaintiffs). The Court must limit its analysis for purposes of the Motion to Dismiss to the allegations described in Part III.B, above (and must construe the allegations in Plaintiffs' favor, and also assume their truth). In what follows, therefore, the Court conducts two different analyses: (A) of Plaintiffs' copyright claims (the First and Second Claims for Relief), as addressed in the Summary Judgment Motion and Plaintiffs' opposing papers; and (B) of the remaining state law claims (the Third through Thirteenth Claims for Relief), as addressed in the Motion to Dismiss and Plaintiffs' opposing papers thereto. The Court addresses the Summary Judgment Motion first due to the centrality of Plain-

tiffs' copyright claims, both to the case, and to the Motion to Dismiss. As will be made clear below, the Court hereby GRANTS the Summary Judgment Motion, and GRANTS IN PART AND DENIES IN PART the Motion to Dismiss.

### A. The Summary Judgment Motion as to Plaintiffs' Copyright Claims

Defendants' Summary Judgment Motion asks this Court to determine that Defendants are entitled to judgment as a matter of law on the First and Second Claims for Relief (for direct and for contributory copyright infringement) because, even assuming that Defendants had access to Plaintiffs' copyrighted works, the film "The Peacemaker" is simply not similar enough to Plaintiffs' works to raise any possible or reasonable inference of unlawful copying of protected expression. In other words, Defendants argue that no reasonable fact-finder could find "substantial similarity" between the protected expression in the Plaintiffs' copyrighted works (Idema's Story) and "The Peacemaker." *See, e.g.,* Summary Judgment Motion at 18. Defendants also argue that inasmuch as Plaintiffs' claim for direct copyright infringement fails, so too must their claim for contributory infringement. *See id.* at 15. The Court agrees with Defendants on both points, and on both claims.

### 1. The Standard(s) Applicable to the Summary Judgment Motion

█ As this Court has recently discussed at some length, in *Rice v. Fox Broadcasting Company,* 148 F.Supp.2d 1029, 1048–1054 (C.D.Cal.2001), a plaintiff asserting infringement of copyright must prove two things: (1) ownership of a valid copyright; and (2) infringement-that a defendant copied *protected* elements of the plaintiff's work. *See Three Boys Music*

*Corp. v. Bolton,* 212 F.3d 477, 481 (9th Cir.2000). "Absent direct evidence of copying, proof of infringement involves fact-based showings that the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar.'" *Id.* The first of the above-described elements (ownership of valid copyright) has been assumed for the purposes of this Summary Judgment Motion.

■ The second requires proof that Defendants had "access" to those works copyrighted by Plaintiffs, and that their allegedly infringing work, "The Peacemaker," is "substantially similar" to one or more of Plaintiffs' copyrighted works.[49] Sufficient "access" to a copyrighted work to make it reasonably plausible that the allegedly infringing work is copied therefrom is defined as having "an opportunity to view or to copy [a] plaintiff's work." *Sid and Marty Krofft Television Productions, Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1172 (9th Cir.1977). The level of access must be a "reasonable" amount, defined as

"more than a bare possibility." *Three Boys Music,* 212 F.3d at 482.

"Access" is most often proven by way of circumstantial evidence (because admissions or direct evidence thereof are rare), in one of two ways: "(1) a particular chain of events is established between the plaintiff's work and the defendant's access to that work ...; or (2) the plaintiff's work has been widely disseminated." *Id.* As with the validity of Plaintiffs' copyrights, "access" is also assumed for the purposes of the present motion, as Defendants have assumed (as is not uncommon in claims of copyright infringement) that they had sufficient access to Plaintiffs' works to satisfy the first element of the test. *See, e.g.,* Summary Judgment Motion at 15 (assuming "access").

Not satisfied with this concession, however, Plaintiffs argue that the evidence of access in this case is sufficient to invoke the "inverse ratio rule," a rule which holds that a lower standard for "substantial similarity" may be applied when a

---

**49.** Plaintiffs make indeterminate references to "actual" copying of Plaintiffs' works, which might suggest they are claiming the Court need not resort to "indirect" proof per the "access" and "substantial similarity" test, but may instead rely on "direct evidence of copying" so rarely available in infringement cases. *See, e.g.,* MSJ Opposition at 14 (quoting *M. Kramer Mfg. Co., Inc. v. Andrews,* 783 F.2d 421 (4th Cir.1986) ("actual copying" case)), 20–24. But Plaintiffs themselves *argue* for denial of Defendants' motion under this access/substantial similarity rubric, and do not directly argue for the application of a different analysis. *See* MSJ Opposition at 5–14, 16, 24–50. Rather, it appears that Plaintiffs argue that their alleged proof of "actual" copying should lower the threshold to show "substantial similarity." *See* MSJ Opposition at 6 n. 4. Their purported "evidence" of "actual" copying, however, is in fact no such thing, as none of it constitutes "direct evidence of copying" by Defendants. Plaintiffs, for instance, cite Petersen's alleged "admission" that he and/or his co-Defendants copied Ide-

ma's life story, and/or "used" Plaintiffs' materials in the creation of "The Peacemaker." Notwithstanding that this statement is wholly inadmissible as to any of the Defendants responsible for the actual creation and development of the film, all that this statement would really establish is that the Defendants had *access* to, and made *use* of, Plaintiffs' materials (i.e., Petersen does not attest to have performed or seen performed any "actual" physical copying, and what he really seems to be saying is that "The Peacemaker" may have been *based* on Plaintiffs' materials—this is simply more "indirect" evidence). Similarly "indirect" are Schiffer's alleged "admissions" that he did not come up with the idea(s) for "The Peacemaker" wholly on his own, alleged *dissimilarities* argued by Plaintiffs between "The Peacemaker" and the Cockburns' article(s), and alleged "late deletions" from prior versions of the screenplay for "The Peacemaker" of scenes Plaintiffs claim were also similar to Idema's Story (none of which are nearly as "similar" as Plaintiffs claim they are). *See* MSJ Opposition at 20–24.

"high degree of access is shown." MSJ Opposition at 6 (quoting *Smith,* 84 F.3d at 1218); *see Three Boys Music,* 212 F.3d at 485; *Shaw v. Lindheim,* 919 F.2d 1353, 1361–62; *Rice,* 148 F.Supp.2d at 1050. The Court does not agree, as Plaintiffs have not adduced evidence of access that is more, or more compelling, than that which is offered in the usual copyright case. Indeed, the *general* unavailability of Plaintiffs' works, especially those which were unpublished, other than by way of their alleged 1994 and 1995 submission(s) to Defendant Spielberg and/or non-party Amblin Entertainment makes "access" to Plaintiffs' copyrighted works somewhat *less* than might be available in a large number of cases. The Court, and Defendants, have *assumed* that Plaintiffs' 1994–95 submissions (the only form of "access" of which actual *proof* was offered) reached the Defendants prior to creation of "The Peacemaker." But that concession on Defendants' part does not alone lower the standard for similarity.

 Accordingly, with the "access" element of the test proved, the Court will confine its analysis of the facts to those which prove or disprove "substantial similarity" between Plaintiffs' works and "The Peacemaker" film. This part of the test measures whether there is a sufficient level of "similarity" between the copyrightable "elements" of a plaintiff's work, and the equivalent "elements" in an allegedly infringing work. Copyright infringement is a measure of the extent to which an allegedly infringing work evidences "copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Thus, "[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected. Originality remains the *sine qua non of* copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author." *Id.* at 348, 111 S.Ct. 1282. And "[n]ot all copying . . . is copyright infringement." *Id.* at 361, 111 S.Ct. 1282.

 It is only "protected *expression*" which is relevant for purposes of assessing "substantial similarity." *See Shaw,* 919 F.2d at 1361. Under the federal Copyright Act, a plaintiff may claim no protection for his or her *ideas* which animate a work which is within the subject matter of copyright, as it is only the *expression* of those ideas over which a monopoly is granted. Therefore, " '[s]ubstantial similarity' refers to similarity of expression, not merely similarity of ideas or concepts." *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1398 (9th Cir.1997) (citing 17 U.S.C. § 102(b)).[50]

 "[T]he party claiming infringement may place '*no* reliance upon any similarity in expression resulting from unprotectable elements.' " *Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1443 (9th Cir.1994) (quoting, and adding emphasis to, *Aliotti v. R. Dakin & Co.,* 831 F.2d 898, 901 (9th Cir.1987)). "[T]he unprotectable elements have to be identified, or filtered, before the works can be considered as a whole." *Id.* Among the "unprotectable elements" which the court must "filter" out of its comparison of a copyrighted work

---

**50.** As Defendants point out, this idea versus expression limit on the scope of monopoly granted by a copyright is of constitutional, not just statutory, dimension. *See* MSJ Reply at 7. Some balance must be struck between the limited monopoly over a particular "expression" of an idea granted to the holder of a copyright by the Copyright Act and by Article I, Section 8 of the U.S. Constitution, versus the right to freely express ideas given by the First Amendment thereto. *See Harper & Row, Publishers v. Nation Enterprises,* 471 U.S. 539, 556, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

and an allegedly infringing work are: "ideas," as distinguished from the "expression" of those ideas;[51] facts, historical events, or other information over which no individual is entitled to claim a monopoly (though original compilations or arrangements of facts may be protectable);[52] elements borrowed from another author or from the "public domain";[53] instances in which a particular "expression" at issue "merges" with the "idea" being expressed;[54] and/or a similar instance in which the form of the "expression" is so "standard" in the treatment of a given "idea" that it constitutes a *scenes a faire*, or a "scene which must be done."[55] *See Rice*, 148 F.Supp.2d at 1052–53 (discussing these limitations).

■ This "filtration" process is accomplished under the first part of the two-part analysis established by the Ninth Circuit to determine or assess "substantial similarity" of an allegedly infringing work: the "extrinsic," or "objective" test. The "extrinsic" test "objectively considers whether there are substantial similarities in *both* ideas and expression." *Apple Computer*, 35 F.3d at 1442 (emphasis in original); *see Smart Inventions, Inc. v. Allied Communications Corp.*, 94 F.Supp.2d 1060, 1065 (C.D.Cal.2000). This is then followed by the second step of this analysis: the "intrinsic," or "subjective"

test, which measures substantial similarity in the "total feel and concept of the works." *Data East*, 862 F.2d at 208.[56] However, only the "extrinsic" test is generally employed at summary judgment, as the "intrinsic" test should generally be reserved for the ultimate finder of fact. *See Three Boys Music*, 212 F.3d at 485; *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir.1994). Moreover, only the "extrinsic" test is necessary to a decision on summary judgment.[57]

■ Under the "extrinsic" test, generally a court will perform what is called "analytic dissection," which is a process wherein each of the "constituent elements" of the copyrighted work(s) are isolated, to the exclusion of other elements, combinations of elements, or types of expression therein. *See Dr. Seuss Enterprises*, 109 F.3d at 1398 n. 3.

In other words, "analytic dissection" requires breaking each work covered by copyright down into its constituent elements, and comparing only those "elements" for proof of copying as measured by "substantial similarity." It is the copyright plaintiff's burden to identify the "elements" for the purposes of this comparison. *See Three Boys Music*, 212 F.3d at 485. Though the "elements" to be compared may vary based on the type(s) of

51. *See, e.g.*, 17 U.S.C. § 102(b); *Rice*, 148 F.Supp.2d at 1052; *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 207 (9th Cir.1988).

52. *See, e.g., Feist*, 499 U.S. at 347–48, 111 S.Ct. 1282.

53. *See, e.g., Feist*, 499 U.S. at 347–48, 111 S.Ct. 1282.

54. *See, e.g., Krofft*, 562 F.2d at 1168; *Shaw*, 919 F.2d at 1360.

55. *See, e.g., Apple Computer*, 35 F.3d at 1444; 4 Nimmer & Nimmer, *Nimmer on Copyright* § 13.03[B][4] at 13–72 (2000) [hereinafter *Nimmer*].

56. While courts most often engage in "analytic dissection" under the "extrinsic" test, the "intrinsic" test asks "whether the ordinary, reasonable person would find the total concept and feel of the works to be substantially similar." *Three Boys Music*, 212 F.3d at 485.

57. While "[a] plaintiff avoids summary judgment by satisfying the extrinsic test which makes similarity of the works a triable issue of fact .... a plaintiff who cannot satisfy the extrinsic test ... loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." *Kouf*, 16 F.3d at 1045; *see also Shaw*, 919 F.2d at 1359–61.

works at issue, in literary or dramatic works the typical objective elements include plot, theme, dialogue, mood, pace, setting, characters, and sequence of events. *See Kouf,* 16 F.3d at 1045; *Shaw,* 919 F.2d at 1359. In comparing these elements, a court must filter out any parts which are not protectable.[58] Thus, a court must first "separate unprotectable facts and ideas from potentially protectable expressions." *Smart Inventions,* 94 F.Supp.2d at 1065–66. "[T]he court must then apply the relevant limiting doctrines in the context of the particular medium involved, through the eyes of the ordinary consumer of that product." *Apple Computer,* 35 F.3d at 1443.[59] Finally, "[h]aving dissected the alleged similarities and considered the range of possible expression, the court must define the scope of the plaintiff's copyright-that is, decide whether the work is entitled to 'broad' or 'thin' protection." *Id.* The "scope of protection" sets the appropriate standard for a subjective comparison of the works "as a whole" to determine whether they are sufficiently similar. *See id.*

■ Where a copyrighted work is composed largely of "unprotectable" elements, or elements "limited" by "merger," "*scenes a faire,*" and/or other limiting doctrines, it receives a "thin" rather than a "broad" scope of protection. *See Feist,* 499 U.S. at 357–58, 111 S.Ct. 1282; *Apple Computer,* 35 F.3d at 1444; *Sega Enterprises Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1524 (9th Cir.1992). There is a "continuum" between highly original works entitled to the most "broad" protection offered under copyright, at one end, and works of a primarily factual or functional nature, to

which only "thin" protection is afforded, at the other. *See Apple Computer,* 35 F.3d at 1446–47. "Which end of the continuum a particular work falls on is a call that must be made case by case." *Id.* at 1447. The fewer original (or non-necessary) elements there are in a copyrighted work, the closer to identical an allegedly infringing work must be before it will be considered "substantially similar." *See id.; Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d 197, 207–08 (9th Cir.1989); *Frybarger v. International Business Machines Corp.,* 812 F.2d 525, 529–30 (9th Cir.1987); *Landsberg v. Scrabble Crossword Game Players, Inc.,* 736 F.2d 485, 488 (9th Cir. 1984).

### 2. Comparison of Plaintiffs' and Defendants' Works

■ With these principles in mind, the Court must therefore engage in an "analytic dissection" and comparison of the works at hand, gauging whether any reasonable fact-finder could find that "The Peacemaker" is "substantially similar" enough to *protected* elements of one or more of Plaintiffs' copyrighted works to support an inference of copying in violation of the Copyright Act. Obviously, at an abstract level, or at the level of ideas, there is *some* similarity. What is important, however, is whether *protectable* "elements" are sufficiently similar.

As the Ninth Circuit observed in *Berkic v. Crichton,* 761 F.2d 1289, 1293 (9th Cir. 1985): "At a very high level of generality, the works do show a certain gruesome similarity." However, as the court concluded in that case, the same could be said

---

**58.** "Because only those elements of a work that are protectable and used without the author's permission can be compared when it comes to the ultimate question of illicit copying, [one must] use analytic dissection to determine the scope of copyright protection before works are considered 'as a whole.'" *Apple Computer,* 35 F.3d at 1443.

**59.** These "limiting doctrines" include the "merger" and "*scenes a faire*" doctrines. *See, e.g., Apple Computer,* 35 F.3d at 1444.

of nearly any two (or more) works at a sufficient level of abstraction. What is required is not just "similarity," but "*substantial* similarity," and it must be measured at the level of the concrete "elements" of each work, rather than at the level of the basic "idea," or "story," that it conveys. As did the Ninth Circuit in *Berkic*, this Court concludes that this level of similarity is absent here, and that no reasonable fact-finder could find "substantial similarity" between Plaintiffs' copyrighted works and the allegedly infringing film, "The Peacemaker." [60]

Seven of the eight works upon which Plaintiffs base their claims are primarily or purportedly factual in nature; only Red Bull Rising holds itself out as a piece of fiction, and even it is largely based on the very same "facts" which drive the other seven works. As has been stated, Plaintiffs cannot claim any exclusive right to use these "facts," at least not under a copyright theory. This is equally the case despite the fact that some or all of the facts are the "story" of Idema's life. Plaintiffs have often proceeded in this case as if they believe they have the exclusive right to capitalize on the events and circumstances of Plaintiff Idema's life. That is simply not the case, at least not under the Copyright Act. Therefore, Plaintiffs may seek protection under copyright only for the *actual expression(s)* in the copyrighted works at issue, not for the "facts" or "ideas" upon which that expression is *based.* Therefore, if events in "The Peacemaker" bear some passing resemblance to events that happened in Plaintiff Idema's *real life,* there is no infringement of copyright unless the film also *expresses* those events in a manner which is similar to the expression of those events in one or more of Plaintiffs' works.[61]

Similarly, Plaintiffs may claim no exclusive right to any of the "ideas" which are

---

**60.** Because it may often involve an intensely factual comparison of copyrighted and allegedly infringing works, summary judgment on the issue of "substantial similarity" is not highly favored. *See Smith v. Jackson,* 84 F.3d 1213, 1218 (9th Cir.1996). However, as this Court has previously observed, nor is it either prohibited or subjected to any kind of "heightened standard." *See Rice,* 148 F.Supp.2d at 1054 (citing *Kouf,* 16 F.3d at 1045 n. 3). Instead, "summary judgment is appropriate if 'no reasonable juror could find substantial similarity of ideas and expression[,]' viewing the evidence in the light most favorable to the nonmoving party." *Kouf,* 16 F.3d at 1045. Summary judgment may be particularly appropriate where a court determines that a substantial portion of a copyrighted work is non-protected, and/or subject to "limiting" doctrines. *See Shaw,* 919 F.2d at 1361 ("Where idea and expression merge, a court is well-suited to make the required determination of similarity on a motion for summary judgment."). As Defendants point out, the Ninth Circuit has routinely affirmed summary judgments granted on the basis of lack of "substantial similarity" of protected expression between artistic or literary works. *See, e.g., Kouf,* 16 F.3d at 1044–46 (screenplay allegedly infringed by the movie "Honey, I Shrunk the Kids"); *Narell v. Freeman,* 872 F.2d 907, 910–15 (9th Cir.1989) (defendant's fictional book indisputably copied *facts* from plaintiff's non-fiction book, sometimes verbatim); *Berkic,* 761 F.2d at 1292–94 (the movie "Coma" alleged to infringe plaintiff's film treatment); *Litchfield v. Spielberg,* 736 F.2d 1352, 1354–58 (9th Cir.1984) (the movie "E.T." alleged to have infringed a musical play). As was observed in *Berkic,* 761 F.2d at 1292, "we have frequently affirmed summary judgments ... on the substantial similarity issue."

**61.** This circumstance was addressed, for example, in *Harper & Row,* 471 U.S. at 556–58, 105 S.Ct. 2218, wherein the Supreme Court concluded that President Ford had no right to prevent other authors from copying the "facts" of his life from his published autobiography, though he could prevent the verbatim copying of his particular "expression" of those facts. Thus, no person may claim an exclusive right to the facts of his or her life (in terms of the publication of those facts), under copyright. Only a particular *expression* of those facts may be protected from copying.

conveyed by (or which Plaintiffs' outlines indicate were intended to be conveyed by) any of the copyrighted works, unless that "idea" was *expressed* in concrete form in these copyrighted works.

Perhaps the most glaring example of this is Plaintiffs' repeated claim that Defendants stole the "idea" of backpack nuclear weapons, or SADMs, and/or their possible use to blow up the UN building located in New York City, from Idema's Story. In fact, none of the copyrighted works actually *expresses* this idea, or shows it *happening,* at anything more than the level of a "concept" or "idea." In the Loose Cannon (film) treatment by Plaintiff Morris, that this *might* happen is the opening "hypothetical" which is based on facts allegedly supplied by Plaintiff Idema. In Red Bull Rising (or more specifically in the one paragraph "character description" at the conclusion thereof), it is Amal Jaman's fondest *wish* to "destroy Manhattan and bring the United Nations to its knees" to seek revenge for the deaths of his family members, but no method is even *specified,* let alone carried out (or attempted) in the text of Red Bull Rising: i.e., Jaman never *attempts* to smuggle a "backpack nuke" into New York in a "diplomatic pouch" so as to blow up the UN building in Manhattan, either in the text of Red Bull Rising as written, or even in any of the "upcoming" chapters. In no other copyrighted work is this particular "twist" even *mentioned,* let alone put into a concrete form entitled to copyright protection.[62]

Similarly suffering from this confusion between an "idea" and its "expression" is the testimony of Plaintiffs' expert (Whitmore), the testimony of Robin Moore, and the testimony of Lt. Colonel Silbergeld. All of this testimony is entirely too general and subjective to be helpful to the Court, and in each case the declarant has clearly just emphasized those few similarities that can be observed at a general level and deemphasized the many *dis* similarities between Plaintiffs' and Defendants' works which are obvious to a casual observer. Thus, as was true for the trial court in *Olson v. National Broadcasting Co., Inc.,* 855 F.2d 1446, 1450 (9th Cir.1988), the Court can make no real use of Plaintiffs' "expert" testimony as evidence of similarity.

The same is true of the Similarities List and the Similarities Videotape, each submitted by Plaintiffs. First of all, such "lists" of similarities are to be discouraged even where they are skillfully prepared, as a list of "random similarities scattered throughout the works" does not connote a "substantial similarity" overall. *Kouf,* 16 F.3d at 1045; *see also Shaw,* 919 F.2d at 1362–63; *Litchfield,* 736 F.2d at 1356. Secondly, Plaintiffs' list and videotape are a particularly poor example of this genre. Both of them selectively draw from the *various* copyrighted works to create a comparison between the *whole* of "Idema's Story" and the *whole* of "The Peacemaker," doing so out of sequence and without regard to the fact that these works are

---

**62.** Indeed, the only place where any Plaintiff "expresses" such an "idea" in tangible form is in the 12/06/94 Letter to Spielberg written by Plaintiff Idema. Even there, it is only in "outline" form, and it never makes it into the Red Bull Rising draft purportedly described by the letter. Plaintiffs have introduced no evidence that the letter is itself the subject of a valid copyright, nor do they base their claims of copyright infringement on the contents of this letter (although the discussion of

this letter does, curiously, form a substantial part of their opposition—*see* MSJ Opposition at 31, Whitmore Decl. ¶ 7). In any case, Plaintiffs can claim no monopoly on this particular "idea." Even their own expert admits that the notion of smuggling a "backpack nuke" into the U.S. in a diplomatic pouch to blow up the UN building, is a "premise," or a "story idea," more than an "expression" thereof. Until this "idea" acquires concrete expression, it is unprotected.

subject to *separate* copyrights. They are also quite lacking in objectivity, as they frequently mischaracterize the works at issue. Finally, *most* of the "106 similarities" are at the abstract level of "ideas" (or an ever. *less* definite form of articulation), rather than "expression." [63]

Having made these initial observations, the Court now engages in the "analytic dissection" which is part and parcel of the "extrinsic" test for assessment of "substantial similarity." In doing so, the Court focuses on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in Plaintiffs' and Defendants' works.[64] *Kouf,* 16 F.3d at 1045.[65]

### a. Plot and Sequence of Events

Of the eight works copyrighted by Plaintiffs, only the Red Bull Rising draft has a measurable "plot" which is separable from what is claimed and represented to be a depiction of the "facts" of Idema's life and the information he uncovered in his trips to Lithuania and Russia/the former Soviet Union. The other seven are largely factual.

To the extent that the "plots" of these non-fiction works might be deduced, they tell the story of how Keith Idema, a "loose cannon" (former) Green Beret with a "bad attitude," but a hero's heart, formed a friendship with officers of the Lithuanian police and/or military in the period surrounding Lithuania's 1991 independence from the former Soviet Union. As a result of that friendship, Idema and his friend(s) in Lithuania and/or Russia allegedly uncovered a plot to smuggle and sell nuclear materials/weapons (including but not limited to SADMs, or "backpack nukes") to terrorists such as Hezbollah and Abu Nidal, with the help of present and former KGB/GRU/OMON forces. The main proof of this plot consisted of: (a) the 1991 murder of eight Lithuanian border guards which was believed to be related to nuclear smuggling; and (b) the 1992 interception of four disassembled SADMs at the border with Russia. In attempting to bring this information to the attention of the U.S. government, Idema refused to divulge the names of his sources within Lithuania and/or Russia, angering government officials and motivating the FBI to frame (and convict) him for a wire fraud crime he did

---

**63.** Examples include claiming that the phrase, "They were pulling off the crime of the century ..." (in Red Bull Rising) is "similar" to the plot of "The Peacemaker" because "The theft of ten nuclear warheads would certainly be the crime of the century" (Similarities List (Exhibit 9) at 0003) and claiming that the sentence "It involved the smuggling of nuclear weapons to Iran, Iraq, and North Korea" (in the Loose Cannon (film) treatment) is "similar" to the plot of "The Peacemaker" because in the film Devoe realizes that the medical truck driven by Kodoroff is headed southward toward Iran (*see id.* at 0002).

**64.** This task is made somewhat more difficult by the fact that the Plaintiffs' somewhat disjointed papers do not clearly track all these categories, or attempt to apply them, to the respective works. This leaves the Court to

pick through Plaintiffs' papers and supporting evidence in search of evidence of similarities in these categories.

**65.** It is these "concrete elements" upon which a factual finding of "substantial similarity" must be based. As the Ninth Circuit noted in *Olson,* 855 F.2d at 1450: " 'The A–Team' and Olson's works share a common idea: Both are group action-adventure series designed to show Vietnam veterans in a positive light. This idea, standing alone, is not protectable." The same observation must hold here: Plaintiffs' and Defendants' works share the "idea" of the impending danger of the threat of nuclear theft and nuclear smuggling from Russia's arsenal. This "idea," on its own, is not protectable. *Accord Allen v. Academic Games League of America, Inc.,* 89 F.3d 614, 617 (9th Cir.1996).

not commit. In spite of their efforts to "break" him, however, Idema remains resolute, and will not divulge his sources, despite the government's attempts to use his girlfriend/wife against him. All of this is presented as "fact," or at least journalistic reportage.

The incomplete text of Red Bull Rising is similarly focused on the "heroic" life of Keith Idema, his training (whether sanctioned or unsanctioned by the U.S. government) as a Green Beret, his attitude, his inspirations, and his friendships and loves. It also focuses on the same "story idea" of smuggling nuclear materials and weapons out of Russia and into the hands of Middle Eastern terrorists, under the direction/supervision of forces inside Russia's KGB/GRU/OMON ranks.

Red Bull Rising also contains a description of a scene in which Russian underground forces smuggle weapons across the border between Russia and Lithuania, in a convoy of trucks, *though what those trucks actually contain is never actually specified in the novel's text* (the fact that they are even *nuclear* weapons is only *implied,* and never specifically stated). The novel also, however, focuses extensively on Idema's background (the first Chapter One), the background and demise of the Green Berets and its apparent continuance (and Idema's ongoing involvement) through engagement in covert action with the implicit but not explicit sanction of the U.S. government (the second Chapter One), Idema's covert mission to retrieve the Kuwaiti crown prince from his hide-out in the Bahamas (Chapter Three), and further background which is tangentially related to the existence of SADMs (Chapter Five). A further "plot" of the novel is suggested by the descriptions of the characters which are included at the end, and/or by the descriptions of "upcoming chapters," but these "story ideas" are not yet written.

By contrast, "The Peacemaker" film, while it is motivated by the same general "story idea" of the theft of nuclear weapons from the decaying and ill-guarded arsenal of Russia/the former Soviet Union, tells an entirely different story than that which is *expressed* and *protectable* in any of the Plaintiffs' copyrighted works. This story includes the theft of nuclear warheads from a train, detonation of one of those warheads, transformation of another of those warheads into a "primary" small enough to be transported in a backpack, and sale of that "backpack primary" to a *Bosnian* terrorist who has the intent of detonating that warhead in or around the UN building in New York City. The conspirators are pursued and eventually their plans are foiled, by an American nuclear physicist teamed with an active military officer.

The *dis* similarities between Idema's Story (even considered as a whole) and "The Peacemaker" are too numerous to name all of them here. The Court instead focuses on what Plaintiffs claim as the most notable *similarities* in plot and sequence of events between their works and the film. These essentially boil down to two alleged similarities: (1) the border crossing scene in Chapter Four of Red Bull Rising, as compared to the violent passage through a checkpoint of the Kodoroff first aid truck in "The Peacemaker"; and (2) the allegedly "similar mistake" made in both the Loose Cannon (film) treatment and in "The Peacemaker" film, that a nuclear warhead, carried inside a backpack, would be capable of destroying approximately ten (10) city blocks.

Even assuming that these two examples were substantially similar, that would not be nearly enough to make the overall plot and sequence of events of "The Peacemaker" film "substantially similar" to Idema's Story (or one of its eight manifestations).

However, even these two examples are not "substantially similar" with regard to the *protected* expression in Plaintiffs' works. As to the allegedly similar "border crossing" scenes, in a story about the "idea" of smuggling, a "border crossing" scene very nearly "merges" with this story idea, or is at least such a standard element as to constitute *scenes a faire.* Even if it were not, the two scenes are similar only at a high level of abstraction: one involves a coordinated assault on a *Lithuanian* border outpost (the *western* border of Russia) by OMON agents accompanying a *convoy* of trucks carrying *unspecified* weapons, during which the border guards are captured and summarily executed (Red Bull Rising), while the other involves a last-second choice by a Russian General to shoot his way out of a checkpoint near the *Azerbaijani* border (the *southern* border of Russia), to avoid discovery of *warheads* ("The Peacemaker").

Moreover, inasmuch as the depiction in Red Bull Rising is based on real events (the alleged 1991 murder of Lithuanian border guards), Plaintiffs cannot claim to have the exclusive right to exploit these facts for dramatic purposes, *even if* Defendants only learned of the alleged events in Lithuania in 1991 by reading Plaintiffs' works. In any case, there is no "similarity" in *protectable expression* (i.e., that is not either fact, the "merger" of idea with expression, or an example of *scenes a faire* ) between the two "border crossing" scenes.

Nor is the alleged "common error" of opining that detonation of one "backpack nuke" could take out ten city blocks evidence of any similarity which might lead to an inference of unlawful copying. In the first place, both the various works which make up Idema's Story, and "The Peacemaker," are somewhat inconsistent about the amount of damage which it is believed that a detonated backpack warhead might cause. *See* Loose Cannon (film) at 000012 (ten blocks, but eighty with collateral damage); The Vilnius Brief at 000071 (capable of leveling a small city); Cool–Hand Keith (SOF) at 00087 (one "backpack nuke" is capable of pulverizing fifty city blocks); "The Peacemaker" (where the "ten city blocks" comment by Kelly is preceded by Taraki telling Vlado that the "primary" will obliterate everything for a quarter mile, and followed by a reference to a map showing that the "blast zone" for the "primary" is projected to have a radius of three full miles). Thus, it is a bit disingenuous for Plaintiffs to claim that the creators of the film picked up on one of many references to damage potential in their works, and plugged it in as one of many references in the film. Secondly, there is no reference in "The Peacemaker" to the "primary" as an "SADM," so it is not even clear whether the two warheads are intended to be of similar size, tonnage, or blast/damage potential.

Finally, even if the Court were to assume that Defendants copied this "fact" (which Plaintiffs *now* assert is actually incorrect) from Morris' film treatment, this would seem no different than relying on *any* alleged "fact" (from whatever source and/or reference material an author might consult) which is later allegedly disproven. In other words, any author is explicitly *allowed* to mine (even copyrighted) sources for *facts* which are described therein, so long as the later *depiction* of those facts does not infringe upon their expression in the source so consulted. Plaintiffs can claim no right to exclusive ownership of this "fact" (whether or not it is actually correct).

Accordingly, there is no "substantial similarity" as to plot or sequence of events between Plaintiffs' works and "The Peacemaker." [66] Nor is this conclusion changed

---

**66.** Though not explicitly relevant here, the Court notes that the plot of "The Peacemak-

by Plaintiffs' references to "copying" the "idea" of having a "backpack nuke" smuggled into New York in a diplomatic pouch for the purpose of blowing up the UN. Plaintiffs never *depicted* this "event" in any of their copyrighted works. Even if they had, or the Court considers the 12/06/94 Letter to Spielberg, they have not shown a substantial similarity of protected *expression*.

### b. Themes

There is also almost no "similarity" of theme between Plaintiffs' and Defendants' works. Plaintiffs' non-fiction works, to the extent they can be said to have a "theme," are clearly largely motivated by the "theme" of Idema's courage and persistence in the fact of alleged betrayal by the FBI and the U.S. Government, his stalwart loyalty to his friends, and his stubborn refusal to compromise his principles, his friendships, or his "loose cannon" attitude under pressure. Quite secondarily, these works focus on the impending threat of smuggling of nuclear weapons out of Russia/the former Soviet Union. Similarly, to the extent that Red Bull Rising is motivated by one or more "themes," of primary importance is the "special character" of the Green Berets, who persevere in spite of a government which has turned its back on them, and whose skills and attitudes set them apart. Of perhaps co-equal status is the portrayal of "honorable" independent Lithuanians contrasted with "dis-

honorable" Russian members of the KGB, GRU, and OMON forces. Again, of lesser status is the nuclear threat "theme."

By contrast, "The Peacemaker" exhibits *none* of the themes which are "primary" in Plaintiffs' copyrighted works (e.g., the betrayal of an honorable Green Beret, the special status of the Green Berets, or the "good guys" and "bad guys" depictions of the Lithuanians and the Russians). Instead, the "nuclear threat" theme is elevated to this "primary" status, as are "themes" about putting aside "theory" and "taking action" (in Kelly and Devoe's interactions), the all-consuming power of greed (Kodoroff), friendship across a Cold War divide (Devoe and Vertikoff), and the danger of improperly channeled anguish, and despair, in a world where one man can do great harm (Dusan). As to "theme," the film bears almost no resemblance to Plaintiffs' works.

### c. Dialogue

Plaintiffs have not identified, nor has the Court found, examples of *any* identical or even substantially similar dialogue in Plaintiffs' works and "The Peacemaker," let alone the "extended similarity . . . [that is] needed to support a claim of substantial similarity based upon this issue." *Olson,* 855 F.2d at 1450; *see also Kouf,* 16 F.3d at 1046 (the "dialogues are similar in random words, at best."). The Plaintiffs make no real effort to even argue similarity of dia-

---

er" is at least as similar, or as likely derived from, the "plot" of the Cockburns' Article and/or the Cockburns' Film Treatment, as it is from the works making up Idema's Story. Present in both the Cockburns' Article and "The Peacemaker" are the KGB/mafia "front" company running out of Vienna (with the name "Nordex" changed to the name "Kordech"), both emphasize the importance of dismantlement treaties (e.g., S.T.A.R.T.) as providing a reason for the transport of large numbers of nuclear warheads from one place to another within the confines of Russia

and/or the storage of these warheads in remote and ineffectively guarded locations (both specifically name Chelyabinsk), and both focus on the underpayment/temptation of Russian soldiers as a primary threat to the security of these warheads. The Cockburns' Film Treatment adds to this the plot twists of warheads being stolen from a train, of the U.S. team being headed by a female nuclear physicist who heads the Nuclear Smuggling Working Group, and of the warheads ending up in the hands of the Bosnian Serbs, all of which appear in the film.

logue between the copyrighted works and the final film, "The Peacemaker."[67]

### d. Mood and Pace

Nor do Plaintiffs make any attempt to argue similarity of mood and pace between their copyrighted works and the film. Though it is always difficult to compare "mood and pace" between works which are captured in different media (written word versus film), to the extent that this element can be deduced in the respective works, there is no "substantial similarity" on this basis either. The "mood and pace" of Plaintiffs' various non-fiction works is somewhat dark, cynical, and slow-moving, inasmuch as they tell the story of a long-suffering man persecuted, prosecuted, and jailed by his own government.

The "mood and pace" of Red Bull Rising is somewhat disjointed, as it jumps backward and forward in time, place, and circumstance over a fifteen-year span. The majority of the novel is more historical and descriptive than it is action-driven, and even that portion which is most focused on the description of "action" (the meetings leading up to, the planning of, and the execution of the "border crossing") is so laden with minutiae as to seem more of a military practice manual than an event-driven action story about a daring and brutal crossing.

By contrast to both the non-fiction works and Red Bull Rising, the "mood and pace" of "The Peacemaker" is of non-stop action which largely sacrifices nuance, his-torical explanation, and/or meaningful character development in the name of suspense and special effects. The entire movie takes place in approximately a one-week timeframe, and the number of events, explosions, physical stunts, and occasional verbal sparring that is packed into the running time makes it hard to believe that the characters are not totally exhausted halfway through. The "mood and pace" could not be more *different* from Idema's Story.

### e. Settings

The non-fiction versions of Idema's Story are "set" largely in Poughkeepsie, New York (for Idema's childhood), Lithuania (where Idema trains and befriends his Lithuanian allies), Moscow (where he meets with Russian contacts), Pentagon and FBI buildings in Washington, D.C. (where his disastrous meetings with U.S. government officials occur), and North Carolina (where Idema runs his SpecOps businesses and where he is at least initially imprisoned). Red Bull Rising takes place in settings far too plentiful to list here (eighteen in all), with the most notable being perhaps North Carolina, Moscow, and Lithuania.

By contrast, "The Peacemaker" takes place in the remote Russian countryside, in the interior of the White House, in Sarajevo, Bosnia, in Vienna, in a U.S. military base in Turkey, in the airspace over Turkey and southern Russia, and in New York, *none* of which locations appear in any of the actual texts of any of Plaintiffs' works.[68] The *only* similarity in "setting"

---

67. Plaintiffs point to allegedly *more* similar dialogue in earlier drafts of the final screenplay, arguing that the excision of passages of dialogue which they claim are similar to Red Bull Rising evidences copying by Defendants (and attempts to hide that copying). However, aside from the fact that Plaintiffs' reliance on earlier scripts for a showing of actionable infringement in the *final* screenplay is without solid foundation in law, the alleged similarities in earlier drafts to which Plaintiffs cite

are no such thing. Plaintiffs again confuse the "idea" conveyed by a particular piece of dialogue with the protectable "expression" thereof. *See* MSJ Opposition at 48–50. The cited text is not "substantially similar" for its own sake, not to mention that even if it were a few overlaps would not make the *entire* dialogue similar.

68. For instance, while nearly the entire second half of the film takes place in and around New York City, Plaintiffs' works hardly even

is that weapons are being smuggled from Russia, through one of its borders, eventually to Iran. There could hardly be a story about nuclear smuggling out of Russia which would *not* include at least some scenes of Russia, however, and with the easy target of the Iraqi and/or Iranian nations near its southern border, the smuggling of weapons to these countries is almost a *scenes a faire* in a story about Russian nuclear smuggling. Moreover, aside from the general commonality of involving Russia's borders, even the particular "settings" *within* this region that are described and depicted in the respective works are wholly different (i.e., the "border crossing" in Red Bull Rising is limited to a single area, in contrast to the wide expanses of Russia which are ostensibly depicted in "The Peacemaker").

### f. Characters

Finally, the Court comes to the comparison of "characters," upon which Plaintiffs spend so much of their energy in their Opposition to the Summary Judgment Motion. These efforts are unavailing, as the Court also finds that there is no *substantial* similarity between the characters populating Plaintiffs' works and those in "The Peacemaker."

Plaintiffs spend a great deal of time and effort attempting to draw parallels between the "character" of Idema and the character of Devoe as he is depicted in "The Peacemaker." However, much of this elucidation of the "character" of Idema depends on "historical fact" and/or on the allegedly "true" events of his life, and as such even Idema can claim no exclusive right to these "facts" of his life. In any case, even assuming that Plaintiffs' citations of similarities *were* based on protectable expression (rather than fact), there is

no "substantial similarity" between the "characters" of Idema and Devoe. Devoe is on active military duty, while Idema is at least ostensibly a "civilian" (though he may actually be working for the government); Devoe is at most a bit cocky and brash, but displays none of what is described as Idema's "loose cannon" behavior, such as disobedience to his superiors, use of obscene language, or other instances of a "bad attitude." Devoe is subject to none of the persecution/prosecution by his own government that is central to (at the least the non-fiction) accounts of Idema's Story. Nor is he "quick to take offense" in the way Idema is described. He seems nearly always calm under pressure.

Moreover, to the extent that the two characters *are* similar, it is only with respect to traits that are so generalized and/or cliché as to be nearly *scenes a faire* of the military/action genre: i.e., the brash, cocky military officer who does things his own way, and who triumphs over the forces of evil through his own guile, wit, and pure physical abilities. Plaintiffs can claim no similarity of character that is not either unprotectable fact, or at this level of generality.

As to other characters, there is absolutely *no* equivalent in the works making up Idema's Story for the Julia Kelly character in "The Peacemaker." This also reflects on Devoe's status as a "co-hero."

 Plaintiffs claim that the Vertikoff character in the film is the substantial equivalent of the "Nick" character described only in a one-paragraph character summary at the conclusion of Red Bull Rising. However, a couple of sentences of vague description is clearly not enough to create a protectable character under copyright. *See Olson*, 855 F.2d at 1452. And even if it were, the description given of the

---

mention New York except as a *possible* destination, and certainly none (with the possible exception of the 12/06/94 Letter to Spielberg)

has any action or events actually *taking place* within the New York area.

shadowy "Nick" character is far too vague to reasonably conclude that *any* character in an allegedly infringing work is similar thereto. A mere equivalency between the fact that each is the "Russian contact" for the male lead in the story, and that each has a teenage daughter, is simply not enough for "substantial similarity." Indeed, the two characters are quite *dis*similar in the fact that Vertikoff makes no attempt to hide his association with Devoe (and Kelly), freely gives his real name (rather than requiring an alias), and is a member of the Russian *Army* rather than the Russian KGB. These two do not advance Plaintiffs' attempt to show "substantial similarity" of characters.

Nor, aside from the fact that they are both "terrorists," are the characters of Amal Jaman and Dusan Gavrich particularly similar. The character of a fanatical terrorist is in any case a *scenes a faire* in a story about the threat of nuclear terrorism. But nearly everything about these two men is different, aside from their common goal of a nuclear strike on the UN and the United States. Jaman is really only the briefest "outline" of a character in Red Bull Rising, but it is at least clear that his *primary* targets are the "infidel" Jews upon whom he blames the destruction of his (unspecified Middle East) homeland. Dusan, on the other hand, has no such motivation. And whereas Jaman is a "world class terrorist," Dusan is otherwise depicted as a mild-mannered piano teacher, husband, and father, driven only by despair.

Plaintiffs' attempts to draw parallels between several of the remaining characters are no more compelling, as the comparisons are only possible at a high level of abstraction, and/or are of characters so minor to the respective stories or standard to the genre that any similarities between them must be largely attributed to the inclusion of *scenes a faire*. This is true of Plaintiffs' comparisons of Bakeyev and Kodoroff, Cole and Costello (whose name hardly even registers in "The Peacemaker"), Joe (Grey) and General Garnett (Devoe's superior, whose appearance in the film is also hardly noticeable), and Selvi and Dr. Taraki. Most of the characters upon which Plaintiffs rely are given almost no *form* in the copyrighted works, limited to one or two-sentence descriptions or brief appearances during the action without much exploration of their "characters." To the extent that they *are* visible in Plaintiffs' works, they bear almost no resemblance to the allegedly "equivalent" characters in "The Peacemaker." [69]

Based on all of these findings, the Court concludes that there is no triable issue of fact with regard to "substantial similarity," and no reasonable juror could find infringement of Plaintiffs' works. As there is no proof of direct infringement, there can be no contributory infringement. *See, e.g., A & M Records, Inc. v. Napster,* 239 F.3d 1004, 1013 n. 2 (9th Cir.2001). Thus, Defendants' Summary Judgment Motion is GRANTED, and the First and Second Claims for Relief are DISMISSED.

### B. The Motion to Dismiss as to Plaintiffs' State Law Claims

Defendants have also moved to dismiss all of the remaining claims in the SAC (the

---

**69.** For instance, Selvi, the "slimy" Turkish "middleman" described as a weapons expert with extensive contacts to the KGB/GRU, the Middle Eastern terrorists, and the Russian mafia, bears almost no resemblance to Dr. Taraki, the bookish nuclear physicist recruited by Kodoroff or Vlado for the express (and limited) purpose of converting a full-sized warhead to a backpack-portable "primary." Similarly, Plaintiffs offer no reasonable basis to conclude that Kodoroff, who apparently acts for his own monetary gain, is "substantially similar" to Bakeyev, the OMON agent whose acts are part of a coordinated quasi-governmental plan.

Third through Thirteenth Claims for Relief), all of which arise under state (or District of Columbia) law. The Motion to Dismiss argues, *inter alia*, that all of Plaintiffs' state law claims are preempted by the Copyright Act and/or that each of them fails to state a claim for which relief can be granted. On these bases, the Motion seeks dismissal with prejudice of all of the state law claims under Rule 12(b)(6). *See* Motion to Dismiss at 13–48. In addition, Defendants seek dismissal with prejudice pursuant to Rule 41(b) of the six state law claims (the Fourth, Fifth, Ninth, Tenth, Twelfth, and Thirteenth Claims for Relief) [70] added *for the first time* in the SAC, as a sanction for addition of these claims in violation of the Court's March 12 Order and/or of Rule 15(a). *See* Motion to Dismiss at 48–50.

Taking this last argument first, again the Court does not agree that Plaintiffs' addition of the six newly added claims was a *direct* contravention of the March 12 Order, though Plaintiffs clearly took liberties not intended by that Order. *See supra* note 15. Plaintiffs also added these claims without seeking or receiving leave of Court to do so, in clear violation of Rule 15(a). However, because the Court would not in any event find the appropriate sanction to be dismissal of these claims *with* prejudice, there is nothing to be gained by the separate consideration of these claims under Rule 41(b) (they will be dismissed either with or without prejudice in any event). Therefore, the Motion to Dismiss is DENIED to the extent it relies on Rule 41(b).

As to the remainder of Defendants' Motion to Dismiss, ordinarily the Court's dismissal of the two copyright claims, which were the sole claims in the SAC over which this Court had original jurisdiction,[71] would simply lead to the dismissal without prejudice of the remaining state law claims pursuant to 28 U.S.C. § 1367(c): "district courts may decline to exercise supplemental jurisdiction … if—… (3) the district court has dismissed all claims over which it has original jurisdiction …". As this Court previously indicated (in both its March 12 Order and in the hearing thereon), it is disinclined to reach state law matters where its basis for original jurisdiction has been dismissed, both because of its own crowded calendar and because this encroaches upon the autonomy and the expertise of the state courts. The normal course would be to dismiss Plaintiffs' state law claims without prejudice to their re-filing in the appropriate state court.

Defendants, however, literally beseech this Court to hear their Motion to Dismiss, and to dismiss some or all of the Third through Thirteenth Claims for Relief with prejudice, instead. *See* Motion to Dismiss at 9–13. Defendants argue that this course would satisfy the ends of justice, for two reasons: (1) some or all of Plaintiffs' state law claims are in any case preempted by copyright, such that even were they re-filed in state court they would end up back in this or some other federal court by way of their removal on the basis of complete preemption; and (2) they have invested such a large amount of money and time in this case to bring it to this point that it would not be equitable to force them to go to state court and start over with a new complaint, a new judicial officer, and a new forum. *See id.*

---

**70.** (4) Fraud; (5) Negligent Misrepresentation; (9) Intentional Interference with Prospective Economic Advantage; (10) Negligent Interference with Prospective Economic Advantage; (12) Unfair and Deceptive Trade Practices; (13) Violation of the Trade Secrets Act.

**71.** The SAC includes no allegations of diversity jurisdiction, and includes the state law claims solely under supplemental jurisdiction.

The Court is somewhat persuaded by the force of these arguments, though much more by the first than by the second. However, it still remains loath to tread too heavily on ground best reserved for the expertise of the state courts. Accordingly, the Court will hear the Motion to Dismiss in this limited respect. The Court will determine the issue of preemption of Plaintiffs' claims under copyright. Those state law claims which are found to preempted will be dismissed, with prejudice. Those claims which survive preemption will then be gauged as to their ability to state a claim under state law. Where it is *clear* that Plaintiffs have failed to state a claim for which relief can be granted, and that claim is either barred as a matter of law or Plaintiffs have failed to state a claim despite repeated attempts to do so, the claim will be dismissed, with prejudice. However, where the issue is not clear, or where the deficiency in the claim is one which might be cured by a more adequate pleading, this is an issue more appropriately resolved by a state court. Thus, claims fitting this category will be dismissed without prejudice to their re-filing in state court as part of a new, separately-filed complaint.

**1. Standard for Preemption Under the Federal Copyright Act**

■ The Ninth Circuit employs a two-part test to determine whether the Copyright Act preempts particular state law claims. Preemption occurs when: (1) the work at issue comes within the subject matter of copyright; and (2) the rights granted under state law are equivalent to those protected by the Act. *See Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1213 (9th Cir.1998); *Valente–Kritzer Video v. Pinckney*, 881 F.2d 772, 776 (9th Cir.1989); *Del Madera Properties v. Rhodes & Gardner, Inc.*, 820 F.2d 973, 976 (9th Cir.1987); 17 U.S.C. § 301(a).

The first prong of this test is satisfied wherever the works at issue come within the "subject matter of copyright," as defined by 17 U.S.C. §§ 102 and 103,[72] even where the works at issue (or some parts of those works) may not actually be protected, or even protectable, under the Copyright Act. *See, e.g., Entous v. Viacom International Inc.*, 58 U.S.P.Q.2d 1628, 1634 (C.D.Cal.2001); *Selby v. New Line Cinema Corp.*, 96 F.Supp.2d 1053, 1058–59 (C.D.Cal.2000); *Firoozye v. Earthlink Network*, 153 F.Supp.2d 1115, 1124–25 (N.D.Cal.2001). In other words, the scope of preemption is broader than the scope of protection, or, as this Court previously observed, "the shadow actually cast by the Act's preemption is notably broader than the wing of its protection." *Endemol Entertainment B.V. v. Twentieth Television Inc.*, 48 U.S.P.Q.2d 1524, 1526 (C.D.Cal. 1998) (quoting *U.S. ex rel. Berge v. Trustees of the University of Alabama*, 104 F.3d 1453, 1463 (4th Cir.1997)). The work(s) upon which a state law claim is based need only be within the "subject matter" of copyright; their actual *protection* thereunder is irrelevant to a preemption analysis.[73]

---

**72.** 17 U.S.C. § 102 defines the "subject matter" of copyright to include "original works of authorship fixed in any tangible medium of expression …". "Works of authorship" are defined to include: "(1) literary works;" "(3) dramatic works …;" and "(6) motion pictures …;". 17 U.S.C. § 102(a). Also the "subject matter" of copyright are "compilations and derivative works …". 17 U.S.C. § 103(a).

**73.** Accordingly, Plaintiffs misunderstand the preemption analysis when they argue that "where there is no protection by copyright … there can be no preemption." MTD Opposition at 6–7. The opposite is the truth: there may be preemption even where there is no protection. Plaintiffs' reading of Section 301(a) would undermine its purpose of establishing the Act as the *exclusive* vehicle for pursuit of claims of unlawful misappropriation of expression. The point of Section

*See, e.g., Kodadek,* 152 F.3d at 1211–1213 (uncopyrighted drawings).

The second prong is satisfied wherever the rights protected by state law are "equivalent" to those protected by the Copyright Act. In order to avoid preemption, "the state cause of action must protect rights which are qualitatively different from the copyright rights." *Del Madera Properties,* 820 F.2d at 977. "The state claim must have an 'extra element' which changes the nature of the action." *Id.* As this test has been most recently applied, a court should not rely merely on a "laundry list" of the alleged "elements" of the state law claims at issue, such that the mere *possibility* of an "extra element" protects a claim from preemption. Instead, the court should engage in a fact-specific inquiry into the *actual* allegations underlying the claims at issue in the case, so as to determine whether the "gravamen" of the state law claim asserted is the same as the rights protected by the Copyright Act. *See Entous,* 58 U.S.P.Q.2d at 1634–35; *Selby,* 96 F.Supp.2d at 1059–60; *Kodadek,* 152 F.3d at 1212 (implicitly adopting this approach); *Dielsi v. Falk,* 916 F.Supp. 985, 990–93 (C.D.Cal.1996). In other words, the question is whether the state law claims *as they are asserted* are "equivalent" to a federal copyright claim.

## 2. Preemption of Plaintiffs' State Law Claims

■ The Court must therefore apply the two prongs of this test to the Third through Thirteenth Claims for Relief in Plaintiffs' SAC. As to the first part of the test, it is clear that all of the materials upon which these state law claims are based are within the "subject matter" of copyright. The eight copyrighted works (i.e., Idema's Story), as well as Plaintiffs' letters, and the "secret Russian documents," are all "works of authorship" (i.e., "literary works") within the broad definition thereof given by the Act. *See* 17 U.S.C. §§ 101, 102(a)(1).

Accordingly, all that remains is to assess each of Plaintiffs' state law claims under the second prong of the preemption analysis: i.e., to gauge whether they seek to protect rights which are more or less "equivalent" to those exclusively protected by copyright. In what follows, the Court concludes that all ten of Plaintiffs' state law claims, to a greater or lesser extent, also meet this test.

The Third Claim for Relief, for Breach of Confidence, is based on Plaintiffs' 1994 and 1995 letters/submissions to Spielberg/Amblin (SAC ¶¶ 121–128), which were allegedly marked "confidential" or "personal and confidential." Plaintiffs claim that Defendants breached what was an allegedly "understood" confidence between them when they "used" the contents of those submissions to create "The Peacemaker." *See* SAC ¶¶ 127, 129 ("These confidential documents [submitted in 1994 and 1995] contained ... protected expressions of fact and fiction, original characters, plots, character relationships, expressions of ideas, and other ... information.... defendants used plaintiffs' documents, treatments, and materials to produce and distribute ..." the film "The Peacemaker") (and the book *One Point Safe* ).[74] Inasmuch as this is essentially just a claim that Defendants unlawfully "used" Plaintiffs'

---

301(a) is that for works which come within the "subject matter" of copyright, an author may sue *only* under the Act for encroachment on those rights attendant to copyright ownership (e.g., copying and distribution).

**74.** It is unclear exactly what "use" Defendants are purported to have made of Plaintiffs' "confidential" materials for purposes of the book *One Point Safe* since, by Plaintiffs' own admission, the book is explicitly not at all similar to Idema's Story. *See* SAC ¶ 107.

(copyrighted and uncopyrighted) materials in the preparation of "The Peacemaker," it is clearly addressing a right "equivalent" to rights of reproduction, distribution, and preparation of derivative works which are exclusively protected under the federal Copyright Act. In other words, Plaintiffs essentially claim that Defendants breached an "implied promise" not to use their materials without compensation.

A number of district courts in this Circuit have concluded that a breach of confidence claim is not preempted by copyright because of the "extra element" of a confidential relationship and/or entrustment with the understanding that the confidential materials would not be disclosed to others. *See, e.g., Berkla v. Corel Corp.,* 66 F.Supp.2d 1129, 1151 (E.D.Cal.1999); *Lattie v. Murdach,* 42 U.S.P.Q.2d 1240, 1244 (N.D.Cal.1997); *Metrano v. Fox Broadcasting Company, Inc.,* 2000 WL 979664, *6 (C.D.Cal.2000); *Anderson v. Stallone,* 1989 WL 206431, *5 (C.D.Cal.1989); 1 *Nimmer* § 1.01[B][1][b] at 1–22. However, while the "extra element" of a confidential relationship may under the right set of facts make a breach of confidence claim differ "qualitatively" from a copyright claim, this case presents no such set of facts.

Indeed, it is clear from Plaintiffs' elucidation of this claim that it depends on the same conduct which underpins their copyright claims: i.e., Defendants allegedly took Plaintiffs' submissions and unlawfully copied the contents and the ideas therefrom. Plaintiffs have failed to allege facts *supporting* existence of a "confidential relationship" between themselves and any Defendant (notwithstanding their meritless claim that "confidential" markings on the envelopes and/or letters created such a relationship).[75] The end result is a claim

which much more closely resembles a breach of implied contract claim, based on an alleged implied promise not to use the materials submitted without compensation to Plaintiffs. Such implied contract (or "quasi contract") claims are clearly preempted. *See Del Madera Properties,* 820 F.2d at 977; *Endemol,* 48 U.S.P.Q.2d at 1528; *Worth v. Universal Pictures, Inc.,* 5 F.Supp.2d 816, 822 (C.D.Cal.1997).

Accordingly, Plaintiffs' Third Claim for Relief, for Breach of Confidence, is preempted by the exclusive authority of the Copyright Act. On that basis, Defendants' Motion to Dismiss is GRANTED as to the Third Claim for Relief, which is hereby DISMISSED, with prejudice.

Plaintiffs' Fourth and Fifth Claims for Relief, for Fraud and for Negligent Misrepresentation, essentially boil down to an allegation that Defendants misrepresented the source of "The Peacemaker" to be the Cockburns' unpublished (the Cockburns' Article and the Cockburns' Film Treatment) and published (*One Point Safe*) works *rather than* the "true" source for the film, which Plaintiffs allege was the works to which they refer as Idema's Story. *See, e.g.,* SAC ¶ 133 ("Defendants concealed the truth: namely that [the film] was actually derived from plaintiffs' submissions."). These claims are virtually identical to the Lanham Act claim, asserted in the FAC, previously dismissed by this Court due to its failure to make out a claim of "reverse passing off" and its preemption by the Copyright Act. *See* March 12 Order at 33–35. These two claims are also preempted for the same reason(s).

Though nominally including an "extra element" of falsity, the only "misrepresentation" alleged is as to the authorship of what was, for purposes of the copyright

---

**75.** For this same reason, the Third Claim for Relief also fails to state a claim under North Carolina law. *See infra* note 81.

claims, the allegedly infringing work ("The Peacemaker" film). Plaintiffs do not allege any "false promise" or misrepresentation {*separate*} from that of authorship/basis for the allegedly infringing work, distinguishing this case from those facts presented in *Valente–Kritzer Video,* 881 F.2d at 776 or *Dielsi,* 916 F.Supp. at 991. Thus, this claim falls squarely within the preemption analysis adopted from *Nimmer* by *Kodadek,* 152 F.3d at 1213, and is on that ground preempted. *See Litchfield,* 736 F.2d at 1358; *Xerox Corp. v. Apple Computer, Inc.,* 734 F.Supp. 1542, 1550–51 (N.D.Cal.1990).

Accordingly, Plaintiffs' Fraud and Negligent Misrepresentation claims are also preempted under Section 301(a) of the Copyright Act. Defendants' Motion to Dismiss is also GRANTED as to the Fourth and Fifth Claims for Relief, which are hereby DISMISSED, with prejudice.

Plaintiffs' Sixth Claim for Relief, for Breach of Contract, has the "extra element" of an alleged exchange of promises/representations between the Scurkas and Defendant Petersen (against whom this claim is solely alleged). *See, e.g., Trenton v. Infinity Broadcasting Corp.,* 865 F.Supp. 1416, 1429 (C.D.Cal.1994); 1 *Nimmer* § 1.01[B][1][a] at 1–15. Thus, the claim depends on more than the mere act of copying or distribution regulated by the federal Copyright Act, and is on that basis not preempted by Section 301(a). Accordingly, this claim will be reserved for a further discussion in Part IV.B.3, below. For the moment, Defendants' Motion to Dismiss is DENIED as to this claim.

Plaintiffs' Seventh Claim for Relief, for Invasion of Privacy, claims that Defendants "knowingly misappropriated Idema's likeness and persona without his consent . . . for the purposes of creating and selling" the film "The Peacemaker." SAC ¶ 155. However, as is true of all Plaintiffs' claims in the SAC, this alleged "misappro-

priation" of Idema's "personality and rights to his story" was accomplished by way of producing a moving "using Idema's Story and personality, and plaintiffs' copyrighted materials" in production of "The Peacemaker," without properly crediting Idema or Plaintiffs for their contributions to the film. *See* SAC ¶¶ 154–156. Therefore, although denominated a claim for "invasion of privacy," this Seventh Claim for Relief is in reality a claim of "misappropriation" of the contents of Idema's Story identical to Plaintiffs' copyright claim. As *Del Madera Properties,* 820 F.2d at 977, recognized, such a claim is preempted by copyright.

Accordingly, Plaintiffs' Seventh Claim for Relief, for Invasion of Privacy, is preempted to the extent it alleges that Defendants are liable for "misappropriating" Idema's likeness and story *from those materials* previously identified which are within the "subject matter" of copyright. On this ground, and to this extent, Defendants' Motion to Dismiss is GRANTED, and this claim is DISMISSED, with prejudice.

Plaintiffs' Eighth Claim for Relief, for Conversion, relies on the alleged "conversion and theft of documents" which were "in fact plaintiffs' lawful and valuable property." SAC ¶ 162. The documents allegedly "converted" were the "secret" Soviet/Russian documents that were allegedly secured and jointly owned by Plaintiffs Idema and Gary Scurka (and also, perhaps, the story outline(s) allegedly transferred from Petersen to Stern, to the Cockburns, and finally, to Spielberg). *See* SAC ¶¶ 162, 182. Though it is not entirely clear from the SAC, it appears Plaintiffs claim Defendants somehow profited from information in those documents, and/or that this information was instrumental in the subsequent production of "The Peacemaker." It is therefore not the documents

*themselves* which Plaintiffs claim as their "property" which was wrongfully converted, but the *information* contained therein. *See* SAC ¶¶ 163–167; MTD Opposition at 23 ("the value of the ... documents ... belonging to plaintiffs resided in their usefulness as supporting background information for making of a film ... The value of the documents was not embodied in the pieces of paper themselves, but in the information which was contained in them. Defendants were fully aware of this value when they converted the documents and used them to make" the film "The Peacemaker"). Plaintiffs do not seek a return of the documents (the originals of which were never given to Petersen or any Defendant), but instead damages based on their *value*.

Accordingly, for the same reasons as were cited in *Dielsi*, 916 F.Supp. at 992, and *Worth*, 5 F.Supp.2d at 822–23,[76] Plaintiffs' claim for conversion is substantially "equivalent" to a copyright claim and lacks the "extra element" of wrongful interference with "tangible" property which normally sets a conversion claim apart from copyright. *See* 1 *Nimmer* § 1.01[B][1][i] at 1–41 to 1–43. In other words, it is the "intangible" value of the *contents* of the documents to which this claim is addressed, and the unauthorized "use" of those documents in creation of "The Peacemaker" upon which the claimed damages are based. For these reasons, Plaintiffs' Eighth Claim for Relief is preempted by the Copyright Act. Thus, Defendants' Motion to Dismiss is GRANTED as to this claim, which is also hereby DISMISSED, with prejudice.

Similarly, the alleged "wrong" addressed by Plaintiffs' Ninth and Tenth Claims for Relief, for Intentional and Negligent Interference with Prospective Economic Advantage, is a "wrong" which is intended to be exclusively addressed by the federal Copy-

right Act: namely, the alleged encroachment on one's exclusive right to profit from sale or reproduction of one's original work(s) of authorship. The SAC claims that Defendants' alleged theft of Idema's Story "interfered with the prospective business relationship between plaintiffs" and unspecified potential contractors with whom Plaintiffs had "come close to closing deals" or had "prospective business relationships." SAC ¶¶ 170–171. This claim does not protect any right "qualitatively different" from those rights protected by copyright. *See, e.g., Worth,* 5 F.Supp.2d at 822; *Motown Record Corp. v. George A. Hormel & Co.,* 657 F.Supp. 1236, 1240 (C.D.Cal.1987); 1 *Nimmer* § 1.01[B][1][a] at 1–17.

Essentially, Plaintiffs merely claim that Defendants copied the contents of Idema's Story *with the intent* of interfering with some unspecified possibilities that Plaintiffs would be able to sell that story to one or more potential buyers. This is merely a restatement of Plaintiffs' copyright claim, and on that basis is preempted. As to Plaintiffs' Ninth and Tenth Claims for Relief, therefore, the Motion to Dismiss is GRANTED, and these claims are DISMISSED, with prejudice.

Plaintiffs' Eleventh Claim for Relief, for Civil Conspiracy, is largely just a restatement of Plaintiffs' prior (FAC) "conspiracy to infringe copyright" claim, which was already dismissed with prejudice by this Court. *See* March 12 Order at 32. As was true with the prior claim, the primary "object" of the conspiracy alleged by Plaintiffs was the "theft" of Plaintiffs' story, and the concealment of Idema's Story as the "true" source of "The Peacemaker." *See* SAC ¶¶ 178–179. The Eleventh Claim for Relief is clearly preempted (and/or barred by *res judicata* ) to the extent it attempts to seek liability under this alternate theory

---

76. *See also Trenton,* 865 F.Supp. at 1428.

for the same conduct challenged under copyright. *See* March 12 Order at 32; *Trenton,* 865 F.Supp. at 1428. However, the SAC also alleges that the purported "civil conspiracy" had as its ends or effects the commission of several federal crimes, and interference with the employment of Kathy Wolff Scurka. *See* SAC ¶¶ 182, 180. As to these additional allegations, this claim would apparently survive preemption. Therefore, this claim must also be further discussed in Part IV.B.3, below. For the moment, Defendants' Motion to Dismiss is GRANTED IN PART AND DENIED IN PART as to Plaintiffs' Eleventh Claim for Relief. This claim is hereby DISMISSED, with prejudice, to the extent it alleges that the "object" of the conspiracy was to "steal" Plaintiffs' protected ideas and expressions (e.g., Idema's Story).

Plaintiffs offer no argument in opposition to Defendants' claim that the Twelfth Claim for Relief in the SAC, for Unfair and Deceptive Trade Practices (under North Carolina law), is preempted by copyright. The Motion to Dismiss could therefore be granted on this ground alone, as Plaintiffs have waived their right to argue non-preemption. This course is not necessary, however, as it is clear that this Unfair and Deceptive Trade Practices claim, inasmuch as it contains no separate allegations supporting its assertion under North Carolina law, merely incorporates and depends on Plaintiffs' more generalized assertions that Defendants "falsely" represented that "The Peacemaker" was based on the Cockburns' published and unpublished works, or, more directly "falsely" *failed* to divulge its "true" source as Idema's Story. *See* SAC ¶ 190. As is clearly the law in this Circuit, unfair competition laws on this basis are preempted by copyright. *See Kodadek,* 152 F.3d at 1212–13; *Del Madera Properties,* 820 F.2d at 977; *Litchfield,* 736 F.2d at 1358; *see also Fisher v. Dees,* 794 F.2d 432, 438 (9th Cir.1986); *Trenton,* 865 F.Supp. at 1428; *Motown,* 657 F.Supp. at 1240. Accordingly, Defendants' Motion to Dismiss is hereby GRANTED as to the Twelfth Claim for Relief, which is hereby DISMISSED, with prejudice.

The Thirteenth Claim for Relief, for violation(s) of the North Carolina Trade Secrets Act, also depends solely on incorporation of the allegations in the remainder of the SAC. *See* SAC ¶¶ 192–194. It likewise depends on their claim that Defendants wrongfully obtained and profited from Plaintiffs' "property materials," (i.e., Idema's Story). The "trade secrets" were allegedly "stolen" from materials submitted to, or allegedly "converted" by, Defendants, and Plaintiffs claim that the use of this information in creating "The Peacemaker" "devalued" these "confidential" materials. *See* MTD Opposition at 38.

However, to the extent that Plaintiffs' so-called "trade secrets" are merely those same ideas and expressions contained in the above-described materials with are within the "subject matter" of copyright, Plaintiffs' Trade Secrets Act claim is merely a "misappropriation" claim which is preempted by the Copyright Act. *See, e.g., Design Art v. National Football League Properties, Inc.,* 2000 WL 33151646, *4 (S.D.Cal.2000). There is no allegation that the information in the materials was a "trade secret" in the sense that its mere *disclosure* would undermine its value; regardless, there is no allegation that any Defendant *made* such a "disclosure." Rather, the SAC alleges that the Defendants violated the Trade Secrets Act by "using" the information in Plaintiffs' materials. These allegations lack the "element" of "secrecy" that is required to escape preemption under copyright. In other words, Plaintiffs cannot claim that the "use" of their alleged information was a Trade Secrets Act violation without tread-

ing on the exclusive domain of copyright; such a claim lacks the "extra element" of "disclosure" of a secret in contravention of a specific duty to keep that information confidential. *See Long v. Quality Computers & Applications, Inc.,* 860 F.Supp. 191, 197 (M.D.Pa.1994) (citing *Computer Associates International, Inc. v. Altai, Inc.,* 982 F.2d 693, 716–19 (2d Cir.1992)); 1 *Nimmer* § 1.01[B][1][h] at 1–40. Thus, to the extent Plaintiffs' Thirteenth Claim for Relief is based on Defendants' alleged "use" of "confidential" material in the above-described works which are within the "subject matter" of copyright, Plaintiffs' claim is preempted by copyright. Defendants' Motion to Dismiss is GRANTED on this ground, and the Thirteenth Claim for Relief is DISMISSED, with prejudice, inasmuch as it relies on the alleged "misappropriation" of the contents of Plaintiffs' materials. *See Kodadek,* 152 F.3d at 1213.

### 3. Discussion of the Remaining State Law Claims

The only Claims for Relief which therefore remain, in whole or in part, after the dismissal with prejudice of the copyright claims under the previously-discussed Summary Judgment Motion, and/or the dismissal with prejudice of the bulk of the state law claims (the Third through Thirteenth Claims for Relief) on preemption grounds under the Motion to Dismiss, are the Sixth Claim for Relief, for Breach of Contract, and the Eleventh Claim for Relief, for Civil Conspiracy. It is also possible that some portion of the Seventh Claim for Relief, alleging Invasion of Privacy, and the Thirteenth Claim for Relief, claiming a violation of North Carolina's Trade Secrets Act, survive preemption. Accordingly, the Court must separately consider whether any or all of these remaining claims are nonetheless subject to dismissal for their failure to state a claim under the applicable jurisdictional law(s).

Only Defendant Petersen, against whom it is solely asserted, has moved to dismiss Plaintiffs' Breach of Contract claim, and only on the ground that it is preempted by copyright. *See* MTD Petersen Joinder at 2–3. Though it is certainly possible that this claim is preempted, in whole, or in part, by the Copyright Act, that preemption is not clear to this Court (a subsequent state court is certainly empowered, with greater elucidation of the factual allegations underpinning the claim, to make its own findings about preemption under copyright). Thus, no other ground for dismissal being offered, the Court hereby DENIES the Motion to Dismiss (and Petersen's joinder therein) as to this claim.

The remainder of Plaintiffs' claims, however, to the extent that they even survive preemption under copyright, fail to state a claim under applicable standards. With one exception, the Seventh, Eighth, and Eleventh Claims for Relief are without substance in state law.

Plaintiffs' Seventh Claim for Relief, for an Invasion of Privacy based on the "misappropriation" of Idema's "likeness and persona," may survive preemption to the extent it is premised on acquisition of Idema's "likeness" from other than Plaintiffs' written materials. In other words, it is possible Plaintiffs are alleging "misappropriation" of Idema's "likeness" and "persona" based on his appearance in "real life," rather than based on his appearance in the materials making up "Idema's Story" (or any other materials within the "subject matter" of copyright). However, even assuming that Plaintiffs' claim could be limited or re-cast in this way, it manifestly fails to state a claim under either District of Columbia or North Carolina law, as Plaintiffs have not and cannot claim that "The Peacemaker" trades on Idema's *name* or *likeness* (neither of which appear in the film) for commercial or advertising pur-

poses. *See, e.g., Polsby v. Spruill,* 43 U.S.P.Q.2d 1904, 1908 (D.D.C.1997); *Vassiliades v. Garfinckel's, Brooks Bros.,* 492 A.2d 580, 587 (D.C.1985); *Barr v. Southern Bell Tel. & Tel. Co.,* 13 N.C.App. 388, 392–93, 185 S.E.2d 714 (1972); *Flake v. Greensboro News Co.,* 212 N.C. 780, 195 S.E. 55, 62–64 (1938); Motion to Dismiss at 32–34. The Seventh Claim for Relief therefore fails.[77] The Motion to Dismiss is GRANTED as to this claim, which is hereby DISMISSED, with prejudice.

Similarly without merit, even to the extent that it might escape preemption, is Plaintiffs' Eighth Claim for Relief, for Conversion. Plaintiffs do not, and now cannot due to the contrary allegations in the SAC, that they were ever *deprived* of the physical possession of the "documents" upon which they base their claim for Conversion.

■ Without this essential allegation, Plaintiffs cannot support a claim for conversion under California, District of Columbia, *or* North Carolina law. An "interference" with a right to possession of some form of "tangible" personal property is the seminal allegation of a conversion claim (the remedy for which is generally either return of the "converted" property, or a "forced sale"). *See, e.g.,* 5 Witkin, *Summary of California Law: Torts* §§ 610–

622 (9th ed.1988); *Pearson v. Dodd,* 410 F.2d 701, 706–08 (D.C.Cir.1969); *Norman v. Nash Johnson & Sons' Farms, Inc.,* 140 N.C.App. 390, 414, 537 S.E.2d 248 (2000). Because Plaintiffs cannot make such a claim (as only *photocopies* of the documents were ever allegedly given to Petersen, and then passed on to Stern, the Cockburns, and Spielberg), even if this claim survives preemption, it fails to state a claim for which relief can be granted. Accordingly, Defendants' Motion to Dismiss is GRANTED, and any remaining portions of this Eighth Claim for Relief are hereby DISMISSED, with prejudice.

As to the final remaining claim, the Eleventh Claim for Relief, for Civil Conspiracy, Plaintiffs strangely attempt to base this tort liability in large part on Defendants' alleged violations of various federal (criminal) statutes. *See* SAC ¶ 182.[78] Secondly, Plaintiffs also assert that an "object" of the conspiracy was interference with the employment of Kathy (Wolff) Scurka, in or around the time that the Plaintiffs filed this lawsuit. *See* SAC ¶¶ 180–181, 183, 12 n. 3.[79]

■ As is "well established" under California law, however, "civil conspiracy is not an independent tort." *Kidron v. Movie Acquisition Corp.,* 40 Cal.App.4th 1571, 1581, 47 Cal.Rptr.2d 752 (1995).[80] Rather,

---

**77.** Moreover, for the reasons stated in Defendants' moving papers, it also appears that such a claim would in any case be barred by the First Amendment protections afforded to fictional works. *See* Motion to Dismiss at 29–31; MTD Reply at 24–26 (and cases cited therein).

**78.** The complete list of federal statutes allegedly violated: 50 U.S.C. § 403–7; 18 U.S.C. § 793; 18 U.S.C. § 798(a)(4); 18 U.S.C. § 1905; 18 U.S.C. § 1924; 18 U.S.C. § 2071; 18 U.S.C. § 641; 18 U.S.C. § 654; 18 U.S.C. § 4; and 18 U.S.C. § 201. *See* SAC ¶ 182(e)(1)–(9).

**79.** The Court has already dismissed this claim with prejudice to the extent it relies on claims

that Defendants misappropriated Idema's Story, or otherwise engaged in activity which is covered by copyright.

**80.** Though the SAC claims that this Civil Conspiracy claim arises under District of Columbia, North Carolina, and/or Virginia law, no attempt is made by Plaintiffs to argue the actual application of, or a different result under, the law of any of these jurisdictions. In the MTD Opposition, aside from an unsupported reference to North Carolina, Plaintiffs argue exclusively the application of *California* law to this claim. Accordingly, the Court will also apply only California law.

it is a " 'legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration.' " *Id.* (citations omitted). Therefore, a claim of civil conspiracy requires the allegation that a "group of two or more persons ... agreed to a common plan or design to commit a *tortious* act." *Id.* (emphasis added). In other words, the alleged "object" of the conspiracy must be an *independently* tortious act, one which on its own provides a cause of action to a plaintiff. *See* 5 Witkin, *Summary of California Law: Torts* § 44 (9th ed. 1988) ("[T]here is *no separate tort* of civil conspiracy, and there is *no civil action* for conspiracy to commit a recognized tort unless the *wrongful* act itself is committed and damage results therefrom.") (emphasis in original); *see id.* § 45 ("A conspiracy is not actionable unless a wrongful act was committed with resulting damage.").

■ Accordingly, Plaintiffs may not premise civil liability on the alleged violation of federal criminal statutes which do not provide, as a general matter, private causes of action. *See, e.g., Chrysler Corp. v. Brown,* 441 U.S. 281, 316–17, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). As the court noted in *Agnew v. Parks,* 172 Cal.App.2d 756, 765, 343 P.2d 118 (1959), "no civil right can be predicated upon a mere violation of a criminal statute ...".

Therefore, Plaintiffs may not base a "civil conspiracy" claim on alleged conduct in violation of federal criminal statutes. Conduct violating these statutes would not constitute independently "tortious" conduct on which such a claim could be based, even if Plaintiffs were successful in proving that such conduct occurred. *See also Beck v. Prupis,* 529 U.S. 494, 501, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000) ("a plaintiff could bring suit for civil conspiracy only if he had been injured by an act

that was itself tortious.... a conspiracy claim was not an independent cause of action, but was only the mechanism for subjecting co-conspirators to liability when one of their member committed a tortious act."). Thus, to the extent that the Eleventh Claim for Relief is based on alleged violations of these federal criminal statutes, Defendants' Motion to Dismiss is GRANTED, and the claim is hereby DISMISSED, with prejudice.

A more difficult question is raised by Plaintiffs' non-specific allegation that the conspiracy also had as its "object" interference with Kathy Wolff Scurka's gainful employment. Though Plaintiffs have not yet stated an independent claim in tort arising out of the actual alleged interference, the Court cannot say without question that such a claim *cannot* be stated in a subsequent state filing, or that such a claim might not support an integrated or separate conspiracy claim to allege joint tortfeasor status among some or all of these Defendants. Though Plaintiffs' current allegations are clearly insufficient to sustain a claim of civil conspiracy in federal court, Plaintiffs are entitled to amend/re-file these claims in state court, and so this Court declines Defendants' invitation to dismiss this remaining basis for Plaintiffs' civil conspiracy claim, with prejudice. As to this sole remaining basis for this claim, Defendants' Motion to Dismiss is DENIED inasmuch as it seeks dismissal of this claim with prejudice.

Therefore, after consideration of Defendants' Summary Judgment Motion, and Defendants' Motion to Dismiss, the sole remaining claims (i.e., those which are not preempted and/or which might possibly state a claim) are the Sixth Claim for Relief, for Breach of Contract, to the extent that it does not simply duplicate the copyright claims, and the Eleventh Claim for Relief, for Civil Conspiracy, to the

extent it relies solely on the allegations related to interference with Kathy Wolff Scurka's employment relationship(s). All other claims have been dismissed, with prejudice, including the copyright claims which were the sole source of this Court's original jurisdiction.[81] Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), this Court hereby exercises its discretion to DECLINE continuing jurisdiction over these remaining state law claims. Accordingly, the Court hereby DISMISSES both the Sixth and the Eleventh Claims for Relief, to the extent they survive the Motion to Dismiss, without prejudice to their re-filing in state court. Difficult issues pertaining to these claims are better left for resolution to the state courts, should Plaintiffs decide to re-file these claims in a subsequent complaint. Because this disposes of the remaining claims in Plaintiffs' current complaint, the SAC is also hereby DISMISSED, and this case is CLOSED for all purposes herein.

## V. CONCLUSION

For the foregoing reasons, the Court hereby GRANTS Defendants' Summary Judgment Motion, in full, and DISMISSES Plaintiffs' First and Second Claims for Relief. The Court also GRANTS IN PART AND DENIES IN PART Defendants' separately-filed Motion to Dismiss. The Motion to Dismiss is GRANTED in this respect: the Third, Fourth, Fifth, Seventh, Eighth, Ninth, Tenth, Twelfth, and Thirteenth Claims for Relief in the SAC are hereby DISMISSED, with prejudice. Furthermore, the Eleventh Claim for Relief (for Civil Conspiracy) is DISMISSED,

with prejudice, to the extent that it relies on allegations of misappropriation and/or "use" of the contents of Plaintiffs' materials with are within the "subject matter" of copyright, and to the extent that it seeks to base tort liability on alleged violations of federal (criminal) statutes. The Motion to Dismiss is DENIED in all other respects. However, the Court declines to continue to exercise supplemental jurisdiction over the remaining claims (the Sixth Claim for Relief, and whatever remains of the Eleventh Claim for Relief), and therefore also DISMISSES those claims, without prejudice to their re-filing in state court. As this disposes of all of the claims in Plaintiffs' SAC, the Court hereby DISMISSES the SAC in its entirety, thereby CLOSING this case.

---

**81.** The Court also notes that, although it does not merit extended discussion due to its dismissal of these claims on preemption grounds, that even were these claims not preempted the Court would still find that Plaintiffs' Third, Fourth, Fifth, Eighth, Ninth, Tenth, Twelfth, and Thirteenth Claims for Relief fail to state claims for relief upon which

relief might be granted, for the reasons stated in Defendants' papers. *See, e.g.,* Motion to Dismiss at 19–21, 23–25, 35–36, 38–39, 44–45, 46–47; MTD Reply at 7–10, 15–16, 26–27, 33–35, 46–49; *see also* MTD Opposition at 7–8, 10–11, 14, 22–24, 28–38 (Plaintiffs' theories).